## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAVID THOMPSON, on behalf of himself, )
and all others similarly situated,                      )
                                                                       )
                        Plaintiff,                             )
                                                                       )Case No. 2:20-CV-12318-PDB-EAS
            v.                                                    )
                                                                       )
CREDIT UNION ONE,                                  )
                                                                       )
                        Defendant.                         )

## DEFENDANT CREDIT UNION ONE'S
## MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant, Credit Union One ("CUO"), moves this Court to dismiss Plaintiff David Thompson's Class Action Complaint for failure to state a claim, as set forth in CUO's accompanying brief in support of this motion. Plaintiff fails to plead a viable cause of action against CUO because the operative contract plainly and unambiguously permits CUO to (1) assess overdraft fees based on the "available balance" of a member's account at the time a debit transaction is paid; (2) CUO complied with all the requirements of Regulation E and is protected by the safe harbor provision, and (3) Plaintiff voluntarily conveyed title for any funds to CUO and CUO did not "wrongfully" take OD fees from Plaintiff or class members.

There was a conference between attorneys in which the movant explained the nature of the motion or request and its legal basis and requested, but did not obtain, concurrence in the relief sought.

WHEREFORE, Defendant Credit Union One respectfully requests that this Court enter an Order: (a) granting its Motion to Dismiss Plaintiff's Class Action Complaint; (b) dismissing Plaintiff's Class Action Complaint with prejudice; and (c) granting Defendant such other and further relief as appropriate.

Dated: October 22, 2020

James R. Branit (to be admitted)
Litchfield Cavo LLP
303 West Madison Street, Suite 300
Chicago, Illinois 60606
(312) 781-6562
branit@litchfieldcavo.com

Respectfully submitted,

*/s/Charles J. Holzman*
Charles J. Holzman (P35625)
Michael Krempa (P76494)
Holzman Law, PLLC
28366 Franklin Rd.
Southfield, MI 48034
(248) 352-4340
cholzman@holzmanlaw.com
mkrempa@holzmanlaw.com

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DAVID THOMPSON, on behalf of himself, )
and all others similarly situated, )
                        )
          Plaintiff, )
                        )Case No. 2:20-CV-12318-PDB-EAS
      v. )
                        )
CREDIT UNION ONE, )
                        )
         Defendant. )

## DEFENDANT CREDIT UNION ONE'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

ISSUES PRESENTED..........................................................................  3

CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR THE RELIEF
SOUGHT......................................................................................  4

INTRODUCTION .............................................................................  5

FACTUAL BACKGROUND................................................................  7

LEGAL STANDARD........................................................................  12

ARGUMENT ................................................................................  12

CONCLUSION ..............................................................................  25

## <u>ISSUES PRESENTED</u>

1.  Whether Plaintiff failed to state a claim for breach of contract.

Defendant states:                 "yes."
Plaintiff presumably states:  "no."

2.  Whether Plaintiff failed to state a claim for violation of Regulation E.

Defendant states:                 "yes."
Plaintiff presumably states:  "no."

3.  Whether Plaintiff failed to state a claim for conversion.

Defendant states:                 "yes."
Plaintiff presumably states:  "no."

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

*Aroma Wines & Equipment, Inc. v. Columbian Distribution Svcs., Inc*., 497 Mich. 337 (2015).

*Daphne Saunders v. Y-12 Federal Credit Union,* Case No. B9LA0120 (Anderson Cty. Tenn. Cir. Ct.),

*Head v. Phillips Camper Sales & Rental, Inc*., 234 Mich. App. 94, 111-12 (1999)

*Lambert v. Navy Fed. Credit Union*, No. 1:19-cv-103-LO-MSN, 2019 WL 3843064, at *2 (E.D. Va. Aug. 14, 2019) (internal citations omitted).

*Lossia v. Flagstar Bancorp, Inc*., 895 F.3d 423, 428–29 (6th Cir. 2018)

*Page v. Alliant Credit Union*, 2020 WL 5076690 (N.D. Ill. Aug. 26, 2020)

Mich. Comp. Laws § 600.2919a

## INTRODUCTION

Credit Union One ("CUO") is a member-owned, not-for-profit, state-chartered credit union, which is insured and regulated by the National Credit Union Administration ("NCUA"). Unlike banks, "[c]redit unions are nonprofit cooperatives, owned by their members and democratically controlled, that may only lend and pay dividends to their members and, as such, are disinclined by their nature and structure to engage in the kinds of practices regarded as predatory or abusive." NCUA Opinion Letter 04-0147, National Credit Union Administration, at 3 (Feb. 10, 2004), available at: https://www.ncua.gov/files/legal-opinions/OL2004-014.pdf. Despite his likely awareness of the many perks associated with credit union membership, Plaintiff filed a complaint against CUO accusing it of the very practices which go against CUO's very nature.  However, none of Plaintiff's claims have any merit; and they are subject to dismissal for failure to state a claim.

Plaintiff's first count alleges that CUO's assessment of overdraft fees ("OD Fees") breaches the contract between CUO and its members by charging fees on debit card transactions that were authorized on sufficient funds. This allegation is directly at odds with the express language contained in the contract between the parties. Plaintiff alleges that when a customer makes a purchase using a debit card, CUO tentatively approves the transaction and purportedly "sequesters" an amount of funds from the customer's account to cover the transaction while it remains

pending. Class Action Complaint ("Compl.") ¶¶ 14-17. If, on the date that the transaction later settles, the customer's account has a negative balance due to intervening charges that post before the challenged transaction, CUO charges an OD Fee on the transaction. Plaintiff terms these transactions as "Authorize Positive, Purportedly Settle Negative" (or "APPSN") Transactions. *Id.* He claims that because CUO supposedly "sequesters" funds in the checking account at the time of purchase for the debit card transactions, assessing an OD Fee on APPSN Transactions violates the terms of CUO's contract. *Id.* As explained below, Plaintiff's theories are factually and legally meritless because they reflect practices that are authorized by the express language of the relevant account documents, which Plaintiff expressly agreed to when he opened his account. Because the parties' contract unambiguously permits the practice Plaintiff challenges, Plaintiff's claims should be dismissed with prejudice as a matter of law.

Plaintiff's remaining counts are also foreclosed as a matter of law. His claim for violation of Regulation E of the Electronic Fund Transfer Act ("EFTA") must fail because CUO complied with all requirements imposed by law, and more importantly, the claim is barred by the applicable safe harbor provision. Lastly, Plaintiff's claim for statutory conversion must be dismissed because Plaintiff voluntarily conveyed title for any funds to CUO and thus could not "wrongfully" take OD fees from Plaintiff for its own use.

## FACTUAL BACKGROUND

### I.   PLAINTIFF'S THEORY AND THE ACCOUNT DOCUMENTS

Plaintiff has a checking account with CUO. Compl. ¶ 7. Plaintiff expressly admits in his Complaint that his checking account is governed by CUO's "Account Documents." *Id*. Indeed, at least two documents apply to the matter herein: the CUO Membership Agreement and Disclosures as well as the Overdraft Protection Disclosure (collectively, the "Membership Agreement"). *Id*; *see also* Compl. Ex. A and Ex. B. The Membership Agreement allows Plaintiff the ability to attempt electronic payment transactions or Automated Clearing House ("ACH") transactions and to use a debit card. Compl. ¶ 12.

Plaintiff's allegations regarding overdraft fees relate solely to a certain type of debit card transaction, which is alternatively referred to as a "swipe" or "every day, non-recurring" debit card transaction ("swipe debit card transactions"). As alleged in Plaintiff's Complaint, a swipe debit card transaction takes place in at least two steps. Compl. at ¶ 26. The first step occurs when a credit union member such as Plaintiff swipes their debit card to make a purchase at a merchant. The merchant's card reader transmits a request for authorization to CUO through an intermediary (like Mastercard or some other network). *Id*. Assuming certain conditions are met, CUO will authorize the transaction, but the transaction is not paid at that time. *Id*.

Plaintiff readily admits that "sometime thereafter the funds are actually transferred from the customer's account to the merchant's account." *Id.* at ¶ 26.

As Plaintiff acknowledges in his Complaint, other intervening transactions that take place between authorization in step one and presentment for payment in step two may result in an overdraft and an overdraft fee. The Membership Agreement plainly states:

> If, on any day, the available funds in your share or deposit account are not sufficient ***to pay*** the full amount of a check, draft, transaction, or other item [. . .] posted to your account, we may return the item or pay it [. . .] The Credit Union's determination of an insufficient available account balance may be made at any time between ***presentation*** and the Credit Union's midnight deadline.

Compl. at ¶¶14-19; *see also* Compl. Ex. A ¶14(a) (emphasis added).

Thus, if the member either previously spent money – such as mailing out the day before a paper check that CUO would not be aware of at the time it authorized the subject swipe debit card transaction, or continued to use his debit card, then those transactions which are actually presented for payment or processed between authorization (step one) and presentment for payment of the subject debit card transaction (step two) may reduce the available account balance.  In fact, the available account balance could be reduced to a point that it no longer has sufficient funds to cover the previously authorized debit card transaction by the time the merchant presents it for payment.

The Membership Agreement also provides in plain and ordinary terms that CUO will determine whether a debit card transaction is subject to an overdraft fee at the time the item is presented for payment and processed by CUO (step two), not at the time of authorization (step one). The Membership Agreement states as follows:

> If we ***pay*** these items […] you agree to pay the insufficient amount, including the fee assessed by us, in accordance with our standard overdraft services or any other service you may have authorized with us, or if you do not have such protections with us, in accordance with any overdraft payment policy we have, as applicable.

Compl. Ex. A at ¶ 14(a) (emphasis added).

The Membership Agreement further discloses in clear and simple terms, to members like Plaintiff, that CUO determines whether there was an overdraft when it processed requests for payment in step two, not at the time of authorization of a debit card transaction in step one. Specifically, the "Order of Payments" provision states that it is the payment of those debit items that may affect the overdraft fees charged to the account, not authorization: "Checks, drafts, transactions, and other items will be paid as presented. The order in which we process checks, drafts, or items, and execute other transactions on your account may affect the total amount of overdraft fees that may be charged to your account." Ex. A at ¶ 14(b).

Plaintiff's self-manufactured "APPSN" theory of liability also rests on the premise that those funds placed under a hold are "sequestered" and "off-limits for other transactions" that CUO authorized. Compl. ¶¶ 14-20. However, Plaintiff fails to cite

any provision in the Membership Agreement establishing that those held funds are untouchable. To the contrary, the Membership Agreement clearly and unambiguously provides that all such funds are subject to payment to CUO if he owes it reimbursement for any overdrafts or fees. The Overdraft Protection Disclosure states, in part: "If the credit union authorizes and **pays** an item as part of this overdraft service you will be notified for each occurrence when the items are **paid**. You agree to reimburse the credit union **immediately for any and all paid overdrafts**." Compl. Ex. B (emphasis added).

## II.    CUO's Opt In Form

Regulation E provides that before a financial institution may "assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service," it must give consumers an opt-in form that includes, among other things, a brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed.  12 C.F.R. § 1005.17.  To implement this rule, the Federal Reserve created a one-page Model Form.  12 C.F.R. § 1005; *see also* A-9 Model Consent Form for Overdraft Services, https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20091112a3.pdf.

Regulation E mandates the notice "shall be substantially similar to Model

Form A-9." 12 C.F.R. § 1005.17(d). CUO's "What You Need to Know About Overdrafts and Overdraft Fees" form ("Opt-in Form") essentially mirrors the Model Form.[1] A side-by-side comparison of the Model Form A-9 and CUO's Opt-In Form is attached hereto as **Exhibit "A."**

### III.   PLAINTIFF'S ALLEGATIONS REGARDING OVERDRAFT FEES.

Plaintiff provides vague and ambiguous examples regarding the alleged OD Fees charged to his account. Plaintiff claims that he was assessed OD Fees for debit card transactions that posted on June 18, 2020, and January 6, 2020, which Plaintiff alleges that "[a]t the time positive funds were deducted, Plaintiff had a positive balance which would not have caused an OD Fee." Compl. ¶ 64. Based on these sparse, conclusory allegations, Plaintiff purports to assert three claims: (1) breach of contract, including breach of the implied covenant of good faith and fair dealing; (2) violation of the Electronic Fund Transfer Act (Regulation E); and (3) statutory conversion. All of Plaintiff's claims are premised upon CUO's assessment of OD Fees.

---

[1] Plaintiff's Complaint references, but does not attach the Opt-In form. In determining whether to grant a Rule 12(b)(6) motion to dismiss, the court can consider other materials than the allegations of the complaint, matters of public record, orders, and exhibits attached to the complaint when the documents attached to the motion to dismiss without converting it to a motion for summary judgment when the new exhibits "simply fill[] in the contours and details of the plaintiff's complaint, and added nothing new." *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997).

## LEGAL STANDARD

To withstand a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" when the plaintiff pleads "factual content" that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a plaintiff's allegations are generally taken as true, neither "labels and conclusions" nor "naked assertions" devoid of "further factual enhancement" will suffice. *Id.* (internal citation omitted). Thus, dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

## ARGUMENT

## I.     PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT

In order to state a breach of contract claim under Michigan law, Plaintiff must establish that: (1) there was a contract; (2) which the other party breached; (3) thereby resulting in damages to the party claiming breach. *Miller-Davis Co. v. Ahrens Construction, Inc.*, 495 Mich. 161, 178 (2014). A cardinal principle of contract construction is that it is to be construed as a whole, and all parts are to be harmonized as much as possible. *Czapp v. Cox*, 179 Mich. App. 216, 219 (1989). Every word must be given effect and taken to have been used for a purpose; no word

12

shall be deemed surplusage if the court can discover any reasonable purpose for it which can be gathered from the instrument as a whole. *Id*.

There is no dispute that a contract exists between CUO and Plaintiff. However, Plaintiff's contract claim fails because his agreement with CUO expressly allows for the assessment of the OD Fees he challenges. Plaintiff's flawed interpretations of the relevant documents flout this basic principle. Plaintiff argues that CUO breached the terms of the account documents by charging an OD Fee on the settlement date although the funds from a debit card transaction allegedly had been tentatively "sequestered" at the time of the transaction. Compl. ¶¶ 14-15, 36. Both practices are clearly permitted by the Membership Agreement. Plaintiff also argues—albeit not in connection with his contract cause of action—that CUO improperly exercised its discretion to approve or deny overdrafts. *Id.* ¶¶ 53-55. This claim, too, ignores the express terms of the documents Plaintiff cites. Accordingly, as a matter of law, the Court should dismiss the contract cause of action in its entirety.

## A. The Plain and Unambiguous Terms of the Membership Agreement Preclude Plaintiff's Claim for Breach of Contract for the Assessment of OD Fees

Plaintiff's breach of contract claim related to CUO's assessment of overdraft fees on swipe debit card transaction fails as a matter of law because it rests on two faulty premises.

      i.    *Plaintiff's premise that CUO must determine whether there is an overdraft only at the time of authorization is false and directly contrary to the Agreement.*

First, Plaintiff's assertion that CUO purportedly promised to assess whether an overdraft occurred only at the time it authorized a debit card transaction is false and unsupported by any language in the Agreement. Indeed, his suggestion is directly contrary to the clear and plain meaning of the Membership Agreement's express terms providing that CUO determines whether there is an overdraft at the time the merchant requests payment, not at the time of authorization.

As conceded in Plaintiff's Complaint, there is no dispute here that a swipe debit card transaction involves at least two separate and distinct steps: (1) authorization; and (2) the merchant's later presentment or request for payment. There is also no dispute that the two steps may take place as much as three days apart. Compl. ¶¶ 26-29.  Most importantly, there is no dispute that other transactions taking place in the intervening period may result in the account balance being negative and thus in overdraft at the time the subject debit card transaction is finally presented for payment.

Consequently, Plaintiff's invented "APPSN" theory necessarily relies on the premise that CUO supposedly promised in the Membership Agreement to determine whether there was an overdraft only at the time the debit card transaction was

authorized in step one. However, Plaintiff's Complaint fails entirely to point to any language in the Membership Agreement supporting that theory.

In reality, the Membership Agreement repeatedly provides in plain and ordinary terms that CUO will determine whether a debit card transaction is subject to an overdraft fee during step two at the time the item is presented for payment by the merchant and processed by CUO, not at the time of authorization in step one. First, the Membership Agreement states in plain terms that CUO determines whether it will assess an overdraft fee when CUO elects to pay an overdraft transaction in step two by focusing on time of payment/presentation to determine whether the account has sufficient available funds for the transaction.  Compl. at ¶¶ 14-19; *see also* Ex. A ¶ 14(a) (CUO's determination of an insufficient balance—triggering OD Fees—is made "at any time between ***presentation*** and [CCU's] midnight deadline" (emphasis added). Of note, the Membership Agreement does not link the determination of whether an account has sufficient funds to authorization, but only to presentation.  Thus, it is the payment which is posted to the account that results in an overdraft, not the authorization. The balance at the time of authorization, step one, has no bearing on whether CUO will assess an overdraft fee on that particular debit card transaction.

The provisions of the Membership Agreement quoted above were clear enough, but it further emphasized in clear and simple terms that it determined

whether an overdraft occurred when it processed the request for payment—not at the time of authorization.  The "Payment Order of Items" provision states that it is the payment of those debit items that results in overdrafts and overdraft fees, not authorization because the order in which the items are presented and processed including the execution of other items may affect the total amount of overdraft fees charged to the account. Compl. Ex. A at ¶ 14(b).  The Membership Agreement then repeats, yet again, that it is the payment of a debit card transaction that creates overdraft liability by advising the member that he is responsible for paying the insufficient amount, including any fees, if CUO <u>pays</u> an item on an account with an insufficient available balance. Compl. Ex. A at ¶ 14(a) ("If we ***pay*** these items" the member is liable for the payment of the transaction plus any applicable fees" (emphasis added).)

Similarly, the Overdraft Protection Disclosure states, in part: "If the credit union authorizes **and pays** an item as part of this overdraft service you will be notified for each occurrence when the items are **paid**. You agree to reimburse the credit union immediately for any and all **paid overdrafts**." Compl. Ex. B (emphasis added). It is clear that CUO's payment of the debit card transaction that generates an overdraft and will result in a fee.

This case is substantively identical to a suit filed against another credit union in Florida, *Choy v. Space Coast Credit Union*, No. 2019-CA-039839, 2020 WL

3039243 (Fla. 18th Cir. Ct. May 11, 2020), attached hereto as **Exhibit "B**.**"** In *Space Coast,* the court dismissed an identical "APPSN" claim because the plaintiffs "baldly assert[ed] contract promises to determine overdrafts at the time of authorization, not settlement." *Id.* But the court in *Space Coast* found "no such specific contractual provision," and instead ruled that "it is clear that an overdraft fee is assessed when the available balance is insufficient to pay a transaction when it is presented for payment." *Id.* Moreover, the court noted that, "'Presented for payment' logically means when the transaction is actually paid or settled, not the prior authorization." *Id.* This Court should apply the same reasoning and reach the same result in this case.

Similarly, in both *Boone v. MB Fin. Bank, N.A.,* 375 F. Supp. 3d 987 (N.D. Ill. 2019) and *Whittington v. MobilOil Fed. Credit Union*, NO. 16-cv-482, 2018 WL 6582824 (E.D. Tex. Oct. 26, 2018) aff'd 780 Fed. Appx 171 (5th Cir. 2019), attached hereto as **Exhibit "C**,**"** the courts considered contract terms substantially similar to those in this case. In both *Boone* and *Whittington*, the district courts ruled that the contracts "unambiguously" provided that an overdraft was determined at the time of the request for payment, not at the time of authorization. In each case, the district courts dismissed the plaintiff's "APPSN" theory with prejudice. This Court should dismiss Plaintiff's Complaint with prejudice.

  ii. *Plaintiff's premise that held funds are "sequestered" and cannot be touched is contrary to the terms of the Membership Agreement.*

  Plaintiff also claims that assessing OD Fees for APPSN violates the contract agreement because "the held funds are off-limits for other transactions." Compl. ¶ 20. There is no such language in the contract. Instead the Membership Agreement states: "If, on any day, the available funds in your share or deposit account are not sufficient **to pay** the full amount of a check, draft, transaction, or other item [. . .] Posted to your account, we may return the item or **pay it** [. . .] The Credit Union's determination of an insufficient available account balance may be made at any time between presentation and the Credit Union's midnight deadline." Compl. Ex A ¶ 14(a). None of the applicable documents state that an overdraft is created when CUO authorizes a transaction.

  Plaintiff's reference to a "must-pay" network rule, which requires CUO to pay debit-card transactions that it has previously authorized, is beside the point and misconstrues that "rule" and conflates the issues before this Court. Compl. ¶30. That CUO agrees to authorize a debit card transaction at the time the customer swipes her debit card means only that CUO must pay the merchant for the transaction when the transaction is eventually presented for settlement. *Id.* It does not mean that CUO pays the merchant at the time of authorization, or that CUO has waived its contractual right to collect overdraft fees from the customer if, at the time of payment, there are insufficient funds in the customer's account.

Furthermore, the Order of Payments provision further undercuts Plaintiff's sequestration theory. Again, that provision states:

> Checks, drafts, transactions, and other items will be paid as presented. The order in which we process checks, drafts, or items, and execute other transactions on your account may affect the total amount of overdraft fees that may be charged to your account."

Compl. Ex. A at ¶ 14(b).

If, as Plaintiff contends, authorization or the imposition of a hold meant money was instantly sequestered for payment, then the payment order of items would be immaterial as to whether there was enough money in an account to pay all of the presented items, and would have no impact on OD Fees thereby rendering the provision to be mere surplusage. That the Agreement makes clear that the payment order does impact those fees necessarily means that authorizations do not lead to the sequestration of funds. *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 516 (D.N.J. 2009); *Gay v. Peoples Bank*, No. 13 CVS 383, 2015 WL 3650090 (N.C. Super. June 10, 2015), attached hereto as **Exhibit "D"**; *Parrish v. Arvest Bank*, 717 F. App'x 756, 760 (10th Cir. 2017), attached hereto as **Exhibit "E."**

In very simple terms, then, a debit card transaction may be assessed a fee if Plaintiff allows intervening transactions to render his account negative by the time that original subject debit card transaction is presented for payment. It is a simple concept: to avoid overdraft fees, Plaintiff has to avoid using more money than he has in his account. In any event, Plaintiff cannot use the supposedly sequestered funds

to pay the merchant because he already owed some or even all of that money to CUO as a result of intervening overdrafts at the time of presentment for payment. Accordingly, CUO was entitled to asses an overdraft fee on such an authorized debit card transaction.

**B.     Plaintiff's Breach Of The Implied Covenant Of Good Faith And Fair Dealing Allegations Cannot Stand**

Plaintiff's allegations regarding a purported duty of good faith and fair dealing are also without merit and fail to state a cause of action.  While Michigan "does impose an implied good-faith covenant on contracting parties where one party to the contract makes its performance a matter of its own discretion[,]" Plaintiff must demonstrate that CUO "breached the underlying contract itself."  *S.D. Benner, LLC v. Bradley Co., LLC*, No. 1:15-673, 2019 WL 2056702, at *13 (W.D. Mich. Mar. 29, 2019) attached hereto as **Exhibit "F**.**"**  Thus, there is no breach of the implied duty of good faith where the parties have "unmistakably expressed their respective rights" and the implied duty "cannot override express contract terms." *Lancia Jeep Hellas S.A. v. Chrysler Grp. Int'l LLC*, No. 329481, 2016 WL 1178303, at *9 (Mich. Ct. App. Mar. 24, 2016) (quotation and citation omitted) attached hereto as **Exhibit "G**.**"**  As explained above, CUO did not breach the parties' agreement and, therefore, CUO did not breach the covenant of good faith and fair dealing.

## II.   PLAINTIFF'S EFTA CLAIM FAILS AS A MATTER OF LAW

### A. CUO Has Complied With Regulation E

In yet another flawed attempt to state a cause of action related to CUO's imposition of OD Fees, Plaintiff essentially mirrors his breach of contract argument but recasts the claim as a violation of Regulation E.  In fact, Plaintiff's EFTA claim is predicated on the very same failed arguments he made in support of his defective contract claim: that CUO violated Regulation E because the Opt-In Form does not accurately describe its overdraft practice sufficiently by stating that an "overdraft occurs when you do not have enough available funds in your checking account to cover a transaction."  Compl. ¶ 106.  Plaintiff seemingly contends this language means that overdrafts must be determined based on the available balance at the time a debt transaction is authorized.  Plaintiff is wrong.

As explained above, when read in conjunction with the Membership Agreement and other disclosures (as it must be), the Opt-in Form accurately describes CUO's overdraft service.  *See Domann v. Summit Credit Union,* No. 18-cv-167-slc, 2018 WL 4374076 (W.D. Wis. Sept. 13, 2018) at *4-5 (construing opt-in form, funds availability disclosure, and account agreement together), attached hereto as **Exhibit "H**."  As explained above, the "enough available funds" language of the Opt-In Form, which references when OD Fees are assessed, must be construed to mean the "available balance" at the time that the debit transaction is paid. *See,*

*e.g., Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1, 10-11 (D.C. Oct. 21, 2016) (interpreting similar opt-in form and holding that because "enough money" refers to the available balance method, the credit union cannot be said to have inaccurately described its overdraft program); *Domann*, 2018 WL 4374076, at *7-8 (same).

### B. CUO Is Insulated From Liability

Moreover, CUO is protected from liability under the EFTA's safe harbor provision. That provision provides "no liability shall be imposed for 'any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board.'" 15 U.S.C. § 1693m(d)(2); see *also Tilley v. Mountain Am. Fed. Credit Union*, No. 217CV01120JNPBCW, 2018 WL 4600655, at *2 (D. Utah Sept. 25, 2018) (dismissing EFTA claim because credit union was insulated from liability by the safe harbor provision), attached hereto as **Exhibit "I**." Here, because CUO's Opt-In Form is based on and essentially mirrors the Model Form A-9 (Exh A), CCCU cannot and should not be liable under the EFTA.

### III. PLAINTIFF'S CONVERSION CLAIM IS LEGALLY DEFECTIVE

Plaintiff's third and final count attempts to bring a statutory claim for conversion under MCL 600.2919a. This claim fails because title passed to CUO

once Plaintiff voluntarily deposited any money into his account and entered into the Membership Agreement.

Under Michigan law, statutory conversion prohibits "another person's stealing or embezzling property," and further requires proof that the defendant converted the property to its "own use." *See* Mich. Comp. Laws § 600.2919a; *Aroma Wines & Equipment, Inc. v. Columbian Distribution Svcs., Inc*., 497 Mich. 337 (2015). "To support an action for conversion of money … [t]he defendant must have obtained the money without the owner's consent to the creation of a debtor and credit relationship." *Head v. Phillips Camper Sales & Rental, Inc*., 234 Mich. App. 94, 111-12 (1999) (citations omitted). When money is placed in a general deposit account, it will inevitably "mingle[] with the money of other depositors in a general fund chargeable with the payment of general deposits, posses[] no trust quality, and lose[] its special identity in its general commingling with the funds of the bank." Because of this, it is impossible for a plaintiff who deposits money in a general deposit account to claim conversion of money placed in the account, as the defendant will not have "an obligation to return the specific money entrusted to his care." *Head*, 234 Mich. App. at 111.

Plaintiff cannot assert a claim for conversion for any monies in his CUO account because he lost title to that money immediately upon depositing the money at CUO. In making a general deposit, Plaintiff consented to the creation of a debtor

and creditor relationship between the financial institution and the depositor. *Owosso*

*Masonic Temple Ass'n v. State Sav. Ba*nk, 273 Mich. 682, 689-90 (1935). Therefore,

title to any deposit passed immediately to CUO. *Id*.; *see also*, *Greenfield Comm.*

*Credit, L.L.C. v. Comerica Bank*, No. 260123, 2005 WL 1459625, at * 2 (Mich. Ct.

App. June 21, 2005) (general deposit is money that is mingled with deposits of others

in a general fund and possess no trust quality), attached hereto as **Exhibit "J."**

Because the money in Plaintiff's CUO account became the literal property of CUO,

it cannot be converted.

Similarly, Plaintiff voluntary deposited the at-issue funds into his CUO

account, and as it has been demonstrated in the foregoing the OD fees were proper.

Thus, Plaintiff cannot support a claim that CUO wrongfully took the money as is

required to support a conversion claim. MCLA § 600.2919a. To the same end, by

entering into the Account Agreement, Plaintiff voluntarily agreed to pay the OD

Fees, which as discussed above were plainly disclosed. For this reason, too, no claim

for statutory conversion is stated.

Finally, Plaintiff does not provide any allegations to support that CUO

converted the monies to its "own use," outside of a single conclusory, self-serving

allegation. Compl. ¶ 95. "Own" is defined as "of, pertaining to" or belonging to

oneself or itself." *Beginin v. Thomas Hospitality Grp*., Docket No. 317515, 2014

WL 6859292 (Mich. App. Ct. Dec. 4, 2014) (citing Webster's Dictionary), attached

hereto as **Exhibit "K**.**"**  Plaintiff does not provide any allegations as to how the funds at issue were "of, pertaining to, or belonging to" CUO's use.  Indeed, any such claim is undermined by the fact that CUO, as a cooperative, non-profit entity, cannot seek to use any funds for its "own use."  *See* Mich. Comp. Laws § 490.102(p) (by definition, credit unions cannot seek to make a profit).  Accordingly, Plaintiff's statutory conversion claim is meritless.

## CONCLUSION

For the foregoing reasons, Credit Union One respectfully requests that this Court grant the Motion and dismiss Plaintiff's Class Action Complaint, *with prejudice*.

Dated: October 22, 2020

James R. Branit (to be admitted)
Litchfield Cavo LLP
303 West Madison Street, Suite 300
Chicago, Illinois 60606
(312) 781-6562
branit@litchfieldcavo.com

Respectfully submitted,

*/s/Charles J. Holzman*
Charles J. Holzman (P35625)
Michael Krempa (P76494)
Holzman Law, PLLC
28366 Franklin Rd.
Southfield, MI 48034
(248) 352-4340
cholzman@holzmanlaw.com
mkrempa@holzmanlaw.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 22, 2020, a copy of the above document was electronically filed with the ECF System, which will send notice of such filing to all attorneys of record.

*/s/Jennifer Kreft*
Paralegal

# EXHIBIT A



## What You Need to Know about Overdrafts and Overdraft Fees

An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have standard overdraft practices that come with your checking account.
2. We also offer overdraft protection plans, such as a link to a savings account or line of credit, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our standard overdraft practices.

**What are the standard overdraft practices that come with my checking account?**

We do authorize and pay overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number
- Automatic bill payments

We do not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):

- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction.

If we do not authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged if Credit Union ONE pays my overdraft?**

Under our standard overdraft practices:

We will charge you a fee of **$30** each time we pay an overdraft.

There is no limit on the total fees we can charge you for overdrawing your checking account.

**What if I want Credit Union ONE to authorize and pay overdrafts on my ATM and everyday debit card transactions?**

Select the appropriate box below indicating your preference as to whether or not you would like Credit Union ONE to authorize and pay overdrafts on your ATM and everyday debit card transactions. If you wish to opt-in at a later date you may do so at any branch, by calling 1-800-451-4292, through online banking, or by completing the form below and mailing it to Credit Union ONE, 400 East Nine Mile Rd, Ferndale, MI, 48220. Once you have opted in you may revoke your consent at any time by visiting any branch, calling 1-800-451-4292, through online banking, or by mailing a signed and dated written request including your name and account number to the address above.

_____ I want Credit Union ONE to authorize and pay overdrafts on my ATM and everyday debit card transactions.

_____ I do not want Credit Union ONE to authorize and pay overdrafts on my ATM and everyday debit card transactions.

Name: _____

Account Number: _____

Signature: __/_____ Date: _____

---

## What You Need to Know about Overdrafts and Overdraft Fees

An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have standard overdraft practices that come with your account.
2. We also offer overdraft protection plans, such as a link to a savings account, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our standard overdraft practices.

**What are the standard overdraft practices that come with my account?**

We do authorize and pay overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number
- Automatic bill payments

We do not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):

- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction.

If we do not authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged if [Institution Name] pays my overdraft?**

Under our standard overdraft practices:

- We will charge you a fee of up to **$30** each time we pay an overdraft.
- Also, if your account is overdrawn for 5 or more consecutive business days, we will charge an additional $5 per day.

There is no limit on the total fees we can charge you for overdrawing your account.

**What if I want [Institution Name] to authorize and pay overdrafts on my ATM and everyday debit card transactions?**

If you also want us to authorize and pay overdrafts on ATM and everyday debit card transactions, call [telephone number], visit [Web site], or complete the form below and present it at a branch[mail it to:

_____ I do not want [Institution Name] to authorize and pay overdrafts on my ATM and everyday debit card transactions.

_____ I want [Institution Name] to authorize and pay overdrafts on my ATM and everyday debit card transactions.

Printed Name: _____

Date: _____

[Account Number]: _____ ]

# EXHIBIT B

2020 WL 3039243 (Fla.Cir.Ct.) (Trial Order)
Circuit Court of Florida,
Eighteenth Judicial Circuit.
Brevard County

Jason CHOY and David Adams, on behalf of themselves and all others similarly situated, Plaintiff,

v.

SPACE COAST CREDIT UNION, Defendant.

No. 2019-CA-039839.
May 11, 2020.

**Order Granting Defendant Space Coast Credit Union's Motion to Dismiss**

Hon. George Paulk, Judge.

**\*1** This cause came before the Court on February 5, 2020, on Defendant Space Coast Credit Union's ("Space Coast") motion to dismiss the Amended Complaint. Present before the Court for Plaintiffs Jason Choy ("Choy") and David Adams ("Adams," together with Choy, "Plaintiffs") were Plaintiffs' counsel Mr. Jeffrey Kaliel, Ms. Lynn Toops, Mr. Ed Norman, and Mr. J. Gerard Stranch. Present on behalf of Space Coast were Space Coast's counsel Mr. Stuart Richter, Mr. Thomas "Kevin" Knight, and Mr. Brandon Bornstein, and Space Coast's representative Mr. John Kabboord. Based upon the allegations of the Amended Complaint, the argument of counsel, the responsive pleadings submitted, and the case law and briefs, the Court makes the following findings:

## I. History

Defendant Space Coast seeks dismissal of the Amended Complaint with prejudice. Plaintiffs filed their amended class-action complaint on October 11, 2019. The Amended Complaint challenges two specific types of fees charged by Space Coast.

In Count I, both Plaintiffs challenged the assessment of overdraft fees by Space Coast on debit transactions when there were sufficient funds in the account when the transaction was first authorized, but not when payment was actually posted. Space Coast reduces the accountholder's available balance at the moment of authorization. Plaintiffs allege Space Coast should never be able to charge an overdraft fee in this instance. Plaintiffs term these charges as "APPSN" when the available balance is sufficient at the time the transaction is authorized but insufficient at the time paid.

In Count II, Plaintiff Choy challenges Space Coast's assessment of more than one non-sufficient funds ("NSF") fee, in those instances where a third party (typically a merchant) later resubmits the same request for electronic payment. Plaintiff Choy does not dispute the initial insufficient funds fee, but does dispute the second and sometimes third fee. These are generally known as "Retry" fees.

The two-count Amended Complaint alleges that both of these fee assessments are not authorized by the agreement between the parties. Therefore, Space Coast has committed a breach of contract and also a breach of accepted contractual principles of good faith and fair dealing.

Attached to the Amended Complaint is a document titled "Agreement and Disclosures." It has subparts titled "Account Agreement," "Account Disclosures," "Electronic Services Agreement and Disclosure," "Funds Availability Policy Disclosure,"

"Wire Transfer Agreement," and "Privacy Policy Disclosure." It has generally been referred to by the parties as either the "Account Agreement" or the "Deposit Agreement." It represents the agreement between the parties.

Defendant filed its motion to dismiss the Amended Complaint on October 23, 2019. Defendant's notice of hearing was served on October 31, 2019, setting the matter for hearing on February 5, 2020. At the hearing, both sides were given a full and fair opportunity to present their arguments, both written and oral. After the filing of the 16-page motion to dismiss, Plaintiffs filed a 71-page response, to which Defendant filed a 67-page reply. Thereafter, the parties filed six additional responses in support of their positions. The Court has reviewed all of these. The matter was well briefed.

 **\*2**  Finally, the Court must highlight the professionalism and collegiality exhibited by both sets of lawyers in this case, especially as these sets of lawyers have litigated this issue in multiple courts throughout the United States. Their conduct is applauded and appreciated.

## II. Motion to Dismiss Standards

Rule 1.140(b)(6) of the Florida Rules of Civil Procedure provides that a court may dismiss a complaint for failure to state a cause of action. The legal standards on motions to dismiss are axiomatic. Judge Antoon summarizes them as follows:

> In Florida, a complaint must contain a short and plain statement of the ultimate facts demonstrating that the plaintiff is entitled to the relief requested. *See* Fla. R. Civ. P. § 1.110(b). In reviewing a motion to dismiss the complaint, the Court must make its decision solely upon questions of law. Conducting this review, the court must confine itself to the four corners of the complaint and accept all allegations in the complaint as true. In this regard, the trial court is not free to speculate as to what may indeed be true or ultimately proven. The question for the trial court to decide is simply whether, assuming the allegations of the complaint to be true, Plaintiff would be entitled to the relief requested.

*See Citron v. Osmose Wood Preserving, Inc.*, 681 So. 2d 859, 860-61 (Fla. 5th DCA 1996) (citing *Odham v. Foremost Dairies, Inc.*, 128 So. 2d 586 (Fla. 1961)). Additionally, the Court notes the following principles. First, leave to amend should be freely granted unless the amendment would be futile. Additionally, factual allegations are taken as true, but conclusory allegations are insufficient. *Stein v. BBX Capital Corp.*, 241 So. 3d 874, 876 (Fla. 4th DCA 2018). Second, if exhibits attached and incorporated by a pleading contradict the cause of action, then the document will control. *Hunt Ridge at Tall Pines, Inc. v. Hall*, 766 So. 2d 399, 401 (Fla. 2d DCA 2000).

## III. Discussion

Defendant's motion to dismiss generally asserts that the two types of fees complained of are authorized by the agreement between the parties, that the agreement is not ambiguous, and that having acted in accordance with their contract, Defendant Space Coast is not guilty of a lack of good faith or fair dealing. Defendant's motion and argument also makes a federal preemption argument over Plaintiffs' allegations that Space Coast did not disclose its fee practices. Plaintiffs assert that this is not their argument; their argument is grounded in breach of contract.

In reviewing the Amended Complaint, the Court finds that this cause of action is clearly based in breach of contract; that the various paragraphs dealing with a lack of disclosure are ancillary, at best, and therefore, Defendant's preemption arguments are unavailing.

Plaintiffs' arguments and written submissions in opposition highlight the "ambiguous" provisions of the agreement, and, therefore, Plaintiffs submitted case law in support of this ambiguity argument, particularly *Roberts v. Capital One, N.A.*, 719 F. App'x 33 (2d Cir. 2017) and *Lloyd v. Navy Federal Credit Union*, No. 17-cv-1280, 2018 WL 1757609 (S.D. Cal. Apr. 12, 2018). Both the *Roberts* and *Lloyd* courts found that the contractual language used was reasonably susceptible to more than one interpretation, particularly on the precise issue of when the banking institution pays an overdraft. Therefore, both courts denied the motions to dismiss. Space Coast asserts that their contract language is significantly different, and, therefore, the *Roberts* and *Lloyd* cases are not on point. Defendants assert that the Court should review *Boone v. MB Financial Bank, N.A.*, 375 Fed. Supp. 3d 987 (N.D. Ill. 2019) and *Lambert v. Navy Federal Credit Union*, No. 1-19-cv-103-LO-MSN, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019).

 **\*3** Similar arguments concern the insufficient funds, the NSF fees. Plaintiff asserts that there is no contractual authorization to charge up to three NSF fees, that accountholders are not on notice of the multiple fees, and that this is proof of ambiguity in the document's use of the word "item." (Item can only mean one charge.)

As a result of these arguments, the Court must note several principles of contract interpretation. First, contract interpretation is a question of law. Second, the Court must first examine the language of the contract for evidence of the parties' intent. Third, words and phrases are given their ordinary meaning. Fourth, the entire contract should be considered and provisions should not be considered in isolation to other provisions of the contract. Fifth, the contract should not be interpreted to achieve a certain result. Sixth, if a contract is reasonably susceptible to more than one interpretation, it is ambiguous. Seventh, a true ambiguity does not exist in the contract because the contract can be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible. *See Burlington & Rochenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 958 (Fla. 5th DCA 2005); *Whitley v. Royal Trials Property Owners' Ass'n., Inc.*, 910 So. 2d 381, 383 (Fla. 5th DCA 2005); *Walsh v. Walsh*, 262 So. 3d 212, 215-16 (Fla. 5th DCA 2018); *Nabbie v. Orlando Outlet Owner, LLC*, 237 So. 3d 463, 466-67 (Fla. 5th 2018) (and the multiple cases cited within those four cases).

As to Count I, Plaintiffs baldly assert that the contract promises to determine overdrafts at the time of authorization, not settlement. The Court knows that there is no such specific contract provision. In reviewing the specific provisions dealing with overdrafts, collection, processing of items, and overdraft balance calculation, it is clear that an overdraft fee is assessed when the available balance is insufficient to pay a transaction when it is presented for payment. "Presented for payment" logically means when the transaction is actually paid or settled, not the prior authorization. Accountholders are on express notice that this is when overdraft assessments are determined.

As to Count II and the Retry fees, Plaintiff asserts that Space Coast may contractually only charge one NSF fee when merchants resubmit a transaction. The appropriate provision in the agreement is titled "Non-Sufficient Funds Returns." This provision states that the NSF fees may be charged each time a pre-authorized transfer is presented for payment. Reading this provision in the context of the whole agreement leads to the inescapable conclusion that Defendant is clearly empowered to charge more than one NSF fee if a transaction is resubmitted. The Court respectfully finds Plaintiffs' arguments unavailing and inconsistent with the actual provision of the agreement between the parties.

Plaintiffs have also submitted for the Court's consideration "much better language" on these two issues used by various institutions throughout the United States. While this is appreciated, those examples cannot inform the Court's analysis. They are not relevant to whether the provisions at hand are clear and unambiguous.

In sum, the actual agreement is clear and unambiguous. Space Coast is authorized by the contract to charge the two fees in dispute. Space Coast has simply exercised its contractual rights. There is no basis, therefore, for granting relief in this case, and any amendment to the pleadings would be futile as they would not change the prior agreement between the parties.

## <u>ORDER</u>

**\*4** Therefore, it is ordered and adjudged:

1. Defendant Space Coast Credit Union's motion to dismiss the Amended Complaint is **GRANTED** with prejudice.

2. The Court retains jurisdiction for all lawful purposes.

**IT IS SO ORDERED.**

Date: May 7, 2020

<<signature>>

Hon. George Paulk

Circuit Court Judge

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

2018 WL 6582824
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas.

Jillian L. WHITTINGTON,
Individually and on Behalf of All
Others Similarly Situated, Plaintiff,
v.
MOBILOIL FEDERAL
CREDIT UNION, Defendant.

CIVIL ACTION NO. 1:16-CV-482
|
Signed 10/26/2018

**Attorneys and Law Firms**

William Craft Hughes, Deola Ali, Jarrett Lee Ellzey, Jr.,
Hughes Ellzey LLP, Houston, TX, Karen Lee Spivey, Pate &
Spivey LLP, Beaumont, TX, for Plaintiff.

Andrew J. Demko, Stuart M. Richter, Katten Muchin
Rosenman LLP, Los Angeles, CA, Emily Lauren Rochy,
Katten Muchin Rosenman, LLP, Houston, TX, for Defendant.

**MEMORANDUM AND ORDER**

MARCIA A. CRONE, UNITED STATES DISTRICT
JUDGE

**\*1** Pending before the court are Defendant Mobiloil Federal
Credit Union's ("MCU") Motion for Summary Judgment
(#38) and Amended Motion for Summary Judgment (#42),
wherein MCU asserts that summary judgment should be
granted in its favor because Plaintiff Jillian L. Whittington
("Whittington") has not met her burden to adduce evidence
sufficient to raise a genuine issue of material fact as
to every element of her fraud claim. Also pending are
Whittington's Motion to Strike MCU's Amended Motion
for Summary Judgment (#45), as well as her Motion for
Partial Summary Judgment (#39), wherein she asks the court
to determine as a matter of law that MCU made false,
material representations concerning its pay privilege and
overdraft protection programs. Having reviewed the pending
motions, the submissions of the parties, the pleadings, and the
applicable law, the court is of the opinion that Whittington's

Motion to Strike should be granted, MCU's Motion for
Summary Judgment should be granted, and Whittington's
Motion for Partial Summary Judgment should be denied.

I. Background

Whittington became a member of MCU in approximately
1999. Since at least 2004, Whittington elected to participate
in the MCU Overdraft Protection Plan, such that her savings
account is linked to her checking account to cover potential
overdrafts. On October 31, 2013, Whittington's husband
opted into MCU's Pay Privilege Plus Program to cover
overdrafts resulting from ATM withdrawals and debit card
transactions; Whittington was not with her husband and was
unaware that he had enrolled their account in Pay Privilege
Plus. Over the next three years, Whittington overdrew
her account more than 150 times.[1] In September 2015,
she spoke with a MCU customer service representative
about her overdrafts, and the customer service representative
explained to Whittington that pending debit transactions are
not instantly applied to her available balance, which can cause
overdrafts (and resultant fees) if additional credit transactions
post before the pending debits settle. Thereafter, Whittington
overdrew her account more than 90 times and eventually
closed her account in December 2016. She filed this putative
class action on November 22, 2016, asserting claims for fraud,
breach of express warranty, and unjust enrichment, as well as
violations of the Texas Deceptive Trade Practice-Consumer
Protection Act ("DTPA") and Regulation E of the Electronic
Funds Transfer Act ("EFTA") (#1). On MCU's motion,
the court dismissed all of Whittington's claims except her
allegation that MCU's affirmative misrepresentations were
fraudulent (#25).[2]

**\*2** On April 5, 2018, the court entered a Second Amended
Scheduling Order, which changed the deadline for dispositive
motions from July 2, 2018, to May 15, 2018. On May 15,
2018, MCU filed its original Motion for Summary Judgment
(#38), and Whittington filed her Motion for Partial Summary
Judgment (#39). After Whittington responded to MCU's
Motion for Summary Judgment, MCU filed an Amended
Motion for Summary Judgment (#42). On June 12, 2018,
Whittington filed her Motion to Strike MCU's Amended
Motion for Summary Judgment, arguing that allowing MCU
to amend its motion would be prejudicial to Whittington
and create unnecessary confusion, expense, and delay in the
motion practice of this case.

## II. Motion to Strike Amended Summary Judgment Motion

MCU filed its Amended Motion for Summary Judgment after the dispositive motion deadline listed in the Second Amended Scheduling Order and after Whittington filed her Response to MCU's original Motion for Summary Judgment without first requesting leave of court. MCU's Amended Motion for Summary Judgment makes no substantive changes to its original motion and was filed in an effort to comply with the court's standing order by adding a table of contents, table of authorities, and an enumerated statement of undisputed facts—which is "virtually verbatim reproduction of the Statement of Facts set forth in the body of its [original motion]" (*compare* #38 *with* #42). Nevertheless, MCU's amended motion was filed after the deadline and without an opportunity for Whittington to respond. Therefore, the court finds that allowing the amended motion would create unnecessary confusion, expense, or delay in this case. Accordingly, Whittington's Motion to Strike (#45) is granted, and the court will not consider MCU's Amended Motion for Summary Judgment.

## III. MCU's Motion for Summary Judgment

### A. Summary Judgment Standard

A party may move for summary judgment without regard to whether the movant is a claimant or a defending party. *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 794 (5th Cir. 2010); *CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 272 (5th Cir. 2009). Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Davis v. Fort Bend Cty.*, 765 F.3d 480, 484 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2804 (2015); *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 407 (5th Cir. 2012). To warrant judgment in its favor, the movant "must establish beyond peradventure *all* of the essential elements of the claim or defense." *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190,

1194 (5th Cir. 1986) ); *accord Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *cert. denied*, 568 U.S. 1194 (2013).

"A fact issue is material if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1715 (2016); *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014); *accord Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005). "Factual disputes that are irrelevant or unnecessary will not be counted." *Tiblier*, 743 F.3d at 1007 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Hudspeth v. City of Shreveport*, 270 F. App'x 332, 334 (5th Cir. 2008) (quoting *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) ). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren*, 820 F.3d at 771 (quoting *Anderson*, 477 U.S. at 248); *Tiblier*, 743 F.3d at 1007; *accord Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013). The moving party, however, "need not negate the elements of the nonmovant's case." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010); *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) ).

**\*3** Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting Fed. R. Civ. P. 56(e) ); *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013). The court must "review the record 'taken as a whole.' " *Black v. Pan Am. Labs., LLC*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ); *see City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Tiblier*, 743 F.3d at 1007; *see Hefren*, 820 F.3d at 771. The evidence of the nonmovants is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in her favor. *Tolan*

*v. Cotton*, 572 U.S. 650, 134 S. Ct. 1861, 1863 (2014) (citing *Anderson*, 477 U.S. at 255); *Hemphill*, 805 F.3d at 538; *Pioneer Expl., L.L.C.*, 767 F.3d at 511. Moreover, summary judgment "generally is inappropriate when inferences parties seek to draw deal with questions of motive and intent." *Williams v. Upjohn Co.*, 153 F.R.D. 110, 116 (S.D. Tex. 1994); *see United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (stating that "we hesitate to grant summary judgment when a case turns on a state of mind determination"); *Pasco v. Knoblauch*, 223 F. App'x 319, 322 (5th Cir. 2007) ("[S]ummary judgment is rarely proper when an issue of intent is involved."). The evidence is construed "in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013) (quoting *Boudreaux*, 402 F.3d at 540).

Furthermore, "only reasonable inferences in favor of the nonmoving party can be drawn from the evidence." *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992), *cert. denied*, 523 U.S. 1094 (1998) ); *accord Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999) (quoting *Eastman Kodak Co.*, 504 U.S. at 468-69); *accord Shelter Mut. Ins. Co. v. Simmons*, 543 F. Supp. 2d 582, 584-85 (S.D. Miss.), *aff'd*, 293 F. App'x 273 (5th Cir. 2008). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill*, 805 F.3d at 538 (citing *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012) ); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *accord Stauffer v. Gearhart*, 741 F.3d 574, 581 (5th Cir. 2014).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *Tiblier*, 743 F.3d at 1007; *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013). "[W]here the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist." *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010). In such a situation, " '[a]

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir.) (quoting *Celotex Corp.*, 477 U.S. at 322-23), *cert. denied*, 555 U.S. 1012 (2008).

### B. Fraud under Texas Law

**\*4** In Texas, common law fraud may consist of an affirmative misrepresentation or, in certain circumstances, the concealment or non-disclosure of a material fact. To recover for fraudulent inducement in the context of a positive representation, the plaintiff must establish that:

(1) the defendant made a material representation concerning an existing fact;

(2) the representation was false when it was made;

(3) the speaker knew the misrepresentation was false, or made it recklessly without knowledge of its truth and as a positive assertion;

(4) the speaker made the misrepresentation with the intent that it should be acted upon;

(5) the plaintiff acted with justifiable reliance on the misrepresentation; and

(6) the plaintiff suffered injury as a result.

*D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 218 (5th Cir. 2018); *Harris Cty. Tex. v. MERSCORP Inc.*, 791 F.3d 545, 558 (5th Cir. 2015); *Massey v. EMC Mortg. Corp.*, 546 F. App'x 477, 481 (5th Cir. 2013); *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir.), *cert. denied*, 558 U.S. 873 (2009); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). "Fraud is never presumed, and it is plaintiff's burden to allege and prove actionable fraud." *William B. Roberts, Inc. v. McDrilling Co.*, 579 S.W.2d 335, 339 (Tex. Civ. App.—Corpus Christi 1979, no writ); *accord Priddy v. Rawson*, 282 S.W.3d 588, 598 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

To constitute fraud, a misrepresentation must concern a material fact. *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 359 (5th Cir. 1996), *cert. denied*, 519 U.S. 1078 (1997) (quoting *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995) ); *see N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461,

474 (5th Cir. 2018) (stating that fraud requires a "material representation" and that " '[m]aterial' means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question"); *Kwik Indus., Inc. v. Rock Prairie Holdings, Ltd.*, No. 05-13-00054-CV, 2015 WL 1449902, at *8 (Tex. App.—Dallas Mar. 30, 2015, no pet.). It is well established under Texas law that "a pure expression of opinion will not support an action for fraud." *Faircloth*, 898 S.W.2d at 276 (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983) ); *see Clardy Mfg. Co.*, 88 F.3d at 359; *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 678-79 (5th Cir. 1986); *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 160, 163 (Tex. 1995). "Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made." *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 338 (quoting *Faircloth*, 898 S.W.2d at 276); *In Interest of Ja.D.Y.*, No. 05-16-01412-CV, 2018 WL 3424359, at *3 (Tex. App.—Dallas July 16, 2018, no pet.). "Among the relevant circumstances are the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future." *Faircloth*, 898 S.W.2d at 276 (citing *Trenholm*, 646 S.W.2d at 930; *Safety Cas. Co. v. McGee*, 127 S.W.2d 176, 178 (Tex. 1939) ); *Kwik Indus., Inc.*, 2015 WL 1449902, at *6.

**\*5** A plaintiff asserting common law fraud must prove the materiality of the alleged misrepresentation. *See Reece v. U.S. Bank Nat'l Ass'n*, 762 F.3d 422, 424 (5th Cir. 2014); *Nissan Motor Co., Ltd. v. Armstrong*, 145 S.W.3d 131, 149 n.79 (Tex. 2004) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) ); *Trenholm*, 646 S.W.2d at 931. A statement is material "if a reasonable person would attach importance to and be induced to act on the information." *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd.*, 607 F.3d 1029, 1032 (Tex. 2010).

Even if material, however, "[a] statement is not fraudulent unless the maker knew it was false when he made it or made it recklessly without knowledge of the truth." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex. 1998) (citing *Prudential Ins. Co. v. Jefferson Assocs.*, 896 S.W.2d 156, 163 (Tex. 1995); *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977) ); *JIK Cayman Bay Exch. LLC v. Medina*, No. 05-16-01176-CV, 2018 WL 2045068, at *3 (Tex. App.—Dallas May 2, 2018, no pet.). To prevail on a common law fraud claim, the plaintiff

must show that the defendant had an intent to mislead. *Dirty Dudds Cleaners, LLC v. CCA of Tenn., LLC*, No. SA-16-CV-1227-XR, 2018 WL 456030, at *5 (W.D. Tex. Jan. 16, 2018); *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 241 F. Supp. 3d 737, 76 (N.D. Tex. 2017); *Formosa Plastics Corp. USA*, 960 S.W.2d at 48 (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *Stanfield v. O'Boyle*, 462 S.W.2d 270, 272 (Tex. 1971) ). Indeed, a "statement of value may be actionable if the speaker knows it is false." *Faircloth*, 898 S.W.2d at 276 (citing *Tex. Indus. Tr., Inc. v. Lusk*, 312 S.W.2d 324, 326 (Tex. Civ. App. —San Antonio 1958, writ ref'd) ).

To recover on a fraudulent representation claim, "the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) ("Both fraud and negligent misrepresentation require that the plaintiff show actual and justifiable reliance."); *accord Lewis v. Bank of Am. NA*, 343 F.3d 540, 546-47 (5th Cir. 2003), *cert. denied*, 540 U.S. 1213 (2004); *CBH Equity, LLC v. Murphy Oil USA, Inc.*, No. 2:15-CV-137, 2018 WL 3647087, at *3 (S.D. Tex. Aug. 1, 2018). "A plaintiff establishes reliance by showing that the defendant's acts and representations induced it to either act or refrain from acting, to its detriment." *Van Marcontell v. Jacoby*, 260 S.W.3d 686, 691 (Tex. App. —Dallas 2008); *see JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 648. Justifiable reliance consists of two elements: (1) the plaintiff must in fact rely on the information; and (2) the reliance must be reasonable. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 501-02 (5th Cir. 2000); *Scottish Heritable Tr., PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 615 (5th Cir.), *cert. denied*, 519 U.S. 869 (1996); *Fustok v. UnitedHealth Grp., Inc.*, No. 12-cv-787, 2013 WL 2189874, at *4 (S.D. Tex. May 20, 2013); *Nwankpa v. Obilom*, No. 03-16-00239-CV, 2017 WL 3902605, at *2 (Tex. App.—Austin Aug. 24, 2017, no pet.). The reasonableness of the plaintiff's reliance is assessed in view of the "individual['s] characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud." *Clardy Mfg. Co.*, 88 F.3d at 360; *accord Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 906 (5th Cir. 2002), *cert. denied*, 538 U.S. 1034 (2003); *In re Enron Corp. Sec.*, Nos. H-01-3624, G-03-0481, 2010 WL 9077875, at *4 (S.D. Tex. Jan. 19, 2010). In addition, "the justifiableness of the reliance is judged in light of the plaintiff's intelligence and experience." *Nunn, Yoest,*

Case 2:20-cv-12318-PDB-EAS   ECF No. 7, PageID.115   Filed 10/22/20   Page 41 of 115
Whittington v. Mobiloil Federal Credit Union, Slip Copy (2018)

2018 WL 6582824

*Principals & Assocs., Inc. v. Union Pac. Corp.*, 69 F. App'x 658, 2003 WL 21356004, at *2 (5th Cir. 2003) (quoting *Scottish Heritable Tr., PLC*, 81 F.3d at 615).

**\*6** Moreover, the plaintiff must show that her injury was proximately caused by the alleged misrepresentation or nondisclosure to recover consequential damages or that "the harm 'result[ed] directly and naturally' from the fraud" to recover general damages. *Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.*, 444 F. App'x 1, 10-11 (5th Cir. 2011) (quoting *Scott v. Sebree*, 986 S.W.2d 364, 371 (Tex. App.—Austin 1999, pet. denied) ); *see Emps. Ret. Sys. of Tex. v. Putnam, LLC*, 294 S.W.3d 309, 316-17 (Tex. App.—Austin 2009, no pet.).

### C. Whittington's Fraud Claim

Whittington's fraud claim is based on three alleged misrepresentations made by MCU. First, Whittington's "sufficient funds theory" complains that MCU wrongfully assessed overdraft fees despite the availability of sufficient funds in her checking account at the time of the transaction and misrepresented this process to members in its Membership Disclosures.[3] Second, Whittington asserts that MCU failed to assess overdrafts only when a member's account balance was negative at the end of the day (the "daily balance claim"). Finally, Whittington argues that MCU's description of its Overdraft Protection Program as "less expensive" is misleading. MCU argues that it is entitled to summary judgment on Whittington's fraud claim because MCU did not make any false statements and, moreover, Whittington did not rely on any of the alleged representations to her detriment.

### 1. The Sufficient Funds Theory

The parties agree that MCU assesses overdrafts based on a member's available balance at the time a transaction posts to the member's account. Whittington's "sufficient funds theory" argues, however, that MCU's process creates "artificial fees" by charging members overdraft fees for purchases made when the member had "a positive balance." Whittington asserts that MCU deemed an account to be overdrawn even when sufficient funds still remained in the account by using a computation called "available balance." Instead of using the actual account balance based on posted transactions to determine whether a member's account is overdrawn, MCU uses the available balance method, which subtracts "pending"

debit transactions from the actual amount of money in the account to determine the "available balance," which is used to determine overdrafts. Thus, MCU treats transactions that caused the available balance to fall below zero, or to remain below zero, as an overdraft, even if the balance based solely on posted transactions is greater than zero.

By illustration, assume a MCU member has $100 in her checking account and makes a $40 purchase. The purchase is pre-authorized at the point-of-purchase and the member's available balance is reduced to $60, even though the funds will not be taken out of her account until the merchant submits the transaction for payment, which could be days later. In other words, MCU puts a hold on the pre-authorized amount because the member has already committed those funds for the purchase. While the $40 purchase is pending, a prior transaction (*e.g.*, a check) for $75 posts to her account. Although her checking account technically has sufficient funds to make the payment, her available balance is only $60. The $75 check will overdraw her available balance by $15 and will cause her to incur a $30 overdraft fee at the time her available balance falls below zero. The $75 check and $30 overdraft fee exceed the funds in the member's account, and therefore, when the merchant submits the original $40 purchase for payment,[4] the available balance is insufficient to cover the transaction. Thus the member incurs another $30 overdraft fee.

**\*7** MCU responds that its practice of calculating overdraft fees operates as described in the Membership Disclosures. MCU's Membership Disclosures' "Withdrawal Restrictions" policy states:

> We will pay checks and drafts, permit withdrawals and make transfers from your account from available funds in your account. The availability of funds in your account may be delayed as described in our Funds Availability Policy. We may also pay checks and drafts, permit withdrawals and make transfers from your account from insufficient available funds if you have established an overdraft protection plan or, if you do not have such a plan with us, in accordance with our overdraft payment policy.

==MCU's Membership Disclosures also include a "Payment of Overdraft" policy which states, in relevant part, that overdrafts are assessed at or after the time the transaction is presented by the merchant for payment:==

> If, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction, or other item posted to your

account plus any applicable fee ("overdraft"), we may pay or return the overdraft. The Credit Union's determination of an insufficient available account balance may be made at any time between presentation and the Credit Union's midnight deadline with only one (1) review of the account required.

Both parties agree that MCU assesses overdraft fees as described in the above disclosure. Whittington complains, however, that MCU's Membership Disclosures fail to define and explain terms critical to understanding how its overdraft system works: "[MCU's] membership disclosures never use the words 'ledger balance,' never explain what a 'hold' is, never explain how 'pre-authorized' transactions differ from 'posted' transactions, and never define 'available balance' or 'available funds.' " Whittington argues that without such definitions, the plain language of the Membership Disclosures misleads members into believing that MCU will assess overdrafts at the time the transaction occurs. The express language of the policy—"an insufficient available account balance may be made *at any time between presentation and the Credit Union's midnight deadline*"—negates such an interpretation.

Additionally, Whittington admitted at deposition that she reviewed the Membership Disclosures when she opened her account and at other times during her membership and that she understands the term "posted" to mean the time at which a merchant is, in fact, paid for a transaction and it "comes out of your actual balance[—]not pending but posted." Whittington further acknowledged that she spoke to a representative of MCU's Customer Services Department, who explained the overdraft process to her, including the impact of debit card holds. In addition, Whittington stated that, at times, she relied on the overdraft protection program when she knew she did not have enough money in her account to cover certain expenditures. Thus, even if MCU's Membership Disclosures were in some manner false or misleading, Whittington did not act with justifiable reliance on them.

Furthermore, the court will not revisit its previous holding that the requirement to make particular disclosures falls squarely within the purview of federal banking regulations and is expressly preempted. *See Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 724 (9th Cir. 2012) (citing OCC Interpretive Letter No. 916, 2001 WL 1285359, at *2 (May 22, 2001) (holding state law cannot impose liability based on the bank's failure to disclose its chosen posting method.") ).

**\*8** MCU's Membership Disclosures correctly describe how overdraft fees are incurred and, therefore, there was no misrepresentation underpinning Whittington's sufficient funds theory to support her fraud claim.

### 2. Daily Positive Balance Claim

Whittington also complains that the phrase "on any day" in the above-quoted Payment of Overdraft policy gives the false impression that overdraft fees will be assessed on the balance of an account at the end of the day, "implying that Plaintiff may be able to remedy an overdraft by depositing money [into] her account shortly after a transaction and before the midnight deadline." In addition to being in conflict with Whittington's argument that the same policy "would lead a reasonable person to believe that overdraft fees are assessed at the time of a transaction,"—not at the end of the day —Whittington's daily positive balance claim fails to give meaning to all parts of the policy. Specifically, immediately following the "on any day," language, the policy reads: "determination of an insufficient available account balance may be made at any time between presentation and [MCU's] midnight deadline."

The parties agree that MCU processes debit card payments when they are submitted by merchants throughout the day and makes overdraft determinations when the transactions are posted to an account. An account could be overdrawn "on any day," depending on when the transaction posts. Therefore, MCU assesses overdrafts in accordance with its written policy. Whittington has not identified any affirmative representation indicating that MCU will assess overdraft fees after balancing all debits and credits to an account at the end of the day or at any other time. Consequently, Whittington's daily positive balance theory fails to support her claim of fraud.

### 3. Overdraft Protection Plan

Whittington complains that MCU's description of its "Overdraft Protection" program is misleading because the plan does not "protect" consumers who are in need of it the most. Whittington further argues that MCU's statement that the program "may be less expensive" does not "erase the clear statement that it is an 'Overdraft Protection' program."

Once a member elects to have this coverage, it operates to allow funds to be transferred from a savings account or line of credit to cover potential overdrafts. MCU's Overdraft Protection Plan is marketed to help members save on overdraft fees by transferring funds from other accounts held by the member to cover overdrafts and avoid overdraft fees ($30.00 per overdraft) by charging the member a lower inter-account transfer fee ($5.50 per transfer[5]).

Whittington complains that if a member does not have enough money in a linked savings account to cover the overdraft incurred in her checking account, the member will be charged both an overdraft fee and a transfer fee, "which happened to [Whittington] 10 times." Whittington's expert witness's report clarifies that Whittington was charged an inter-account transfer fee 10 times, and that "[o]f those 10 instances, 6 transfers ... were insufficient to cover the overdraft triggering transaction and thus Whittington was assessed a transfer fee and then still assessed the overdraft fee that the transfer was supposed to prevent." Therefore, the Overdraft Protection program actually saved Whittington $65.00 in fees over the course of the 10 identified transactions.[6] Even though 6 of the cited transactions incurred both an overdraft fee and a transfer fee, the Overdraft Protection program actually was less expensive over the course of the 10 transactions. There is nothing false or misleading about MCU's statement that the Overdraft Protection program "may be less expensive," and, thus, there is no misrepresentation to support her fraud claim.

**\*9** The court, therefore, determines that Whittington's sufficient funds theory, daily positive balance claim, and contention with MCU's marketing of its "Overdraft

Protection" program fail to identify an affirmative misrepresentation by MCU. Consequently, summary judgment in favor of MCU is warranted as to Whittington's fraud claim.

IV. Whittington's Motion for Partial Summary Judgment

In her Motion for Partial Summary Judgment, Whittington seeks partial summary judgment solely on the first two elements of her fraud claim: (1) that a material representation was made; and (2) the representation was false. In Whittington's reply to MCU's response to her Motion for Partial Summary Judgment, she requests that the court stay consideration of the motion until after class certification. Having determined that MCU's Motion for Summary Judgment should be granted and that Whittington has failed to identify an affirmative misrepresentation by MCU, Whittington's Motion for Partial Summary Judgment should be denied.

V. Conclusion

In accordance with the foregoing analysis, Whittington's Motion to Strike is GRANTED. MCU's Motion for Summary Judgment is GRANTED. Whittington's Motion for Partial Summary Judgment is DENIED.

A final judgment order in favor of MCU will be entered separately.

**All Citations**

Slip Copy, 2018 WL 6582824

Footnotes

1   Whittington overdrew her account 27 times in 2014, 55 times in 2015, and 76 times in 2016.

2   The court held that the Federal Credit Union Act preempted Whittington's unconscionability-based DTPA and unjust enrichment claims and that her remaining unjust enrichment claim failed due to the existence of a contract covering the subject matter of the claim. The court further held that Whittington's remaining DTPA claims, as well as her claim based on EFTA, are time-barred. Finally, the court held that the Truth in Savings Act preempts Whittington's fraud claim so far as it is based on failure to disclose information.

3   MCU's Membership Disclosures include three sections: (i) the Membership and Account Agreement; (ii) the Funds Availability Policy Disclosure; and (iii) the Electronic Fund Transfers Agreement & Disclosure. Whittington admits that she received and reviewed the Membership Disclosures when she opened her account. MCU also has a separate disclosure document entitled, "What You Need to Know about Overdrafts and Overdraft Fees" ("What You Need to Know"). Whittington claims she never received or reviewed the terms of the "What You Need to Know" disclosure.

4   When the $40 purchase is submitted for payment, MCU essentially deletes the $40 preauthorization hold, which increases the available balance by $40, and posts the purchase to the account, reducing the available balance and actual balance by the $40.

**Whittington v. Mobiloil Federal Credit Union, Slip Copy (2018)**

2018 WL 6582824

5    Whittington's expert states that MCU's transfer fees were $5.00 or $5.50 per transfer. *See* □41-1, at 22. The discrepancy does not affect the court's opinion.

6    Whittington used the Overdraft Protection program 10 times. Without this protection, she would have owed $30.00 per overdraft, or $300.00 total. With the program, she paid a total of $235.00 in overdraft and transfer fees: She overdrew her account 6 times when she had insufficient funds in her lin□ed savings accounts, incurring both the $30.00 fee and the $5.50 fee, which amounts to $213.00; she overdrew her account an additional 4 times when there were sufficient funds in her lin□ed account and incurred only the $5.50 transfer fee, which amounts to $22.00.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

Gay v. Peoples Bank, Not Reported in S.E.2d (2015)

2015 WL 3650090, 2015 NCBC 59

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re TD Bank, N.A., D.S.C., December 10, 2015

2015 WL 3650090

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of North Carolina,
Lincoln County,
Business Court.

Joseph Lee GAY, Individually and on Behalf of All Persons Similarly Situated, Plaintiff,

v.

PEOPLES BANK, Defendant.

No. 13 CVS 383.
|
June 10, 2015.

{1} **THIS MATTER** is before the Court upon Defendant Peoples Bank's ("Defendant," "Peoples," or the "Bank") Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Motion for Summary Judgment"); Plaintiff Joseph Lee Gay's ("Plaintiff") Motion for Permission to File Plaintiff's Supplement (the "Motion to Supplement"); and Defendant's Motion to Strike Plaintiff's Supplement in Further Opposition to Defendant's Motion for Summary Judgment (the "Motion to Strike") in the above-captioned case.

{2} After considering the Motions, briefs in support of and in opposition to the Motions, the appropriate evidence of record, and the arguments of counsel at the March 4, 2015 hearing on this matter, the Court hereby **GRANTS** Plaintiff's Motion to Supplement, **DENIES** Defendant's Motion to Strike, and **GRANTS** Defendant's Motion for Summary Judgment.

**Attorneys and Law Firms**

Sigmon, Clark, Mackie, Hanvey & Ferrell, P.A. by Stephen L. Palmer; Squitieri & Fearon, LLP by Stephen J. Fearon, Jr.; and Greg Coleman Law PC by Greg Coleman for Plaintiff Joseph Lee Gay.

Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by Reid L. Phillips and Daniel F.E. Smith for Defendant Peoples Bank.

**ORDER AND OPINION**

BLEDSOE, Judge.

I.

PROCEDURAL HISTORY

*1 {3} Plaintiff alleges claims, both individually and purportedly on behalf of a class of similarly situated persons, arising out of certain overdraft fees incurred by Plaintiff and other of Defendant's customers between June 6, 2008 and July 1, 2011 .[1] Plaintiff's claims are specifically focused on multiple overdraft fees incurred on a single banking day by Plaintiff and other customers as a result of Defendant's high-to-low posting of ATM and one-time, non-recurring, debit card transactions, which Plaintiff contends Defendant did not properly disclose in an effort to derive excessive overdraft fee income at the expense of unsuspecting customers. Plaintiff's core contention is that Defendant manipulated the timing and order in which customer debit charges were processed—without notice to customers and in violation of Defendant's contract obligations to its customers—to charge overdraft fees on accounts that were not actually overdrawn.

{4} Defendant contends that, unlike certain large national banks sued in other class actions around the United States with whom Plaintiff compares Defendant, Defendant always disclosed to its customers that it paid transactions in high-to-low order during the time period at issue and always posted credits to its customers' accounts before posting debits. Defendant asserts that Defendant fully complied with the terms of its applicable agreements with Plaintiff and other Bank customers and that Plaintiff's claims represent an improper attempt to shift responsibility for managing Plaintiff's account to avoid overdrafts from Plaintiff to Defendant.

{5} Plaintiff filed his Class Action Complaint on March 25, 2013, in Lincoln County Superior Court, asserting claims against Defendant for breach of contract, breach of the covenant of good faith and fair dealing, conversion, unjust enrichment, and unfair and deceptive trade practices under N.C. Gen.Stat. §§ 75–1.1, et seq. ("UDTP").

{6} On October 24, 2014, Defendant filed its Motion for Summary Judgment.[2] Plaintiff filed his Response to the Motion for Summary Judgment on December 10, 2014 and Defendant filed its Reply to Plaintiff's Response on December 23, 2014.

{7} On February 16, 2015, Plaintiff filed a Supplement in Further Opposition to Defendant's Motion for Summary Judgment (the "Supplement"). The next day, Defendant filed its Objection and Motion to Strike Plaintiff's Supplement. Plaintiff subsequently filed his Motion to Supplement on February 27, 2015.

{8} The Court held a hearing on the Motions on March 14, 2015, at which all parties were represented by counsel. The Motions are now ripe for resolution.

II.

FACTUAL BACKGROUND

{9} While findings of fact are not necessary or proper on a motion for summary judgment, "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier,* 204 N.C.App. 160, 161–62, 693 S .E.2d 250, 252 (2010). Therefore, the Court limits its factual recitation to the undisputed material facts necessary to decide the Motions, and not to resolve issues of material fact.

 **\*2** {10} Plaintiff Joseph Lee Gay is a resident of Lincolnton, North Carolina, and maintained a checking account with Peoples Bank at all times relevant to this action. (Compl.¶ 9.)

{11} Defendant Peoples Bank is a North Carolina corporation that provides retail banking services to thousands of customers at approximately 22 branches in North Carolina. (Compl.¶ 2.)

{12} The Bank's services include issuing debit cards, which allow the Bank's customers to transact with third parties using funds paid directly from their checking accounts, and issuing automatic teller machine ("ATM") cards, which allow the Bank's customers to withdraw cash directly from their accounts at ATMs. These debit card and ATM transactions are generally referred to as "electronic debit transactions." (Compl.¶¶ 2–3, 38–39.)

{13} Since December 8, 1999, Peoples Bank has processed electronic debit transactions from the highest to lowest dollar amount. (Def.'s Br. Supp. Mot. Summ. J., p. 13–14; Pl.'s Resp. Def.'s Mot. Summ. J., p. 1.)

{14} On July 3, 2008, Plaintiff opened an account at the Bank, at which time Plaintiff agreed to and received the following documents: (i) the Terms and Conditions of the Account Agreement ("Terms and Conditions"); (ii) an Addendum to the Terms and Conditions ("Terms and Conditions Addendum"); (iii) a Funds Availability disclosure (per Regulation CC); (iv) Electronic Funds Transfers Disclosures, Peoples Bank 24 Express, & Peoples Bank 24 Express Check Terms, Conditions and Agreements ("ETF Agreements"); (v) a truth-in-savings disclosure (per Regulation DD); (vi) a No Bounce Advantage (overdraft program) disclosure;[3] and (vii) a privacy disclosure (per Regulation P) (collectively, the "Account Agreement Documents"). (Connie Ollis Aff., ¶¶ 13, 14; Ans. Ex. 8.)[4]

{15} On September 14, 2009, Plaintiff was charged multiple overdraft fees for the payment of ATM and/or one-time debit card transactions from his Peoples Bank checking account. Peoples Bank assessed Plaintiff's account eleven (11) insufficient funds charges of $33 each for a total charge of $363. (Compl.¶ 9.)

{16} On September 18, 2009, Peoples Bank refunded nine (9) of the eleven (11) overdraft fees incurred by Plaintiff. (Def.'s Br. Supp. Mot. Summ. J., p. 9.)

{17} The following allegations form the basis of Plaintiff's claims against Peoples Bank:

a. "The [A]ccount [A]greement [Documents] failed to disclose the Bank's policy to *always* reorder debits from highest dollar value to lowest. Moreover, the Account Agreement [Documents] failed to disclose that Peoples would process debits to a customer's account before processing credits in order to maximize overdrafts, and that the Bank delayed posting certain transactions, or processed them ahead of, or behind, transactions from different days, in order to post multiple debits on a single day and maximize overdrafts on that day. Thus the Account Agreement [Documents] failed to disclose that Peoples reordering practices would allow the Bank

2015 WL 3650090, 2015 NCBC 59

to maximize the number of overdrafts on any account, and to assess overdraft fees for days when a customer's account was not actually overdrawn (but for the Bank's reordering)." (Compl.¶ 43) (emphasis in original).

**\*3** b. "Peoples failed to disclose that it would charge overdraft fees when customer accounts had a positive balance and were not overdrawn. The Account Agreement [Documents] failed to disclose the Bank's wrongful practices relating to its reordering of debit transactions and imposing overdraft fees from debit card purchases and ATM withdrawals. As described herein, Peoples did not debit customer accounts immediately at the time of purchase in the amount of that purchase only, and Peoples reordered transactions from different days for its own benefit, to the customer's detriment." (Compl.¶ 44.)

c. "Peoples representations were deceptive and unfair because it was, in fact, the Bank's policy and practice during the Class Period to *always* reorder debits from highest dollar value to lowest, and because the Bank grouped together point of sale transactions that occurred on subsequent days with those transactions that occurred on earlier days, and reordered them so that debits were processed before credits and higher debits that occurred on subsequent days were posted to its customers' accounts before lower debits that occurred on earlier days." (Compl.¶ 45) (emphasis in original).

d. "Even if Plaintiff was given materials containing clear and unambiguous language disclosing or authorizing the Bank's practices as described above, any such notice or authorization would have been inadequate and ineffective. Furthermore, any reservation of discretion to reorder transactions and assess overdraft fees would be constrained by Peoples's obligation to deal fairly and in good faith." (Compl.¶ 47.)

## III.

## LEGAL STANDARD

{18} Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N. C. R. Civ.

P. Rule 56(c) (2015). "A movant may meet its burden by showing either that: (1) an essential element of the non-movant's case is nonexistent; or (2) based upon discovery, the non-movant cannot produce evidence to support an essential element of its claim; or (3) the [non-]movant cannot surmount an affirmative defense which would bar the claim." *McKinnon v. CV Indus.,* 213 N.C.App. 328, 332, 713 S.E.2d 495, 499 (2011) (citations and internal quotation marks omitted). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Whitley v. Cubberly,* 24 N.C.App. 204, 206, 210 S.E.2d 389, 291 (1974); *See generally McKee v. James,* 2014 NCBC 73 ¶ 31 (N.C.Super.Ct. Dec. 31, 2014), www.ncbusinesscourt.net/opinions/2014_NCBC_73.pdf (discussing standard).

## IV.

## ANALYSIS

### A. *Plaintiff's Motion to Supplement and Defendant's Motion to Strike*

{19} Based on the particular procedural facts here—and without intending to create a rule of general application and without prejudice to future challenges under Business Court Rule 15.6 concerning response briefs in this case—the Court elects, in its discretion, to consider all the arguments presented in Plaintiff's Supplement in considering Defendant's Motion for Summary Judgment. Accordingly, the Court determines that Defendants' Motion to Strike should be denied and Plaintiff's Motion to Supplement should be granted.

### B. *Defendant's Motion for Summary Judgment*

**\*4** {20} As an initial matter, Plaintiff contends that Defendant's Motion should be denied because Judge Murphy rejected Defendant's contract-based arguments in denying Defendant's Motion for Judgment on the Pleadings under Rule 12(c). (Pl.'s Resp. Def.'s Mot. Summ. J., p. 8.) North Carolina law is clear, however, that "denial of a previous motion for judgment on the pleadings made under N.C. Gen.Stat. § 1A1, Rule 12(c) (2003) does not preclude the trial court from granting a subsequent motion for summary judgment." *Rhue v. Pace,* 165 N.C.App. 423, 426, 598 S.E.2d 662, 664–65 (2004). Moreover, it is undisputed that Defendant has relied upon certain evidence that was not before Judge Murphy on Defendant's Rule 12(c) Motion to support Defendant's Motion for Summary

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.123 Filed 10/22/20 Page 49 of 115
Gay v. Peoples Bank, Not Reported in S.E.2d (2015)

2015 WL 3650090, 2015 NCBC 59

Judgment, providing further basis for the Court to re-examine Defendant's arguments under the standards of Rule 56.[5] Accordingly, the Court rejects Plaintiff's contention that the Court is bound on this Motion by Judge Murphy's interpretation of the Account Agreement Documents in resolving Defendant's Motion for Judgment on the Pleadings.

i. *Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing*

{21} "Courts may enter summary judgment in contract disputes because they have the power to interpret the terms of contracts." *McKinnon,* 213 N.C.App. at 333, 713 S.E.2d at 500. "[I]f the meaning of the [contract] is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein." *Woods v. Nationwide Mut. Ins. Co.,* 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978). Furthermore, the Court must "construe an ambiguous contract in a manner that gives effect to all of its provisions, if the court is reasonably able to do so." *Johnston Cnty. v. R.N. Rouse & Co.,* 331 N.C. 88, 94, 414 S.E.2d 30, 34 (1992) (citations omitted).

a. *Breach of Contract: High–to–Low Posting*

{22} As noted previously, it is undisputed that People's Bank used a high-to-low posting order for debit transactions throughout the relevant period. (Def.'s Br. Supp. Mot. for Summ. J., p. 13; Pl .'s Resp. Def.'s Mot. Summ. J., p. 1.) Plaintiff alleges that Peoples Bank's policy of paying debit card transactions from highest dollar value to lowest was inconsistent with the terms of the Account Agreement Documents, constitutes a breach of contract, and was undertaken to maximize the number of the Bank's overdraft charges—and hence the Bank's profits—at the expense of Plaintiff and other Bank customers. (Compl.¶ 85.)

{23} The Terms and Conditions Addendum provides in relevant part as follows:

**Payment Order of Items**—The law permits us to pay items (such as checks or drafts) drawn on your account in any order. To assist you in handling your account with us, we are providing you with the following information regarding how we process the items that you write. *When processing items drawn on your account, our policy is to pay them according to the dollar amount. We pay the largest items first.* The order in which items are paid is

important if there is not enough money in your account to pay all of the items that are presented. *Our payment policy will cause your largest, and perhaps more important, items to be paid first ..., but may increase the overdraft or NSF fees you have to pay if funds are not available to pay all of the items. If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (NSF).* The amounts of the overdraft and NSF fees are disclosed elsewhere.

**\*5** (Ans. Ex. 3; *see* Pl.'s Resp. Def.'s 1st Requests for Admission, no. 4) (emphasis added).

{24} The relevant portion of the Terms and Conditions Addendum therefore clearly stated that Peoples Bank processed "items" from largest to smallest, and authorized overdraft fees for "items" drawn on insufficient funds. (Ans.Ex.3.) The Terms and Conditions document also expressly provided that the customer "agree[s] that we may charge fees for overdrafts and use subsequent deposits ... to cover such overdrafts and overdraft fees." (Ans.Ex.2, pp. 1, 3.) Plaintiff accepted the terms of the governing documents when he signed the Account Agreement Documents and used Defendant's banking services.

{25} Plaintiff's primary argument focuses on the first sentence of the Terms and Conditions Addendum: "The law permits us to pay items (such as checks or drafts) drawn on your account in any order." Plaintiff argues that the term "item," as used here, does not include debit transactions and that, as a result, Defendant's high-to-low posting of debits was not permitted and not disclosed. Plaintiff bases his argument on his belief that Defendant's use of the parenthetical "such as checks or drafts" to describe "items," coupled with the fact that the EFT Agreements specifically reference debits without discussing the high-to-low posting order, shows that the high-to-low posting order stated in the Terms and Conditions Addendum did not apply to debit transactions. The Court finds Plaintiff's argument unpersuasive.

{26} "An ambiguity exists where the 'language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties.' " *Myers v. Myers,* 213 N.C.App. 171, 175, 714 S.E.2d 194, 198 (2011). The law is clear, however, that the Court will not read an ambiguity into a contract where none exists. *See Henderson v. United States Fid. & Guar. Co.,* 124 N.C.App. 103, 107, 476 S.E.2d 459, 461 (1996) ("Where, however, no ambiguity exists, the court may not rewrite the contract and find coverage where none

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.124 Filed 10/22/20 Page 50 of 115
Gay v. Peoples Bank, Not Reported in S.E.2d (2015)
2015 WL 3650090, 2015 NCBC 59

was contracted for."). Moreover, our courts have long held that "[p]arties can differ as to the interpretation of language without its being ambiguous." *Walton v. City of Raleigh,* 342 N.C. 879, 881–82, 467 S.E.2d 410, 412 (1996).

{27} Applying these principles here, the Court concludes that Defendant's use of the phrase "such as checks or drafts" in this specific context is an unambiguous phrase of inclusion and not an exhaustive list of the specific "items" embraced by the Bank's policy. In particular, the Court finds the phrase "such as," as used here, to be synonymous with "for example," "for instance," or "like" and to identify "checks or drafts" as an illustration of two types of transfers the Bank may pay as provided in the policy statement.

{26} Moreover, the Court further concludes that the term "item," as used here, plainly contemplates any debit to an account—whether by check, draft, ACH payment, wire, online, mobile device, voice response, debit transaction or other withdrawal. This reading is not only supported by the "plain, ordinary and popular" use of the word "item"—*see Webster's Third New International Dictionary, Unabridged* (2002) (defining "item" variously as "each of the separate credits or debits detailed in a book of account")[6]—but also by the way the term is used in the Account Agreement Documents. For example, the Court reads the EFT Agreements to include debit card transactions as an "item" (referencing "failure to pay 'other items' drawn on [a] checking account"), (Ans., Ex. 5 ¶ 13(b) at p. 5), as well as the No Bounce Advantage disclosure (requesting "check number (if applicable)" concerning an "item" and referencing the "order of item payment" in discussing "electronic transactions") (Second Ollis Aff. Ex. F.) The fact that the Account Agreement Documents do not expressly state that an "item" includes an "electronic debit transaction" does not create ambiguity where, as here, the plain meaning of the term can be discerned by reference to the relevant documents. *See RL Regi N.C., LLC v. Lighthouse Cove, LLC,* 367 N .C. 425, 428, 762 S.E.2d 188, 190 (2014) ("Applying contract principles, we determine the intent of the parties by the plain meaning of the written terms."); *see also Lee v. Scarborough,* 164 N.C.App. 357, 360, 595 S.E.2d 729, 732 (2004) ("[T]he clear intent of the parties as expressed on the face of the contract controls."); *Brawley v. Brawley,* 87 N.C.App. 545, 549, 361 S.E .2d 759, 762 (1987) ("[W]here the language used in the contract is clear and unambiguous, the intention of the parties is to be gathered from the face of the contract.").

**\*6** {29} Having concluded that electronic debit transactions are included within the term "items" under the Terms and Conditions Addendum and the other Account Agreement Documents, the plain language of the Addendum compels the conclusion that the Bank retained the right to pay, and disclosed to the Bank's customers that the Bank would pay, debit transactions in high-to-low order during the time period at issue. (*See* Ans. Ex. 3 ("When processing items drawn on your account, our policy is to pay them according to the dollar amount. We pay the largest items first.").)

{30} The Court finds further support for its reading in the language of the No Bounce Advantage disclosure stating that "[i]n the normal course of business, we generally pay electronic transactions first and then checks beginning with the highest dollar amount, per the bank's policy"[7] and warning customers to "be aware that the order of item payment may create multiple overdrafts during a single banking day for which you will be charged our paid item NSF fee of $33 for each overdraft paid." (Ollis Second Aff. Ex. E) (emphasis added).[8]

{31} When read and considered together, the Court finds that the language describing the payment priority of electronic debit transactions in the Account Agreement Documents generally, and in the Terms and Conditions Addendum specifically, is unambiguous and clearly discloses Defendant's policy to pay electronic transactions before checks, with high-to-low posting, and to permit the assessment of a bank overdraft fee for debit transactions drawn on insufficient funds. Given that the evidence is undisputed that Defendant followed this policy during the relevant time period, the Court concludes that Plaintiff's breach of contract claim on this ground should be dismissed.[9]

b. *Breach of Contract: Chronological or Immediate Posting.*

{32} Next, Plaintiff contends that Defendant breached the terms of the Account Agreement Documents because it did not debit customers' accounts immediately at the time of purchase. Plaintiff offers support for his position by first pointing to a statement in the EFT Agreements that a debit transaction "will constitute a simultaneous withdrawal from and/or demand from your checking account." (Pl.'s Resp. Def.'s Mot. Summ. J., p. 9; Ans. Ex. 5 ¶ 13a.) Plaintiff also points to a statement in the EFT Agreements that the customer "should treat all banking card transactions as immediate withdrawals from [the customer's] account and reflect them

2015 WL 3650090, 2015 NCBC 59

as such in [the customer's] personal records," (Ans.Ex.5) as further evidence that Defendant was obligated to debit a customer's account chronologically or immediately at the time of purchase. (Pl.'s Resp. Def.'s Mot. Summ. J., p. 9.) Plaintiff's argument fails, however, when these statements are considered in context and the EFT Agreements are considered as a whole.

{33} First, the statement advising customers that debit transactions will constitute a simultaneous withdrawal is followed in the very same sentence by the phrase "even though the transaction may not actually be posted to that account," (Ans.Ex.5), negating any obligation of chronological or immediate posting by the Bank. The Court thus does not find support for Plaintiff's contention that "simultaneous withdrawal" in this context means "instantaneous" or "chronological" posting.

*7 {34} Similarly, the admonition that customers "should treat all banking card transactions as immediate withdrawals" is followed later in the EFT Agreements by the customer's express agreement "to assume responsibility for all authorized transactions arising from the use of the ATM or debit card." Not only is the "should treat" language here exhortative and directed to the customer's activities—not the Bank's—but, read in context, is intended to advise the customer that he must keep track of his account activity if he is to avoid overdrafts and overdraft charges. This reading is further supported by the Bank's statement to customers that overdraft services "should not be viewed as an encouragement to overdraw your account," (Ollis Aff. Exs. E–G; Ans. Ex. 7, p. 4), and the Bank's various admonitions in the Account Agreement Documents that the "best way to avoid overdraft fees is to manage your account so you don't overdraw it," "keep track of [the] account balance by entering all items in [a] check register," and reconcile the account regularly. (Ollis Aff. Exs. E–G; Ans. Ex. 7, p. 4.)[10]

{35} Based on the foregoing, the Court concludes that the undisputed evidence of record shows that Defendant did not have an obligation to post debits to customers' accounts chronologically or immediately at the time of purchase under the EFT Agreements or any of the other Account Agreement Documents. As a result, Plaintiff's claim for breach of contract on this basis should be dismissed.

c. *Breach of Contract: Overdraft Charge When Not Overdrawn*

{36} Plaintiff also argues that Defendant did not disclose it would charge overdraft fees when customer accounts had a positive balance and were not overdrawn and that its conduct in doing so breached Defendant's contract with Plaintiff. Plaintiff, however, has presented no evidence from which the Court could conclude that Defendant charged an overdraft fee to Plaintiff's account when Plaintiff's account had a positive balance and was not overdrawn. Indeed, although Plaintiff contends that the monthly account statements he received from the Bank reflect numerous instances of the Bank charging an overdraft fee before his account was actually overdrawn, the undisputed testimony shows that the Bank's monthly statements did not reflect "real-time" posting or set forth a "running balance" on a customer's account, were not intended to communicate specific overdraft information to the Bank's customers, and instead simply listed, by date, all of the transactions that occurred on a customer's account on a given business or banking day. (*See, e.g.,* Ollis Dep. 153, 156–62.) The Bank's policy and practice was to provide a separate Notice of Insufficient Funds document to Plaintiff and other customers to show which specific transactions caused each overdraft charge that had been incurred. (*See, e.g.,* Anthony Wolfe Dep. 208–09.) Plaintiff has not brought forward evidence to rebut or dispute the Bank's contention that it is the Notice of Insufficient Funds document that communicates Plaintiff's account balance at the time an overdraft fee is incurred, nor has Plaintiff presented a Notice of Insufficient Funds document or other evidence that demonstrates that the Bank charged Plaintiff an overdraft fee when his account had a positive balance. As a result, the Court concludes that Plaintiff has failed to bring forward sufficient evidence to sustain his claim for breach of contract on this theory.

*8 {37} Plaintiff also contends that "the Bank grouped together point of sale transactions that occurred on subsequent days with those transactions that occurred on earlier days, and reordered them so that debits were processed before credits and higher debits that occurred on subsequent days were posted to its customers' accounts before lower debits that occurred on earlier days." (Compl.¶ 45.) The evidence is undisputed, however, that when Plaintiff or another customer presented an item for payment without sufficient funds, the Bank's policy and practice was for Bank personnel to decide whether to pay or return the item on the next business or banking day. (Ollis Dep. 163; Def.'s Resp. to Second Set of Interrogs. No. 3.) Thus, the evidence Plaintiff offers in support of his contention—an overdraft item presented on a Friday with the customer's monthly account statement not reflecting

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.126 Filed 10/22/20 Page 52 of 115
Gay v. Peoples Bank, Not Reported in S.E.2d (2015)

2015 WL 3650090, 2015 NCBC 59

an overdraft charge until the following Monday (i.e., the next banking day)—is not an example of the Bank reordering transactions over several days to assess an overdraft fee on what would otherwise be a positive account balance. Rather, Plaintiff's evidence merely reflects the Bank's policy and practice in operation—an overdraft item presented on a Friday with the monthly statement reflecting the Bank's decision on the following Monday to pay the item and assess an overcharge fee. Moreover, the evidence is undisputed that the Bank could only process a customer's debit transactions with a vendor after the Bank received a request for payment from the vendor. Although Plaintiff suggests that the Bank reordered such transactions to assess excessive overdraft fees, it is undisputed that the "delayed" charges Plaintiff identifies resulted from the Bank not receiving a vendor's request for payment until a day or two after the point-of-sale transactions, not because of an attempt to reorder the transactions to create an opportunity to assess fees when no fees could be properly charged. In short, the Notice of Insufficient Funds document makes clear which items caused each overdraft fee, and Plaintiff has failed to show any evidence that the Bank posted debits before credits or charged an overdraft fee on a positive account balance.

{38} Based on the foregoing, the Court concludes that Plaintiff has failed to bring forward evidence to show that Defendant failed to comply with the terms contained in the various disclosures, addendums, and forms that constituted the Account Agreement Documents. Consequently, the Court finds that Plaintiff's claim for breach of contract should be dismissed.

d. *Implied Covenant of Good Faith and Fair Dealing*

{39} North Carolina law provides that in every contract, in addition to its express terms, "there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Governor's Club Inc. v. Governors Club Ltd. P'ship,* 152 N.C.App. 240, 251, 567 S.E.2d 781, 789 (2002) (citation omitted) (internal quotation marks omitted); *see, e.g., Hamm v. Blue Cross & Blue Shield of N.C.,* 2010 NCBC 14 ¶ 80 (N.C .Super.Ct. Aug. 27, 2010), ww w.ncbusinesscourt.net/opinions/2010_NCBC_14.pdf (noting good faith and fair dealing claim "requires the wrongful intent of a party to deprive another party of its contractual rights."). Moreover, our courts have held that "[a] contract ... encompasses not only its express provisions but also all such implied provisions as are necessary to effect the intention of the parties unless express terms prevent such inclusion."

*Lane v. Scarborough,* 284 N.C. 407, 410, 200 S.E.2d 622, 624 (1973); *see, e.g., Maglione v. Aegis Family Health Ctrs.,* 168 N.C.App. 49, 56, 607 S.E.2d 286, 291 (2005) ("In addition to its express terms, a contract contains all terms that are necessarily implied to effect the intention of the parties and which are not in conflict with the express terms.") (quotations and citations omitted).

**\*9** {40} Plaintiff alleges that Defendant breached the covenant of good faith and fair dealing here when it failed to exercise its discretion properly under the Account Agreement Documents in paying transactions or returning them for insufficient funds ("NSF"). Specifically, Plaintiff argues that Defendant should have refused to pay any NSF items and thereby prevented Plaintiff's account from becoming overdrawn and subject to overdraft fees. (Pl.'s Resp. Def.'s Mot. Summ. J., p. 8–9.) The language in the Account Agreement Documents is clear, however, that Defendant was under no obligation to return items NSF and instead had the right to pay or return items in the event of an overdraft in the exercise of its sole discretion. (*See* Ans. Ex. 3 ("If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (NSF).").) Plaintiff's claim therefore asks the Court to impose an implied term—requiring Defendant to always return and not pay NSF items—that is contrary to the express terms of the Account Agreement Documents. This the Court may not do. *See, e.g., Lane,* 284 N.C. at 410, 200 S.E.2d at 624 (implying contract terms only if they do not conflict with express terms); *Maglione,* 168 N.C.App. at 56, 607 S.E.2d at 291 (same).

{41} Moreover, Plaintiff has not brought forward any evidence to suggest that the parties intended that the Bank would always exercise its discretion to refuse to pay NSF items as Plaintiff contends the Bank should have done here. As a result, Plaintiff has failed to show that the implied term Plaintiff argues for "effects the intention of the parties," *Lane,* 284 N.C. at 410, 200 S.E.2d at 624, or otherwise "accomplishes the purposes of the [agreement]," *Maglione,* 168 N.C.App. at 56, 607 S.E.2d at 291 ("All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose.").

{42} Based on the foregoing, the Court concludes that Plaintiff has failed to show that he has been deprived of any rights or benefits under the Account Agreement Documents,

2015 WL 3650090, 2015 NCBC 59

and increased, that Plaintiff's claim for breach of the covenant of good faith and fair dealing should be dismissed. *See, e.g., Governor's Club Inc.,* 152 N.C.App. at 251, 567 S.E.2d at 789; *see also Suntrust Bank v. Bryant/Sutphin Prop., LLC,* 222 N.C.App. 821, 833, 732 S.E .2d 594, 603 (2012) ("As the jury determined that plaintiff did not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts.").

### ii. *Conversion*

{¶43} "[C]onversion is defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.,* 192 N.C.App. 74, 86, 665 S.E.2d 478, 488 (2008) (internal citations omitted). A plaintiff must prove two essential elements to establish a conversion claim under North Carolina law: (1) ownership in the plaintiff, and (2) a wrongful possession or conversion by the defendant. *Id.; Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC,* 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner ... and in consequence it is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from the act." *Lake Mary L.P. v. Johnston,* 145 N.C.App. 525, 532, 551 S.E.2d 546, 552 (2001); *Bartlett Milling Co. L.P. v. Walnut Grove Auction & Realty Co.,* 192 N.C.App. 74, 86, 665 S.E.2d 478, 488 (2008).

**\*10** {¶44} In this case, Plaintiff does not challenge Defendant's general right to charge overdraft fees but nonetheless argues that "Peoples has wrongly collected overdraft fees from Plaintiff" as a result of its manipulation and posting of debit card transactions and continues to exercise "the right of ownership over these funds in hostility to the rights of Plaintiff." (Compl.¶¶ 94–96.) The Court, however, has already concluded that the Account Agreement Documents authorized the Bank to charge overdraft fees to Plaintiff and other Bank customers, Defendant was within its rights to charge overdraft fees based on the high-to-low posting of debits, (Ans.Exs.1–2, 5), and Plaintiff has not shown that Defendant failed to comply with the Account Agreement Documents in assessing overdraft fees against Plaintiff. As a result, the Court concludes that Plaintiff has not brought forward evidence of Defendant's wrongful

possession or conversion of Plaintiff's property, and Plaintiff's conversion claim should therefore be dismissed.

### iii. *Unjust Enrichment*

{¶46} When a party "confers a benefit upon another which is not required by a contract either express or implied or a legal duty, the recipient thereof is often unjustly enriched and will be required to make restitution therefor." *Progressive Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 184 N.C.App. 688, 695–96, 647 S.E.2d 111, 116 (2007). However, "[o]nly in the absence of an express agreement of the parties will courts impose a quasi-contract or a contract implied in law in order to prevent an unjust enrichment." *Paul L. Whitfield, P.A. v. Gilchrist,* 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998); *see, e.g., Booe v. Shadrick,* 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1998) (rejecting unjust enrichment claim and holding that "[i]f there is a contract between the parties, the contract governs the claim and the law will not imply a contract"); *Vetco Concrete Co. v. Troy Lumber Co.,* 256 N.C. 709, 713, 124 S.E.2d 905, 908 (1962) (holding that "[i]t is a [well-established] principle that an express contract precludes an implied contract with reference to the same matter"). Because the Court has concluded that the express terms of the Account Agreement Documents permit Defendant to assess the overdraft fees it charged to Plaintiff here, Plaintiff's unjust enrichment claim must therefore be dismissed.

### iv. *Unfair and Deceptive Trade Practices* N.C. Gen.Stat. §§ 75–1.1, et seq.

{¶46} The issue of whether an act or practice is unfair or deceptive is a question of law for the court. *Songwooyarn Trading Co. v. Sox Eleven, Inc.,* 213 N.C.App. 49, 56, 714 S.E.2d 162, 167 (2011). To prevail on a UDTP claim under N.C. Gen.Stat. § 751.1, Plaintiff must demonstrate: "(1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff or his business." *Dalton v. Camp,* 138 N.C.App. 201, 209, 531 S.E.2d 258, 264, *rev'd on other grounds,* 353 N.C. 647, 548 S.E.2d 704 (2001) (internal citation omitted). " ' A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,' and a 'practice is deceptive if it has the capacity or tendency to deceive.' " *Bumpers v. Cmty. Bank of Va.,* 367 N.C. 81, 91, 747 S.E.2d 220, 228 (2013) (internal citations omitted).

*Gay v. Peoples Bank, Not Reported in S.E.2d (2015)*
Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.128 Filed 10/22/20 Page 54 of 115
2015 WL 3650090, 2015 NCBC 59

**\*11** {¶47} Plaintiff argues that Defendant violated the UDTPA "by misrepresenting to customers that debits were posted chronologically and by victimizing customers to maximize unauthorized fees." (Pl.'s Resp. Def.'s Mot. Summ. J., p. 19.) Plaintiff's claim must be dismissed for at least two reasons.

{¶48} First, it is undisputed that the Bank processed debit transactions in high-to-low priority during the relevant period, and the Court has already concluded that Defendant disclosed to customers in the Account Agreement Documents that the Bank processed large debits first and, in its discretion, assessed overdraft fees for transactions drawn on insufficient funds. Hence, Plaintiff has failed to bring forward evidence showing that Defendant "misrepresent[ed] to customers that debits were posted chronologically" or otherwise engaged in conduct that violated its obligations under the Account Agreement Documents.[11] Noel L. Allen, 1 *North Carolina Unfair Business Practice* § 19.04[2][b] (Matthew Bender 2014) ("Although it may seem obvious, a party's actions that conform with the terms of a contract have not been considered an unfair trade practice."). Further, Plaintiff does not otherwise offer evidence—independent from conduct permitted by contract—to support his claim that Defendant has violated N.C. Gen.Stat. § 75–1.1. *See, e.g., Gaynoe v. First Union Corp.,* 153 N.C.App. 750, 755, 571 S.E.2d 24, 27 (2002) ("Since we have concluded that defendants acted in accordance with the cardholder agreement, a careful review of the record does not establish independent grounds for a [UDTP claim].").

{¶49} Second, while Plaintiff claims Defendant should have declined the transactions that would draw on insufficient funds, the record discloses that Defendant was not obligated to refrain from drawing on insufficient funds in the event of an overdraft, (Ans.Ex.3), and further that Plaintiff was notified of the procedure to remove the overdraft (i.e., "No Bounce") protection from his account, which would have prevented those items from being paid by the Bank, yet never exercised this option. Furthermore, it is certainly relevant that Plaintiff was the purchaser initiating the transactions at issue and the holder and user of his debit card. It cannot be disputed that he was in the best position to prevent items from being paid when there was not enough money in his account to cover them. That Plaintiff failed to manage and reconcile his account to avoid these charges in the circumstances here does not provide grounds for a UDTP claim.

{¶50} For the reasons set forth above, the Court concludes that Plaintiff has not brought forward sufficient evidence to permit his UDTP claim to survive Defendant's motion for summary judgment.

V.

CONCLUSION

{¶51} Based on the foregoing, the Court hereby **GRANTS** Plaintiff's Motion for Permission to File Plaintiff's Supplement, **DENIES** Defendant's Motion to Strike Plaintiff's Supplement, and **GRANTS** Defendant's Motion for Summary Judgment on all claims. Accordingly, Plaintiff's Complaint and all claims contained therein is hereby **DISMISSED** with prejudice.[12]

**\*12** **SO ORDERED.**

**All Citations**

Not Reported in S.E.2d, 2015 WL 3650090, 2015 NCBC 59

---

Footnotes

1    The termination date for the class period appears somewhat unclear and may also be July 2010 or August of 2010. A determination of the end date for the class period is not necessary to resolve Defendant's motion.

2    Although Defendant moved for summary judgment prior to the close of the discovery period, Rule 56 expressly provides that a party may move for summary judgment at any time after the expiration of 30 days from the commencement of the action or after service of motion for summary judgment. N.C. R. Civ. P. 56(a) and Plaintiff has not filed an affidavit as permitted under Rule 56(f) stating that he cannot for reasons stated present by affidavit facts essential to justify his opposition. N.C. R. Civ. P. 56(f). Accordingly, contrary to Plaintiff's contention that Defendant's motion is premature, (Pl.'s Resp. Def.'s Mot. Summ. J.), the Court finds no procedural impediment to its consideration of Defendant's Motion for Summary Judgment on the record here.

3    The No Bounce Advantage Product was marketed to Defendant by Pinnacle Financial Services, Inc. The Pinnacle Plan allows Bank customers to overdraw their accounts. The customer is required to pay fees for excessive overdrafts but

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.129 Filed 10/22/20 Page 55 of 115
Gay v. Peoples Bank, Not Reported in S.E.2d (2015)

2015 WL 3650090, 2015 NCBC 59

benefits from having additional screening power not incurring returned check fees avoiding negative credit history impacts and avoiding embarrassment from dishonored or rejected transactions. Kim Decl. Decl. ¶¶ 00-0. Although Plaintiff argues that Peoples retained Pinnacle to increase revenue dramatically and said Pinnacle is based on additional overdraft fees generated, Pl.s Resp. Decl.s not. Summ. ¶ ¶. there is no evidence that Pinnacle influenced the Bank's decision to post transactions in high-to-low order or that Pinnacle's product controlled the Bank's high-to-low posting. Gillen Decl. ¶¶ 2 2 0.

Defendant typically provides each of these documents to each customer opening an account at the Bank during this same time period. Ellis ¶¶ ¶¶.

In particular defendant has offered the following evidence that was not before Judge Murphy on Defendant's Rule 2 c motion a 200 No Bounce Advantage Brochure and disclosure document undisputed evidence that one of the Terms and Conditions upon which defendant relied on before Judge Murphy in denying defendant's Rule 2 c motion was not implemented until July of 20 and did not apply during the period at issue undisputed affidavit testimony seeking to establish that an approved credit card transaction may not be returned to the Bank. Decl.s Mr. Sum. Not. Summ. ¶¶ ¶¶.

*See also* *Black's Law Dictionary,* th ¶¶ ¶¶¶¶¶¶¶¶ defining item variously as a separate entry in an account or a schedule or a separate particular in an enumeration of a total. ¶¶ *Black's Law Dictionary,* th ¶¶ ¶¶¶¶¶¶¶¶ defining item as a negotiable instrument or a promise or order to pay money handled by a bank for collection or payment. ¶¶

Plaintiff contends that as used here the phrase beginning with the highest dollar amount relates to checks and not to electronic transactions and that at a minimum the sentence creates ambiguity concerning the payment of electronic transactions. Although the use of commas in the sentence could have provided more clarity the Court concludes that the phrase per the Bank's policy removes any ambiguity and makes clear that consistent with the Bank's policy as set out in the Terms and Conditions Defendant the Bank paid electronic transactions first in high-to-low priority.

The Account Agreement Documents do not impose any duty on Defendant to notify a Bank customer before the Bank paid or returned an item.

Although Plaintiff contends that the Bank posted debits before credits and thus acted in breach of the Account Agreement Documents as explained more fully *infra* at ¶¶. ¶¶¶¶¶¶¶¶ Plaintiff fails to identify any competent evidence that would permit a reasonable factfinder to agree with Plaintiff's claim. *See also, e.g.,* Guntch Decl. ¶¶¶¶¶ Guntch ¶¶¶ ¶¶ 2 ¶.

Similarly in addressing Plaintiff's unclean allegations of improper overdraft fees at Peoples Bank the Federal Deposit Insurance Corporation ¶¶¶¶¶ state that in order to assist consumers the ¶¶¶ recommends consumers use a check register to keep a record of all purchases and preauthorized transactions that will be processed through their checking account. Ellis ¶¶ ¶¶ ¶¶.

Although Plaintiff seeks to equate Defendant's actions here with the actions of other banks whose practices have been deemed unlawful the Court finds Plaintiff's comparisons unpersuasive. For example in *Gutierrez v. Wells Fargo Bank, N.A.,* ¶22 F.Su¶¶2¶ ¶¶¶¶¶¶¶¶ N.¶.¶al.200¶ a case relied upon by Plaintiff the Bank's policy unlike defendant's here was to post items presented against the Account in an order the Bank chooses.... Similarly in *Hughes v. TD Bank, N.A.,* ¶¶¶ F.Su¶¶2¶ ¶¶¶¶¶¶¶¶ ¶.N.¶.20¶2 another case relied upon by Plaintiff and again unlike here the Bank informed customers that it may choose our Processing orders in our sole discretion and without notice to you regardless of whether additional fees may result. The Court does not find either case to present circumstances analogous to those here. Moreover it appears undisputed that unlike other banks referenced by Plaintiff Defendant always posted credits to a customer's account before posting debits to that account Guntch Decl. ¶¶¶¶ Guntch ¶¶ ¶¶ 2 ¶ has not commingled transactions to increase overdraft fees Guntch Decl. ¶¶¶¶ Guntch ¶¶¶ ¶¶ ¶¶¶22 and has never subtracted fees before processing a customer's transaction Guntch Decl. ¶¶¶¶.

Defendant also moves for dismissal of Plaintiff's complaint under Rule ¶¶ on grounds of laches and waiver. The Court declines to reach Defendant's arguments in light of the Court's resolution of Defendant's Motion on the grounds stated.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

KeyCite Yellow Flag - Negative Treatment
Distinguished by Brown v. Kruger Family Holdings II, LLC, N.D.Okla.,
August 28, 2019

717 Fed.Appx. 756
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 10th Cir. Rule 32.1.
United States Court of Appeals, Tenth Circuit.

Sarah Lee Gossett PARRISH,
Plaintiff-Appellant,

v.

ARVEST BANK, Defendant-Appellee.

No. 17-6042
|
Filed November 20, 2017

**Synopsis**
**Background:** Customer brought action against bank, on
behalf of herself and all others similarly situated, for actual
fraud, constructive fraud, false representation/deceit, breach
of fiduciary duty, breach of contract, and unjust enrichment,
alleging that bank made false and misleading statements
leading customers to believe their transactions would be
debited chronologically, when they were actually posted
in "batches" by transaction type at end of each business
day, and that this resulted in the assessment of more non-
sufficient funds (NSF) and overdraft (OD) fees. The United
States District Court for the Western District of Oklahoma,
Joe Heaton, J., 2017 WL 5241236, dismissed complaint for
failure to state a claim. Customer appealed.

**Holdings:** The Court of Appeals held that:

[1] bank's statements in electronic fund transfer agreement
and disclosure and in pamphlet regarding how to keep
good bank records did not amount to misrepresentation for
purposes of fraud claim;

[2] customer did not allege a plausible fraud claim
with particularity based on allegedly inaccurate balance

information available to customers through bank's online and
mobile banking platforms;

[3] bank and customer did not have special relationship giving
rise to fiduciary duties under Oklahoma law;

[4] customer's allegations were insufficient to state a claim for
breach of implied covenant of good faith and fair dealing;

[5] customer alleged sufficient facts to plausibly state claim
for breach of contract; and

[6] customer was not entitled to pursue claim for unjust
enrichment under Oklahoma law.

Affirmed in part, reversed in part, and remanded.

West Headnotes (8)

[1]  **Finance, Banking, and Credit** 🔑 Electronic
transactions in general

Bank's statement in electronic fund transfer
agreement and disclosure that "each time"
customer used their debit card, the amount
of the transaction would be debited from the
customer's account, and bank's statements in
pamphlet advising customers to "enter every
transaction as soon as possible" in order to
keep good bank records and telling customers
that check numbers did not always clear in
numerical order or immediately, did not amount
to a misrepresentation by bank that customer's
transactions would be debited chronologically,
when they were actually posted in "batches" by
transaction type at end of each business day, and
thus the statements did not support customer's
fraud claim against bank.

[2]  **Federal Civil Procedure** 🔑 Fraud, mistake
and condition of mind

Bank customer did not allege with
sufficient particularity her reliance on any
misrepresentation by bank suggesting that
customer's transactions would be debited
chronologically, when they were actually posted

in "batches" by transaction type at end of each business day, and thus customer failed to state fraud claim against bank, though customer claimed that bank's actual posting practices resulted in assessment of more non-sufficient funds (NSF) and overdraft (OD) fees; customer failed to show she would have incurred fewer NSF/OD fees had her transactions been posted chronologically, and customer made only broad allegations of reliance. Fed. R. Civ. P. 9(b).

1 Cases that cite this headnote

**[3]  Federal Civil Procedure**  🗝  Fraud, mistake and condition of mind

Bank customer did not allege a plausible fraud claim with particularity against bank based on allegedly inaccurate balance information available to customers through bank's online and mobile banking platforms, though bank's electronic fund transfer agreement and disclosure stated customers could use the online and mobile banking platforms to check their account balances; customer alleged only that she checked her online balance once at some undisclosed point during a weekend, noting her check had not yet cleared, that there were "sufficient funds" in her account at that time, that she decided to delay making deposit, and that check was posted at some point before she put more money in her account on Monday, but did not allege that the check was the only transaction affecting the account. Fed. R. Civ. P. 9(b), 12(b)(6).

**[4]  Finance, Banking, and Credit**  🗝  Electronic transactions in general

Under Oklahoma law, bank's alleged agreement in its electronic fund transfer agreement and disclosure to provide accurate, real-time account balance information through its online and mobile banking platforms did not form a special relationship between bank and customer giving rise to fiduciary duties, and thus bank did not owe fiduciary duty to customer; there was no express written agreement by bank to assume fiduciary duty, and expectation for banks

to provide accurate account information did not transform creditor-debtor relationship to a special relationship. 6 Okla. Stat. Ann. § 425.

**[5]  Finance, Banking, and Credit**  🗝  Electronic transactions in general

Customer's allegations that bank failed to fully inform its customers that it posted transactions in "batches" by transaction type at end of each business day, rather than chronologically, and that bank made misleading statements suggesting that it posted transactions chronologically, were insufficient to state a claim against bank for breach of implied covenant of good faith and fair dealing, where customer did not tether these allegations to anything bank agreed to do, but had not performed in good faith.

1 Cases that cite this headnote

**[6]  Finance, Banking, and Credit**  🗝  Electronic transactions in general

Customer alleged sufficient facts to plausibly state a claim against bank for breach of its electronic fund transfer agreement and disclosure, under which bank stated that customers could use bank's online and mobile banking platforms to check their account balances and the credits and debits that had posted to their accounts; customer alleged that bank displayed inaccurate account balances by not instantaneously processing transfers between accounts, even when it represented through customer's online or mobile account balance it had done so, and that customer overdrew her accounts as a result and incurred unexpected non-sufficient funds (NSF) and overdraft (OD) fees.

**[7]  Implied and Constructive Contracts**  🗝  Unjust enrichment

Bank's allegedly misleading statements in electronic fund transfer agreement and disclosure, and in pamphlet given to customers regarding how to keep good bank records, suggesting that customers' transactions would be

debited chronologically, when they were actually posted in "batches" by transaction type at end of each business day, did not provide basis for unjust enrichment claim by customer against bank under Oklahoma law, given that customer failed to allege a misrepresentation by bank regarding chronological posting.

**[8]** **Implied and Constructive Contracts** 👉 Effect of Express Contract

Under Oklahoma law, bank customer was not entitled to pursue claim for unjust enrichment against bank based on allegedly false account balance information provided through its online and mobile banking platforms, where customer had also asserted a plausible claim for breach of contract against bank and thus had an adequate remedy at law for breach of contract.

3 Cases that cite this headnote

**\*758** (D.C. No. 5:15-CV-00913-HE) (W.D. Oklahoma)

**Attorneys and Law Firms**

Matthew W. Brockman, William Alan Johnson, Drew Neville, Jr., Elizabeth A. Price, Hartzog Conger Cason & Neville, Oklahoma City, OK, for Plaintiff-Appellant

Michael Avery, Spencer F. Smith, McAfee & Taft, Oklahoma City, OK, Gregory Carl Cook, Adam K. Israel, Balch & Bingham, Birmingham, AL, John A. Kenney, McAfee & Taft, Tulsa, OK, for Defendant-Appellee

Before BRISCOE, O'BRIEN, and BACHARACH, Circuit Judges.

**ORDER AND JUDGMENT**[*]

Terrence L. O'Brien, Circuit Judge

Sarah Lee Gossett Parrish appeals from the dismissal of her second amended class action complaint ("Complaint") for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.

**I. Background**

Parrish filed her Complaint against Arvest Bank on behalf of herself and all others similarly situated. She included claims for actual fraud, constructive fraud, false representation/deceit, breach of fiduciary duty, breach of contract, and unjust enrichment. In support of her fraud claims, she alleges Arvest made false or misleading statements in its Electronic Fund Transfer Agreement and Disclosure ("EFTA") and in certain marketing materials, which led customers to believe their transactions would be debited chronologically, i.e., in the order transactions are initiated (or in the case of checks, in the order they are presented). But, and contrary to the misrepresentations, Arvest actually posts all transactions in "batches" by transaction type at the end of each business day. She claims the batching process manipulates the posting order of transactions to maximize the number of insufficient funds and overdraft fees ("NSF/OD Fees") it imposes on customers. More specifically, she alleges the batching causes transactions to be posted in the following order: POS transactions,[1] other debit transactions, check transactions, **\*759** ACH transactions,[2] and other types of transactions. Moreover, she claims transactions of the same type are not necessarily posted in chronological order within a batch.

In sum, Parrish claims Arvest's false and misleading statements regarding the chronological posting of transactions leaves its customers unable to determine (before initiating and completing a transaction) whether it will result in an NSF/OD Fee. She alleges generally that Arvest assessed one or more NSF/OD Fees on multiple occasions when her check register showed a positive balance, and she claims she would have incurred fewer NSF/OD Fees on other occasions had Arvest posted her transactions chronologically.

She also alleges fraud based on the account information Arvest displays via its online and mobile banking platforms, in which it misrepresents customers' account balances to be accurate, "real-time" balances, when they are actually inaccurate, "false" balances because of Arvest's posting process. She claims to have relied on inaccurate account balances in initiating and completing transactions and, as a result, incurred unexpected NSF/OD Fees.[3]

In addition to her fraud claims, Parrish alleges claims for breach of fiduciary duty, breach of the EFTA, and unjust enrichment based on the same factual allegations.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The district judge decided Parrish's Complaint fails to state a claim under Rule 12(b)(6) because: 1) her fraud claims do not allege with particularity any misrepresentation by Arvest that it posts transactions instantaneously or in chronological order; 2) the facts she alleges in her fiduciary duty claim do not support a fiduciary relationship between Arvest and its customers; 3) her breach-of-contract claim is infirm because Arvest did not promise in the EFTA to provide account balances reflecting instantaneous posting, and she does not adequately plead facts supporting her general allegation that Arvest breached the implied covenant of good faith and fair dealing; and 4) her unjust enrichment claim does not state a plausible basis to infer that Arvest's conduct was unfair, unconscionable, and oppressive.

## II. Discussion

We review de novo the dismissal of a complaint for failure to state a claim under Rule 12(b)(6). *George v. Urban Settlement Serv.*, 833 F.3d 1242, 1247 (10th Cir. 2016). "We accept a plaintiff's well-pleaded factual allegations as true and determine whether the plaintiff has provided enough facts to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "[A] claim is facially plausible if the plaintiff has pled factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation and internal **\*760** quotation marks omitted). A putative class action complaint should be dismissed if the named plaintiff's individual claims fail to state a claim for relief. *See Robey v. Shapiro, Marianos & Cejda, L.L.C.*, 434 F.3d 1208, 1213 (10th Cir. 2006) (holding class-action allegations were properly dismissed where plaintiff failed to state a claim on his own behalf).

### A. Fraud Claims

A stricter pleading standard applies to Parrish's fraud claims. Under Fed. R. Civ. P. 9(b), "a party must state with particularity the circumstances constituting fraud .... Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." "More specifically, this court requires a complaint alleging fraud to set forth the time,

place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000).

### 1. Alleged Misrepresentations Regarding Chronological Processing of Transactions

[1] Parrish does not claim Arvest explicitly stated that it posts transactions chronologically, rather that it made misleading statements in the EFTA and in certain marketing materials, which created the false impression it does so, when in fact it does not—it batch posts transactions at the end of each business day.

She first points to the following statement in the EFTA: "Each time you use your CheckCard, the amount of the transaction will be debited from your designated account." Aplt. App., Vol. 2 at 252. Emphasizing the words "each time," she alleges that, although this statement "may or may not imply that the posting will be instantaneous, it clearly does imply that transactions will be debited in the order in which they occur." *Id.* at 240. Moreover, she says, Arvest reinforced this implication in a pamphlet titled "How to Keep Good Bank Records" by advising customers to "enter every transaction as soon as possible." *Id.* at 230 (internal quotation marks omitted). She alleges that, by specifically telling customers "Check numbers do not always clear in numerical order or immediately," *id.* at 230-31 (internal quotation marks omitted), the pamphlet suggests other transactions do post chronologically.

The district judge concluded the statement in the EFTA about accounts being debited "each time" a customer uses a debit card "does not say or imply that the posting will be instantaneous," nor does the pamphlet suggest that non-check transactions are posted immediately or chronologically. *Id.* at 371. Parrish complains that the judge failed to view the facts she alleged in the light most favorable to her position and did not address her contention regarding chronological (as opposed to immediate) posting. When considered together, she urges, the EFTA and the pamphlet create a false impression that customers' accounts are debited in the order their transactions occur.

Arvest contends its "each time" statement in the EFTA addresses only the mechanics of how a CheckCard works, i.e., indicating that each POS transaction will result in a debit to

the customer's account. It points to language in the pamphlet telling customers, "The debit card purchase amount may show one day as verification and then will be processed as the actual purchase amount in one or more days and they may not be the same amount." *Id.* at 289.[4]

**\*761** The district judge is correct: Parrish fails to allege a misrepresentation by Arvest. Her fraud allegations do not plausibly show what she claims: that the EFTA or the pamphlet actually represents that CheckCard or other transactions will be posted in chronological order. Her allegations are, at best, "merely consistent with" her claim that Arvest made false representations. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (internal quotation marks omitted). That is not enough and our saying so does not merely choose one plausible interpretation over another. Arguments about plausibility must be rationally based; they are not all equally meritorious.

Parrish relies heavily on *Gutierrez v. Wells Fargo Bank, NA, 704 F.3d 712, 730 (9th Cir. 2012)*, in which the Ninth Circuit affirmed a holding that Wells Fargo violated California's unfair competition law "by making misleading statements likely to deceive its customers." We do not see the facts in *Gutierrez* as sufficiently similar to those presented here. There Wells Fargo posted debit-card purchases in the order of highest to lowest dollar amount, which increased the number of NSF/OD Fees customers incurred. *See id.* at 716-17.[5] But contrary to its actual practice, Wells Fargo explicitly told customers in marketing materials that check card transactions "generally reduce the balance in your account immediately," "the money comes right out of your checking account the minute you use your debit-card," and POS purchases are deducted "immediately" or "automatically" from a customer's account. *Id.* at 729 (internal quotation marks omitted).

As Parrish readily acknowledges, she does not allege any such explicit representations by Arvest in the EFTA or the pamphlet regarding chronological posting. She nonetheless points to allegations in her Complaint similar to the facts recited in *Gutierrez*, in particular Arvest's display of transactions in chronological order via its online and mobile banking platforms and its advice to customers to maintain accurate check registers. In *Gutierrez*, the district judge found similar practices to have bolstered Wells Fargo's numerous explicit statements regarding immediate debiting of transactions. *See Gutierrez v. Wells Fargo Bank, N.A., 730 F.Supp.2d 1080, 1117 (N.D. Cal. 2010), aff'd in part*

*and rev'd in part by Gutierrez*, 704 F.3d at 730. But it did not rely on these practices alone in finding that Wells Fargo had "promoted a false perception that debit-card purchases would be deducted from [customers'] accounts in the order transacted." *Id.*; *see also id.* at 1116-17 (listing numerous explicit statements by Wells Fargo regarding immediate balance reductions).

**[2]** Moreover, Parrish also fails to allege facts demonstrating her reliance on **\*762** any misrepresentation by Arvest regarding chronological posting. Under Rule 9(b), she must allege with particularity the "consequences" of Arvest's false statements. *Koch*, 203 F.3d at 1236; *see also George, 833 F.3d at 1256* (holding allegations "identify[ing] the actions the plaintiffs took in reliance on [the] misrepresentations, [and] detail[ing] the injuries they suffered as a result" were sufficient to satisfy Rule 9(b)).

Here, she alleges only two specific instances in which she incurred unexpected NSF/OD Fees on her Arvest accounts. Her allegations regarding transactions on July 2-3, 2012, fail to show she would have incurred fewer fees had her transactions been posted chronologically. *See Aplt. App., Vol. 2 at 232-34*. Parrish now maintains these allegations are not intended to demonstrate her reliance. *See Aplt. Reply Br. at 4*. That leaves her allegations regarding an NSF/OD Fee she incurred on July 13, 2015. But these allegations also do not relate to Parrish's claim of reliance on chronological posting of transactions. *See Aplt. App., Vol. 2 at 236-37*. Nor are her other broad allegations regarding her reliance sufficient to satisfy Rule 9(b). *See Koch*, 203 F.3d at 1236-37 (affirming dismissal of fraud claims based on broad allegations that "set forth none of the specific and required allegations," *id.* at 1237).

## 2. Alleged Inaccurate and Unreliable Account Balances

**[3]** Parrish also attempts to allege a fraud claim related to the account balance information available to customers through Arvest's online and mobile banking platforms. She alleges she believed, due to Arvest's misrepresentations, that it provided "real-time account balances" through these services. Aplt. App., Vol. 2 at 236. Parrish claims she initiated and completed transactions in reliance on these account balances, incurring unexpected NSF/OD Fees as a result.

To the extent she relies on alleged misrepresentations by Arvest regarding chronological posting, this claim fails for

the reasons explained above. But Parrish also points to the following language in the EFTA:

> ONLINE & MOBILE BANKING—You may use your access code to perform the following functions through our internet banking or mobile banking solutions:
>
> - Initiate transfers of funds between your Arvest Bank accounts.
>
> - Check your Arvest Bank account balance(s), and the credits and debits that have posted to your accounts.

*Id.* at 252. She argues Arvest misrepresents through this language that it displays accurate account balances via its online and mobile banking systems when in fact it does not.

Once again, Parrish must allege a plausible fraud claim with particularity. According to the Complaint:

> [O]n July 8, 2015, Parrish mistakenly wrote a check from her bank account ending in 9398, believing she had done so from a different account. When she realized her error over the weekend, Parrish checked the balance reflected on Arvest's online banking system. It reflected that the check had not processed and there were sufficient funds in the account. Parrish relied on this representation, which ultimately proved to be false, and waited until the following Monday morning to deposit additional funds in the account. On Monday, July 13, 2015, Arvest's online banking system indicated that Arvest had in fact processed and posted the check prior to Parrish's deposit, contrary to the representation upon which Parrish relied over **\*763** the weekend. As a result of this reliance, Parrish incurred an unexpected NSF/OD Fee.

*Id.* at 236-37. These fraud allegations do not survive a motion to dismiss. Parrish claims she checked her online balance once at some undisclosed point during a weekend, noting her check had not yet cleared. She alleges vaguely there were "sufficient funds" in her account at that time, but she does not say her check was the only transaction affecting the account. She states that she decided to delay—not forgo—making a deposit. Ultimately, Parrish fails to explain how Arvest's posting of her check at some point before she put more money in her account on the following Monday demonstrates that the online balance Arvest displayed over the weekend was "false" at that time. Parrish's allegations do not allege with specificity a plausible fraud claim against Arvest.

We affirm the district judge's dismissal of Parrish's fraud claims. She did not "nudge[ ]" these claims "across the line

from conceivable to plausible." *Iqbal*, 556 U.S. at 680, 129 S.Ct. 1937 (internal quotation marks omitted).[6]

### B. Breach of Fiduciary Duty

**[4]** Under Oklahoma law, a bank does not owe its customers fiduciary duties absent a written agreement:

> Unless a state or national bank shall have expressly agreed in writing to assume special or fiduciary duties or obligations, no such duties or obligations will be imposed on the bank with respect to a depositor of the bank ... and no special or fiduciary relationship shall be deemed to exist.

Okla. Stat. tit. 6, § 425. Parrish's breach-of-fiduciary-duty claim was dismissed because she failed to allege an express written agreement to assume such duties. The judge also held her allegation of a special relationship between Arvest and its customers—based on Arvest's superior knowledge of its posting processes and its customers' lack of sophistication— failed as a matter of law. *See First Nat'l Bank & Tr. Co. of Vinita v. Kissee*, 859 P.2d 502, 510-11 (Okla. 1993).

In support of her fiduciary duty argument Parrish points to Arvest's agreement in the EFTA to provide accurate, real-time account balance information through its online and mobile banking platforms. Banks have always been expected to provide accurate account information, but that does not transform a creditor-debtor relationship between a bank and its customers into a special relationship giving rise to fiduciary duties, and we fail to see how the offering of what has now become routine banking services will do so. Parrish has offered no contrary authority. We see no error.

### C. Breach of Contract

**[5]** Parrish initially contends her Complaint states a claim for breach of the implied covenant of good faith and fair dealing. She cites cases in which other courts have refused to dismiss implied-covenant claims with fact patterns similar to those she has alleged. In particular, she notes her allegations regarding Arvest's posting process, its failure to fully inform customers regarding that process, and its misleading statements regarding chronological posting. But she does not tether **\*764** these allegations to anything Arvest agreed to do, but has not performed in good faith. In the cases she relies on, the plaintiffs alleged that banks failed to exercise good faith in performing express contractual terms granting them discretion to post transactions in any order. *See, e.g., In re Checking Account Overdraft Litig.*, 694 F.Supp.2d 1302, 1314-16 (S.D. Fla. 2010). Since she does not

point to any similar allegation in her Complaint she fails to demonstrate how the district judge erred in concluding her general allegation regarding Arvest's breach of the implied covenant is insufficient to state a claim under Rule 12(b)(6).

**[6]** Parrish also alleges Arvest breached its agreement in the EFTA to provide accurate and reliable account balance information via its online and mobile banking platforms. As noted above, the EFTA provides that, via these systems, customers can initiate transfers between their Arvest accounts, as well as check their "account balance(s), and the credits and debits that have posted to [their] accounts." Aplt. App., Vol. 2 at 252. She construes this language as an agreement to provide current, real-time balance information, which she claims Arvest breached by displaying inaccurate account balances. By example, she alleges that Arvest does not instantaneously process transfers between Arvest accounts, even when it represents through a customer's online or mobile account balance it has done so. *See id.* at 236. And she claims to have relied on that inaccurate online and mobile account balance information in initiating and completing transactions. As a result, she overdrew her accounts and incurred unexpected NSF/OD Fees.

In dismissing this claim, the district judge incorporated the following reasoning from a previous dismissal order:

> The complaint asserts that Arvest breached the [EFTA] by providing inaccurate account balances, but it is not apparent what makes the balances inaccurate. Plaintiff's argument is essentially that an "accurate" balance is only one which reflects instantaneous posting of transactions. But the agreement promises no such thing and there is no apparent reason for concluding that transactions posted by size or some other batching process result in balances that are other than "accurate" for purposes of the agreement. Aplt. App., Vol. 1 at 220.

But the EFTA tells customers they can use Arvest's online and mobile banking platforms to check their account balances and the credits and debits *that have posted to* their accounts. Parrish alleges, to the contrary, that account information Arvest makes available through its online and mobile banking platforms does not accurately reflect actual account balances. Her example of Arvest not carrying out an intra-bank transfer, while displaying the transfer as completed, illustrates how an online or mobile banking account balance could be inaccurate. Unlike her fraud claims, Parrish was not required to plead this claim with particularity. And her allegations are not, as Arvest maintains, merely conclusory. Accepting

her allegations as true and construing them in a light most favorable to her, she has alleged enough facts to plausibly state a facially valid claim to relief.

Arvest asserts the form agreements governing Parrish's use of its online and mobile banking platforms do not warrant these systems as error free and also disclaim liability for customers' reliance upon them. But Parrish's claim is based on the EFTA, which she attached to her complaint. She does not rely on or attach the other agreements Arvest cites. We do not **\*765** consider these other agreements because "[o]ur role is to assess whether the plaintiff's complaint alone is legally sufficient to state a claim upon which relief may be granted." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 713 (10th Cir. 2006).

We affirm the district judge's dismissal of Parrish's claim asserting breach of the implied covenant of good faith and fair dealing, but reverse its dismissal of her claim asserting Arvest breached the EFTA by providing inaccurate account balance information to customers through its online and mobile banking platforms.

### D. Unjust Enrichment

**[7]** Parrish asserts an unjust-enrichment claim as an alternative to her breach-of-contract claim. She first maintains this claim is based upon Arvest's alleged misrepresentations regarding chronological posting of transactions and the resulting increase in NSF/OD Fees Arvest imposes. Because she fails to allege a misrepresentation by Arvest regarding chronological posting, these allegations do not support a claim for unjust enrichment.

**[8]** Parrish also asserts her unjust-enrichment claim is based on the allegedly false account balance information Arvest provides through its online and mobile banking platforms. We have affirmed dismissal of her fraud claim based on these allegations because she did not plead with particularity any false account balance information pertaining to her own accounts. But we have reversed the dismissal of Parrish's breach-of-contract claim based on inaccurate balance information displayed via Arvest's online or mobile banking systems. Under Oklahoma law, Arvest says, quasi-contractual remedies such as unjust enrichment are not available where an enforceable contract governs the parties' relationship. Parrish does not address this contention in her reply brief.

In Oklahoma "a party is not entitled to pursue a claim for unjust enrichment when it has an adequate remedy at law for breach of contract." *Am. Biomedical Grp., Inc. v Techtrol, Inc.* 374 P.3d 820, 828 (Okla. 2016).[7] We have cited "the hornbook rule that quasi-contractual remedies ... are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue." *Member Serv. Life Ins. Co. v. Am. Nat'l Bank & Tr. Co. of Sapulpa*, 130 F.3d 950, 957 (10th Cir. 1997) (citing 1 Joseph M. Perillo, Corbin on Contracts § 1.20 (rev. ed. 1993)). We applied this rule in a case where the plaintiff tried to allege an unjust-enrichment claim to recover unpaid royalties. *See Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1107-09 (10th Cir. 2005). We affirmed a summary judgment because "the claim for unpaid royalties is grounded in the

parties' contractual relationship." *Id.* at 1117. Parrish presents no argument as to why this rule does not bar her unjust-enrichment claim. We therefore affirm the dismissal of her claim on that basis.

### III. Conclusion

The district court's judgment is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this order and judgment.

### All Citations

717 Fed.Appx. 756

## Footnotes

* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

1 According to the EFTA, which Parrish attached to her Complaint, POS stands for "Point-of-Sale." Aplt. App., Vol. 2 at 251. A POS transaction occurs when a customer uses a CheckCard to purchase goods and services from a participating merchant. *See id.*

2 ACH stands for "Automated Clearing House," a network through which bank customers can pay certain bills electronically. Aplt. App., Vol. 2 at 252.

3 Parrish clarifies that her fraud claims "do not challenge Arvest's chosen posting order, nor do they attempt to require Arvest to make particular disclosures to its customers." Aplt. Reply Br. at 11.

4 Although Parrish did not attach a copy of the pamphlet to the Complaint, she did refer to it and the document is central to her fraud claims. Because Parrish has not disputed the authenticity of the pamphlet document Arvest submitted with its motion to dismiss, we consider that document as part of Parrish's Complaint. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

5 In striking contrast, Parrish does not allege Arvest posts debit-card transactions in high-to-low order. She does claim check transactions have a higher median transaction value than ACH transactions, and that Arvest batch posts checks before ACH transactions. But she also alleges that Arvest posts POS and other types of debit transactions first, and she does not claim these types of transactions have a higher median transaction value than check or ACH transactions.

6 Parrish's constructive fraud claim fails for the same reasons as her other fraud claims. Moreover, she does not allege facts supporting her two theories why Arvest had a duty to disclose information about its posting practices. She alleges no partial, misleading disclosure by Arvest giving rise to a duty to speak. Nor, as we explain next, does she allege facts supporting a finding that Arvest has a fiduciary relationship with its customers.

7 This rule does not apply when a party is seeking to rescind the contract, *see Roberson v. PaineWebber, Inc.*, 998 P.2d 193, 200 (Okla. Civ. App. 1999), but Parrish does not seek to rescind the EFTA.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

2019 WL 2056702

2019 WL 2056702
Only the Westlaw citation is currently available.
United States District Court, W.D.
Michigan, Southern Division.

S.D. BENNER, LLC, et al., Plaintiffs,

v.

BRADLEY COMPANY, LLC, Defendant.

Case No. 1:15-cv-673
|
Signed 03/29/2019

**Attorneys and Law Firms**

Charles Christopher Newberg, Rodenhouse Kuipers, Grand Rapids, MI, for Plaintiffs.

Scott R. Murphy, Barnes & Thornburg LLP, Grand Rapids, MI, for Defendant.

**OPINION AND ORDER**

PHILLIP J. GREEN, United States Magistrate Judge

 **\*1** This is a civil action brought by S.D. Benner, LLC, and S.D. Benner III, LLC, against Bradley Company, LLC, on the following claims under Michigan law: breach of contract, five breach of fiduciary duties claims under Mich. Comp. Laws § 339.2512d(2), and one claim labeled "Mental Anguish."[1] (Am. Compl., ECF No. 6).

The matter is now before the Court on defendant's motion for summary judgment. (ECF No. 105). Plaintiff opposes the motion. (ECF No. 109). Defendant filed a reply brief. (ECF No. 112). For the reasons set forth herein, defendant's motion will be granted and a separate judgment will be entered in defendant's favor on all plaintiffs' claims.

**Applicable Standards**

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016). The standard

for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Rocheleau v. Elder Living Const.*, LLC, 814 F.3d 398, 400 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) ). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *France v. Lucas*, 836 F.3d 612, 624 (6th Cir. 2016).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. *See Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990); *See Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 533 (6th Cir. 2012). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].' " *Dominguez v. Corr. Med. Serves.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *See Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018).

**Facts**

 **\*2** The plaintiffs in this lawsuit are S.D. Benner, LLC (Benner), and S.D. Benner III, LLC (Benner III). Steven Benner is the sole member of Benner and Benner III. (Benner Aff. ¶ 3, ECF No. 109-1, PageID.693; Benner Dep., 6-9; ECF No. 109-6, PageID.832-33). But he is not a party to this lawsuit.

2019 WL 2056702

### A. Chapter Eleven Bankruptcies

On July 29, 2011, Benner and Benner III filed for Chapter Eleven bankruptcy protection in the United States Bankruptcy Court for the Western District of Michigan.[2] (Benner Aff. ¶ 4, PageID.693; Benner Dep., 9-10, PageID.833). Benner and Benner III were in default with their primary creditor, Comerica Bank (Comerica), and they were at risk of losing the 22 properties securing Comerica's loan of approximately $22 million. (Benner Aff. ¶¶ 3-4, PageID.693; Benner Dep., 9-16, PageID.833-34).

Before seeking bankruptcy protection, plaintiffs made unsuccessful attempts to obtain refinancing to pay the debt owed to Comerica. (Benner Dep., 23-24, 101, PageID.836, 856). Mr. Benner and plaintiffs continued to seek refinancing during the years the bankruptcy cases were pending. (*Id.* at 25-26, 59-63, 96, 100-01, 142-49, PageID.837, 845-46, 854-56, 866-68).

As part of the bankruptcy cases, plaintiffs made various public filings listing their assets, debts, and secured and unsecured creditors. Plaintiffs also periodically filed statements of financial affairs and operating reports reflecting their tenants, and income and expense information related to various properties. (Smoke Aff. ¶ 9, ECF No. 106-14, PageID.612). Further, as part of the reorganization plans in bankruptcy, Benner and Benner III agreed to list properties for sale. Mr. Benner testified that Comerica had authority to approve the broker, and that it encouraged him to select Signature Associates. (Benner Dep., 18-22, 69, PageID.835-36, 848).

On February 29, 2012, Mr. Benner sent an email to John Mundell, a licensed commercial real estate broker and partner at Signature Associates, asking if Mr. Mundell was able to send him a copy of a broker opinion of value (BOV). (ECF No. 109-2, PageID.705; Mundell Dep., 9-11, ECF No. 109-5, PageID.758-59). Mr. Benner asked for this information to have some basis for discussing the potential for refinancing with lenders other than Comerica. (Benner Dep., 59-62, PageID.845-46). Comerica permitted Mr. Benner to obtain a copy of the BOV from Mr. Mundell. (Benner Aff. ¶ 10, PageID.694; Benner Dep., 181-82, PageID.876). Mr. Mundell did not create the BOV. It was created by "someone else" at Signature Associates. (ECF No. 109-3, PageID.707-29; Mundell Dep., 12-20, PageID.759-61).

On March 19, 2012, Mr. Mundell sent Mr. Benner a copy of the BOV. He emphasized that it was not an appraisal:

[W]e have offered this market analysis and opinion of value for the purpose of potentially earning future brokerage business. We have not been compensated for this work and are not licensed appraisers. We highly recommend that you consider hiring a professional commercial appraiser to provide such service. This email is intended for your information and is not for other parties to rely on for valuation purposes.

**\*3** (ECF No. 109-3, PageID.707).

Benner and Benner III entered into listing agreements with Signature Associates for the sale of ten properties subject to Comerica's secured interest. These listings were in effect from April 19, 2013, through September 30, 2013. Mr. Benner came up with the listing prices. None of the properties were sold during the term of the listing agreements with Signature Associates. Signature Associates attempted to renew the listing agreements after they had expired, but Mr. Benner did not respond to its emails or phone calls. (Benner Aff. ¶ 16, PageID.695; ECF No. 109-4, PageID.731-53; Mundell Dep., 20-33, PageID.761-64; Benner Dep., 78-81, PageID.850-51).

### B. Comerica's Motions to Convert to Chapter Seven Liquidations

On February 4, 2014, Comerica filed its motions to convert the Chapter Eleven reorganization cases into Chapter Seven liquidation cases. Comerica indicated that Benner and Benner III owed it approximately $23 million.

On January 23, 2013, the bankruptcy court confirmed Benner and Benner III's sixth amended reorganization plans. Comerica's motions requesting conversions to Chapter Seven liquidations indicated that Benner and Benner III had committed numerous defaults. For example, a key provision of the reorganization plans was an agreement that the debtors' management company would employ an outside accounting professional upon whom Comerica and the bankruptcy trustee could rely on for unbiased and accurate financial figures. John Huizinga, CPA, was hired, terminated in the summer of 2013, and then rehired after Comerica sent plaintiffs an August 30, 2013, notice that terminating the accountant constituted a default under the reorganization plans. On December 3, 2013, Benner, Benner III, and their management company terminated Mr. Huizinga's employment for a second time and attempted to conceal that termination from Comerica. On February 18, 2014, United States Bankruptcy Judge Scott Dales entered an order setting a one-day trial on April 28,

S.D. Benner, LLC v. Bradley Company, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 2056702

2015, on Comerica's motion to convert the Chapter Eleven reorganization cases into a Chapter Seven liquidation.

### C. Bradley Company, LLC

Mr. Mundell accepted a position with Bradley Company, LLC, in January 2014. (Mundell Dep., 11, 33-36, 180-84, PageID.759, 764-65, 801-02). Bradley Company performs various commercial real estate brokerage services in multiple markets in Indiana and Michigan. (O'Dowd Aff. ¶ 3, ECF No. 106-15, PageID.617; ECF No. 109-28, PageID.1376; Toothaker Dep., 4, 12, ECF No. 109-25, PageID.1311, 1313). Bradley Toothaker is the majority owner of the company. (Toothaker Dep., 3-4, PageID.1311).

Mr. Mundell met Mr. Benner on March 30, 2014. According to Mr. Benner, they discussed brokerage listing agreements, bankruptcy proceedings, and the possibility of obtaining financing to pay off the debt Mr. Benner's companies owed Comerica. (Benner Aff. ¶¶ 19-22, PageID.696). Mr. Benner testified that he brought to this meeting rent rolls, income and expense statements for three years, possibly some leases, and pictures of properties. (Benner Dep., 95, 178-79, PageID.854, 875). He testified that in the bankruptcy proceedings Benner and Benner III filed income reports, rent rolls, and financial statements. These public records were updated during the years the bankruptcy cases were pending. (Id. at 103-04, PageID.856).

**\*4** On March 30, 2014, at 2:08 p.m., Mr. Benner sent an email to Mr. Mundell. The subject line was labeled "Refinance Package for 20.8 million Dollar Loan-1." The body of the email was a form letter describing a refinancing package for ten commercial properties. It did not mention the ongoing bankruptcy proceedings. (ECF No. 109-8, PageID.907). The attached documents were labeled as "United Developers Refinance Portfolio Package # 1," and they likewise contained no reference to the bankruptcy cases. (Id. at PageID.909-47).

Mr. Mundell initially testified that he forwarded this information to Bryse Toothaker at Great Lakes Capital.[3] (Mundell Dep., 48-56, PageID.768-70). He later corrected his testimony to indicate that he forwarded the information to Bryse Toothaker at Bradley Company. (Id. at 101-02, PageID.781). Bryse Toothaker was employed by Bradley Company, not Great Lakes Capital. (ECF No. 109-29, PageID.1379). Bradley Capital Markets was a subsidiary of Bradley Company formed by Bryse Toothaker and Andy

Martin. It was formed to match debt sources with potential investment sales transactions. (Id. at PageID.1377). Bryse Toothaker was a director at Great Lakes Capital. (ECF No. 109-29, PageID.1413; ECF No. 109-30, PageID.1418).

On March 30, 2014, at 2:15 p.m., Mr. Benner sent an email to Mr. Mundell with the subject line "Orchard Village Joint Venture Partnership Opportunity." The body of the email was a form letter indicating that Mr. Benner had received someone's "request from Loopnet" regarding the Orchard Village development. (ECF No. 109-9, PageID.949; ECF No. 109-11, PageID.1010). Attached were various papers regarding the Village at Knapp's Crossing. These papers identified Anthony Coriano as the broker, and again, the papers made no reference to the bankruptcy proceedings. (ECF No. 109-9, PageID.949-1005; ECF No. 109-11, PageID.1012-66). On March 31, 2014, Mr. Mundell sent an email to Mr. Benner stating that he was working his way through the information and indicated that he would "get paperwork ASAP." (ECF No. 109-10, PageID.1007).

On April 1, 2014, Mr. Benner sent an email to Mr. Mundell thanking him for sending him listing agreements, and he indicated that he would be going through the agreements and then returning them to Mr. Mundell. Mr. Benner also made the following inquiry:

> Wanted to see if you talked to your main office in [S]outh Bend if they can help me and ca[n] get the refinancing done on my Comerica Portfolio by April 29, 2014[,] and if so what are the next steps for getting it done and in exchange I would do listing agreements on all spaces for lease within the refinanced portfolio for the length of the loan which will give a lot of your new sales people something to do as they enter the marketplace with your company.

(ECF No. 109-12, PageID.1068).

On April 3, 2014, Mr. Mundell sent an email to Mr. Benner. It stated: "Great Lakes Capital and Bradley Capital Market [were] working to get a refinance purchase option together. Can you please provide me an update on the listings?" (ECF No. 109-13, PageID.1070). Mr. Benner indicated that he had conversations with Mr. Mundell, but Mr. Mundell never provided any type of documentation regarding refinancing, and plaintiffs never received a commitment to provide refinancing. (Benner Dep., 29-30, 155, PageID.838, 869). Great Lakes Capital never agreed to provide financing to Benner or Benner III. (Smoke Aff. ¶¶ 13-15, ECF No. 106-14, PageID.613).

S.D. Benner, LLC v. Bradley Company, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 2056702

### D. Broker Agreements for Sales

**\*5** On April 9, 2014, Benner entered into six Broker Agreements for Sales with Bradley Company regarding seven properties.[4] (*See* Exhibit A attached). The listing contracts stated that Bradley Company would be paid a six percent brokerage fee on the date of each sale closing. The company agreed to list the properties on the Multiple Listing Service (MLS), and to use its "best effort" to find a buyer. (ECF No. 106-4, PageID.527, 529, 531, 533, 535, 537; ECF No. 109-14, PageID.1076, 1078, 1080, 1082, 1084, 1086). Benner in turn agreed that, in the event of a sale, it would provide a title insurance policy and convey by warranty deed good and marketable title to the premises to the buyer.[5] (*Id.*).

The listing contracts contain a provision regarding confidential information:

> [Bradley Company] acknowledges that [Benner] may disclose confidential information to [Bradley Company] in connection with the performance of services under this Agreement, and the [Bradley Company] agrees to preserve such information in confidence and not to disclose any such information to the detriment of the [Benner] in connection with any transaction described herein.

(ECF No. 106-4, PageID.528, 530, 532, 534, 536, 538; ECF No. 109-14, PageID.1077, 1079, 1081, 1083, 1087, 1087).

Every agreement specified that it was "governed by Michigan law" and contained the following integration clause:

> This contract contains all the terms and conditions of the Agreement between the parties with respect to the subject matter, and there are no representations, warranties, conditions, or promises except those expressly set forth in this contract. This contract may be modified only by a writing signed by the parties.

(*Id.*).

Mr. Mundell summarized defendant's efforts to sell the properties as follows:

> We received a listing, we process it within the Board of Association of Realtors, which is quite a bit of additional paperwork, the details of each property. We created specific fliers. We had signs made that were specific to the properties that we were allowed to put signs up. We made contact with neighbors or likely candidates for lease and or sale, depending on our role. So, very traditional brokerage process.

(Mundell Dep., 104, ECF No. 109-5, PageID.782).

All the properties were listed for sale on the MLS for the Commercial Alliance of Realtors for West Michigan (CARWM), Loopnet, and the Indiana multiple listing service. (O'Dowd Aff. ¶¶ 5, 14-23, ECF No. 106-15, PageID.618, 620-22; ECF No. 106-5, PageID.549- 55; Mundell Dep., 106, PageID.782; ECF No. 109-28, PageID.1383-85). Margaret O'Dowd, an associate providing broker support to Mr. Mundell, described the process of listing the properties and the problems that she encountered obtaining necessary information from Mr. Benner. (O'Dowd Aff. ¶¶ 2-12, PageID.617-19). None of the properties were sold. (Mundell Dep., 105, PageID.782; Benner Aff. ¶ 32, PageID.698).

### E. Settlement Agreement with Comerica

On April 27, 2014, one day before the scheduled trial in bankruptcy court, Mr. Benner and plaintiffs entered into a settlement agreement with Comerica.[6] (ECF No. 106-1, PageID.410-95; Zarb Aff. ¶¶ 2, 3, ECF No. 106-13, PageID.607; Benner Aff. ¶ 25, PageID.697). Under the settlement agreement, Mr. Benner, as personal guarantor, and Benner and Benner III, as bankrupt debtors, provided Comerica fully executed deeds in lieu of foreclosure for all 22 properties. They also provided powers of attorney and agreed to the appointment of a receiver. The documents would be enforced if plaintiffs did not pay a settlement payment of $18.75 million dollars to Comerica by August 8, 2014.[7] (ECF No. 106-1, PageID.410-95).

**\*6** On April 28, 2014, the bankruptcy court held a hearing on a motion to approve the proposed settlement, and copies of the settlement agreement were filed with the court. On May 6, 2014, Judge Dales entered an order approving the settlement agreement. The order stated that the agreement was binding and enforceable in accordance with its terms, and that Comerica was entitled to enforce all remedies described therein without further order of the bankruptcy court. Comerica later extended the payment deadline to September 9, 2014. All of this information was publicly available as part of the bankruptcy proceedings. (Smoke Aff. ¶¶ 10-11, ECF No. 106-14, PageID.612-13; Benner Aff. ¶ 25, PageID.697; Benner Dep., 53-57, PageID.844-45).

On April 30, 2014, Attorney Roach sent Mr. Mundell a copy of the settlement agreement. (ECF No. 109-19, PageID.1172-1258).

S.D. Benner, LLC v. Bradley Company, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 2056702

### F. The Village at Knapp's Crossing, LLC's, Bankruptcy

The Village at Knapp's Crossing, LLC (Knapp's Crossing), filed for Chapter Eleven bankruptcy protection on July 31, 2013. *See In re The Village at Knapp's Crossing, LLC*, No. 13-6094 (W.D. Mich. Bankr.). Mr. Benner is a member of Knapp's Crossing. His testimony in that bankruptcy proceeding relates to his efforts to refinance plaintiffs' debt to Comerica.[8]

Mr. Benner testified before Judge Dales in a bankruptcy hearing in the Knapp's Crossing case that he had obtained, late the night before, a "term sheet" from Silver Arch Capital Partners to obtain a $19.25 million loan. Mr. Benner also testified that Knapp's Crossing would use the loan to pay Comerica Bank, Benner's primary lender, $18,750,000.00, which was due August 8, 2014. (June 9, 2014, Op., 3.)[9] Although Mr. Benner claimed that Silver Arch was aware of the bankruptcy proceedings, the term sheet did not mention bankruptcy, and the projected closing date was fourteen days after the Comerica payment was due. Judge Dales expressed doubts that Silver Arch had been informed of the bankruptcy, and he noted that the timing "suggest[ed] that Mr. Benner slapped [these documents] together to meet the litigation-related need to respond to the motion[.]" (*Id.* at 9.) Judge Dales noted that a term sheet that could be binding on a lender without prior bankruptcy court approval was "implausible." (*Id.* at n.3).

During his deposition in this case, Mr. Benner initially denied testifying as Judge Dales indicated in his opinion. (Benner Dep., 113-14, PageID.859.) When asked if he was claiming that the judge had mischaracterized his testimony, Mr. Benner did not provide a direct response. (*Id.* at 115-16, PageID.859.)

### G. Broker Agreements for Leases

On June 1, 2014, Benner entered into three Broker Agreements for Leases regarding fourteen properties.[10] (*See* Exhibit B attached). The agreements stated that Bradley Company would be paid a six percent brokerage fee from the total rent due and payable over the years each new lease was in effect, up to ten years. The agreements specified that they should be governed by Michigan law. The confidentiality and integration clauses were identical to those found in the earlier Broker Agreements for Sales. (ECF No. 106-4, PageID.539-47; ECF No. 109-15, PageID.1089-97).

Most of the properties for rent were vacant, and in those that had tenants, Bradley Company found it difficult to determine the tenants' actual identities. When the company located potential lessees, it had a difficult time obtaining responses from Mr. Benner. Limitations on the signage that could be posted on properties posed an additional challenge. (Mundell Dep., 83-86, PageID.777). On July 2, 2014, Ms. O'Dowd sent Mr. Benner an email indicating that there were inquiries regarding the properties requiring Mr. Benner's input.

**\*7** On August 28, 2014, Ms. O'Dowd sent plaintiff an email to Mr. Benner requesting the floor plan for one of the properties. The prospective tenant wanted to operate a fitness center and made an offer, but it was rejected as being too low. (Benner Dep., 138-39, PageID.865). None of the listed properties were leased. (Benner Aff., ¶ 32, 698; Benner Dep., 123-24, PageID.861).

### H. Dual Agency Agreement

On July 23, 2014, Mr. Mundell and Mr. Benner met and signed the Dual Agency Agreement. (ECF No. 106-8, PageID.563). Mr. Mundell signed as a licensed broker and Mr. Benner signed on behalf of the "seller." This agreement identified Great Lakes Capital as a potential buyer. (*Id.*; ECF No. 109-28, PageID.1383; Mundell Dep., 135-40, PageID.790-91; Benner Dep., 129-30, PageID.863). Mr. Benner testified that he had discussions with Mr. Mundell in July and August 2014 about Great Lakes Capital purchasing some of the Benner and Benner III properties, but plaintiffs refused to sell at the price offered. (Benner Dep., 102-03, PageID.856).

### I. Comerica's Enforcement of the Settlement Agreement

On September 3, 2014, Judge Dales entered an order directing Benner and Benner III to provide the court with a report regarding the status of their payment of the $18.75 million settlement amount and other matters. (Sept. 3, 2014, Order, 1.)[11]

At 8:00 a.m. on September 9, 2014, Mr. Benner sent an email to Judge Dales's personal email address. Later that day, Judge Dales entered an order in the bankruptcy cases regarding Mr. Benner's improper *ex parte* communication. Among other things, he enjoined Mr. Benner from sending any such emails in the future. Judge Dales also reminded Mr. Benner that Benner and Benner III are distinct legal entities, and that they

2019 WL 2056702

could only appear in federal court through counsel. (Sept. 9, 2014, Order, 3).[12]

Judge Dales made the offending email part of the record. In that email, Mr. Benner represented to Judge Dales that, after "5 months of hard work," he had secured a commitment from a financier, Cantor Fitzgerald, for refinancing the Comerica loan.[13] Mr. Benner asked Judge Dales to deny the motion that he knew Comerica would be filing later that day. (ECF No. 106-10, PageID.581-82; *see also* Cantor Fitzgerald term sheet, ECF No. 109-18, PageID.1155-67).

At 9:00 a.m. on September 9, 2014, Mr. Benner sent an email to the attorneys representing Benner and Benner III in the bankruptcy proceedings. He demanded that the attorneys file a motion that morning to allow more time to close a loan with Cantor Fitzgerald and for a stay preventing the assets of Benner and Benner III from being sold. Mr. Benner threatened that, if the motions were not filed immediately, it would be grounds for damages against each of the attorneys in the law firm in the amount of the loss of his assets. (Benner Dep., 153-54, PageID.869).

**\*8** Benner and Benner III failed to make the $18.75 million payment to Comerica required under the settlement agreement. On September 9, 2014, Comerica filed a motion and an agreed order in the Kent County Circuit Court for the appointment of a receiver to assume full possession and control over the properties. Later that day, Circuit Judge Christopher Yates entered the order appointing the receiver. Plaintiffs owed Comerica not less than $22 million dollars. (ECF No. 106-12, PageID.587-605; Zarb Aff. ¶ 4, ECF No. 106-13, PageID.608; Smoke Aff. ¶¶ 4, 16-17, ECF No. 106-14, PageID.611, 613; Benner Aff. ¶ 34, PageID.698; Benner Dep., 46, PageID.842; ECF No. 109-20, PageID.1261-83).

Judge Yates's order authorized the receiver to take immediate possession and full control of the receivership property, and Benner and Benner III had neither possession nor control of, nor the right to any income derived from the receivership property. Among other things, Benner and Benner III were ordered to cooperate in the transition of management of receivership property to the receiver. (ECF No. 106-12, PageID.588-89). The receivership property included the real property, all the tangible and intangible property used in connection with the operations of the property, all income, and all books, records, accounts or documents which in any

way related to the properties, collateral, and income. (*Id.* at PageID.598).

Judge Yates entered another order on September 9, authorizing the receiver to sell the real property. The sale was to be a cash sale to a bona fide purchaser for the best price obtainable. The sale was to be free and clear of any claim of Benner and Benner III, and they had no redemption rights. (ECF No. 109-20, PageID.1280-83).

That same day, Attorney Roach sent Mr. Mundell a copy of Judge Yates's orders appointing a receiver and empowering the receiver to sell the property. (ECF No. 109-20, PageID.1260-83). Mr. Mundell asked whether there were any redemption rights or appeals to slow the process. Attorney Roach responded that there were 21 days for an appeal and that there were no redemption rights. (ECF No. 109-20, PageID.1286-88).

On September 10, 2014, Mr. Mundell sent an email to Attorney Roach identifying Great Lakes Capital as a potential buyer for the note, and he provided contact information. Mr. Mundell indicated that Great Lakes Capital was "quite knowledgeable of the portfolio," and that it had the capacity to expedite sale of the active note. (ECF No. 109-21, PageID.1293).

Mr. Benner testified that he was a member and had an interest in Kicko Properties, LLC (Kicko), and that through Kicko he made an offer to buy the properties from the receiver. Mr. Benner initially testified that he could not remember what Kicko had offered. (Benner Dep., 38, PageID.840). He later testified that he directed an attorney to send a letter to the receiver, nine days after the receiver had been appointed, indicating that Kicko was making an offer to buy the properties for $18.75 million.[14] (*Id.* at 159-61, PageID.870-71).

### J. Comerica's Sale

Comerica elected to sell all its rights, title interest in, and claims under the loan documents, including the settlement agreement (loan position)[15] to the highest bidder. Comerica would receive money and the highest bidder would essentially step into Comerica's shoes. In October 2014, Comerica sent confidentiality agreements to more than thirty parties, and at least 25 recipients signed and returned those agreements. Comerica then sent due diligence packages to the parties who had signed the confidentiality agreements.

2019 WL 2056702

The information provided to potential purchasers included information regarding the loan, the properties, rent rolls, title searches, financial statements, etc. In addition, all potential bidders were strongly encouraged to undertake their own due diligence review, including a review of the bankruptcy court proceedings and the receivership proceedings then pending in Kent County Circuit Court. (Zarb Aff. ¶¶ 5-9, ECF No. 106-13, PageID.608-09; Smoke Aff. ¶¶ 18-20, ECF No. 106-14, PageID.614).

**\*9** Great Lakes Capital's affiliate, GRR Capital Funding, LLC (GRR Capital), relied on the information provided by Comerica in evaluating whether to purchase its loan position. GRR Capital was the highest bidder for the note sale. On December 31, 2014, GRR Capital entered into an agreement with Comerica to purchase Comerica's loan position. Comerica sold, assigned, and transferred to GRR Capital all the bank's rights, title interest in, and claims under the loan documents, including the settlement agreement. The purchase price for the note sale was $18.75 million. (Smoke Aff. ¶¶ 18-22, PageID.614; Zarb Aff. ¶ 10, PageID.609).

### K. Conclusion of the Bankruptcy Cases and the Kent County Case

On June 22, 2015, the bankruptcy court dismissed the Benner and Benner III bankruptcy petitions. The bankruptcy court denied subsequent motions to reopen those petitions.

On January 9, 2015, GRR Capital moved to be substituted for Comerica in the Kent County proceedings before Judge Yates. The motion indicated that Comerica sold the note and the loan documents were assigned to GRR Capital. (ECF No. 109-27, PageID.1369-71). Judge Yates granted the motion.

On February 6, 2015, Mr. Benner filed a motion for an order vacating the deeds in lieu of foreclosure and to hold GRR Capital in contempt for violating the receivership stay. Judge Yates denied the motion as well as Mr. Benner's subsequent motion for reconsideration. Judge Yates found that that Mr. Benner "chose a path of massive resistance," and the judge directed GRR Capital to submit a proposed consent judgment.[16] *GRR Capital Funding, LLC v. Benner,* No. 333017, 2017 WL 4158031, at *1 (Mich. Ct. App. Sept. 19, 2017). The proposed consent judgment was for "approximately $2.6 million, which represented the total indebtedness of $21.3 million, less the $18.75 million satisfied by the deeds in lieu of foreclosure."[17] The Michigan Court of Appeals affirmed the lower court's rejection of Mr.

Benner's argument that the judgment did not conform to the terms of the settlement agreement. It noted that, under the settlement agreement, a default would occur if Mr. Benner, as guarantor, took any action that impeded GRR Capital's ability to enforce its rights under the agreement, including filing a bankruptcy petition or the commencement of any other legal, judicial or quasi-judicial proceedings. 2017 WL 4158031, at *3. Mr. Benner impeded GRR Capital's "ability to enforce its rights when he attempted to vacate the deeds in lieu of foreclosure, among other legal challenges." *Id.* Because Mr. Benner defaulted, he was liable as personal guarantor. *Id.* Michigan's highest court denied Mr. Benner's application for leave to appeal. *See GRR Capital Funding, LLC v. Benner,* 908 N.W.2d 892 (Mich. 2018).

### L. Professional Associations and State Licensing Authorities

After Comerica's sale of its loan position to GRR Capital, Mr. Benner, Sarah Benner (his daughter), Benner, and Benner III filed complaints with professional associations and state licensing authorities.

Mr. Benner filed a complaint with the Institute of Real Estate Management (IREM) against Bradley Toothaker and Bradley Company. Benner and Benner III filed complaints against Bradley Company, Bradley Toothaker, John Mundell, and Robert Bradley Associates, LLC, with Michigan's Licensing Bureau. There is no evidence before the Court regarding findings made on these complaints. Portions of the responses to the complaints were filed as exhibits in opposition to defendant's motion for summary judgment. (ECF No. 109-32; ECF No. 109-33).

**\*10** Bradley Toothaker is the majority owner of Bradley Company. (Toothaker Dep., 3-4, 8, ECF No. 109-25, PageID.1311-12). Bradley Company provides commercial real estate management, maintenance and brokerage. Its primary business is leasing and selling properties and it is paid through commissions. (*Id.* at 12-15, 37, PageID.1313-14, 1319). Bradly Toothaker also has an ownership interest in Great Lakes Capital. (Toothaker Dep., 19, PageID.1315). Great Lakes Capital is in the business of investment and development of commercial real estate. (*Id.* at 53, PageID.1323). Bradley Company and Great Lakes Capital have offices located on different floors of the same building. (*Id.* at 91-92, 96, PageID.1333-34).

Bradley Toothaker signed the ten-page response to Mr. Benner's IREM complaint. He emphasized that the purchase

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.147 Filed 10/22/20 Page 73 of 115

S.D. Benner, LLC v. Bradley Company, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 2056702

of Comerica's position was an arm's-length transaction, conducted only after Mr. Benner lost all of his rights to the property. He noted: "A court has approved and affirmed not only the purchase itself but also the purchaser's exercise of its rights." (ECF No. 109-32, PageID.1425). He indicated that Mr. Benner signed the dual agency disclosure and provided "outdated, unreliable and incomplete financial information to Mundell to forward to Great Lakes Capital." (ECF No. 109-32, PageID.1427). "Great Lakes Capital reviewed the information and decided against doing business with [Mr.] Benner." (*Id.* at PageID.1429).

On May 15, 2015, an attorney filed a response on behalf of the LLCs and individuals named in the complaint that Benner and Benner III filed with Michigan's Licensing Bureau.[18] In pertinent part, the response stated that, after Great Lakes Capital had been disclosed as a potential buyer, "Benner provided outdated, unreliable and incomplete financial information to Mundell to forward to Great Lakes Capital." (ECF No. 109-33, PageID.1437, 1452).

Sarah Benner filed a complaint with the Indiana Association of Professional Realtors against Bradley Toothaker and Bryse Toothaker. "[A]lthough Sarah Benner was not an individual party to the underlying transactions, she was allowed to file a complaint. She is the daughter of Steven D. Benner, who controlled the LLCs that owned the subject real estate." (ECF No. 109-34, PageID.1457). The Indiana Hearing panel generally rejected the claims asserted, but it found that Bradley Toothaker violated two Indiana ethics rules because he did not inform Mr. Benner of his specific interests in GRR Capital. He received a $1,000 fine and a letter of reprimand. (*Id.* at PageID.1457-65).

**Discussion**

**I. Breach of Contracts Claims**

Count II of plaintiffs' Amended Complaint[19] is a claim for breach of contract based on alleged violations of the Broker Agreements. (Am. Compl. ¶¶ 18, 51-54, ECF No. 6, PageID.36, 40). Under Michigan law, a breach of contract claim requires the plaintiff to prove: (1) the existence of a valid and enforceable contract between the parties, (2) the terms of the contract, (3) that the defendant breached the terms of the contract, and (4) the breach caused the claimant's injury. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003); *See Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 101-04 (Mich. 2014).

**\*11** All the Broker Agreements were between Benner and defendant Bradley Company. Neither Benner nor Benner III have a contract claim based on failed refinancing. There was no contract between plaintiffs and defendant for refinancing.[20]

A. Listing Properties

Plaintiffs allege that defendant violated the Broker Agreements by not listing properties on the Multiple Listing Service or any other listing service designed to provide widespread exposure for the properties. (Am. Compl. ¶ 34, ECF. No. 6, PageID.38). Plaintiffs have abandoned this claim (*see* Plaintiffs' Brief, 12, ECF No. 109, PageID.681), and they have provided no evidence contrary to defendant's evidence that all the properties were listed.

B. Best Efforts

Plaintiffs also allege that Bradley Company breached the Broker Agreements because it did not use its "best efforts" to find purchasers and lessees for the properties; instead, acting "in its own self-interest to acquire for itself such properties, which was a material breach of the Broker Agreements." (Am. Compl. ¶ 53, PageID.40). Bradley Company never acquired the plaintiffs' properties.

The briefs submitted by the parties are not helpful on the issue of whether there was a breach of the "best efforts" provision of *each* contract. Plaintiffs lump all the agreements together and characterize a two-month delay as "inexcusable." (Plaintiffs' Brief, 13, ECF No. 109, PageID.682). But they presented no expert evidence regarding how long it should take a competent broker to list each of the parcels in question for sale or lease under the circumstances. Defendant's reply brief is likewise deficient. Although the gap between the signing of the Broker Agreements for Leases and the MLS listing dates was generally shorter (Reply Brief, 6, ECF No. 112, PageID.1487), defendant has not directly addressed the gap between each Broker Agreement and each MLS listing date. Moreover, defendant has failed to explain how it constituted defendant's "best effort."

Whether a party exercised "best efforts" is generally a question of fact. *See Wal-Mart Real Estate Business Trust v. Eastwood, LLC*, No. 1:13-cv-1348, 2015 WL 12910670, at *6 (W.D. Mich. July 27, 2015); *In re Raymond L. Frick Tr.*, No. 341498, 2018 WL 6519620, at *2 (Mich. Ct. App. Dec. 11, 2018) ("[A] 'best efforts' assessment is generally a

matter of fact and not law[.]"). The Court finds that there is a genuine issue of fact under each listing agreement whether the interval between the agreement date and the MLS listing date constitutes a breach of the "best efforts" provision.

Plaintiffs' breach of contract claims fatally falter on the elements of causation and damage. The same is true for their claims for breach of statutory duties. Rather than a repetitive discussion of these elements after each claim, causation and damages are addressed in Section III, *infra*.

### C. Breach of Confidentiality Provisions

**\*12** Plaintiffs argue that defendant violated the confidentiality provisions of the Broker Agreements. (Plaintiffs' Brief, 12, ECF No. 109, PageID.681). No such claim appears in plaintiffs' Amended Complaint. (*See* Am. Compl. ¶¶ 18, 51-54, ECF No. 6, PageID.36, 40).

The contracts between Benner and Bradley Company contain the following confidentiality paragraph:

> [Bradley Company] acknowledges that [Benner] may disclose confidential information to [Bradley Company] in connection with the performance of services under this Agreement, and [Bradley Company] agrees to preserve such information in confidence and not to disclose any such information to the detriment of [Benner] in connection with any transaction described herein.

(ECF No. 106-4, PageID.528, 530, 532, 534, 536, 538, 540, 543, 546; ECF No. 109-14, PageID.1077, 1079, 1081, 1083, 1085, 1087; ECF No. 109-15, PageID.1090, 1093, 1096).

Plaintiffs argue that they provided "volumes of confidential information," and that defendant violated the confidentiality provisions of the Broker Agreements "by disclosing this information to Great Lakes Capital,[21] who then used it for the sole purpose of purchasing the Note and Plaintiffs' properties at a 'significant discount' upon Plaintiffs' default with Comerica." (Plaintiffs' Brief, 1, 12-13, ECF No. 109, PageID.670, 681-82). Bare assertions that that there were "volumes" of information, and that it was plaintiffs' "confidential" information, do not suffice at the summary judgment stage. Specific evidence is required to raise a genuine issue of fact for trial. *See Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009); *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008); *see also Another Step Forward v. State Farm Mut. Auto. Ins. Co.*, 367 F. App'x 648, 650-51 (6th Cir. 2010) (affirming district court's grant of summary judgment because the plaintiffs failed to present "specific evidence" necessary to demonstrate breach of contract).

In order to show a breach of contract, plaintiffs were required to identify the specific documents and provide evidence that they were confidential. *See Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 921-22 (Mich. Ct. App. 2014); *Michigan One Funding, LLC v. MacLean*, No. 303799, 2012 WL 4210424, at *2-3 (Mich. Ct. App. Sept. 20, 2012). Documents filed with federal and state courts are generally open to the public, as are Internet postings. There is no evidence that Great Lakes Capital or GRR Capital used any "confidential information" that plaintiffs provided to defendant, much less used it "for the sole purpose of purchasing the Note and Plaintiffs' properties at a 'significant discount' upon Plaintiffs' default with Comerica." (Plaintiffs' Brief, 13, PageID.682).

**\*13** The Broker Agreements for Sales did not go into effect until April 9, 2014, and plaintiffs provide no developed argument how information that Mr. Benner and plaintiffs elected to provide before April 9, 2014, were provided in connection with the performance of a transaction described in those Broker Agreements.

On September 9, 2014, the receiver was placed in control of the corporate records regarding the Benner and Benner III properties and the properties themselves. Comerica provided extensive disclosures regarding the properties, loan documents, and other due diligence materials to interested bidders, and GRR Capital was the high bidder at the note sale. Plaintiffs failed to present specific evidence on which a reasonable trier of fact could find a breach of the confidentiality provisions of the Broker Agreements. In addition, for the reasons stated in Section III *infra*, these claims also fail for lack of supporting evidence of causation and damages.

### D. Implied Covenant of Good Faith and Fair Dealing

Plaintiffs argue that defendant violated an "implied covenant of good faith and fair dealing" by "acting in concert with Great Lakes Capital and Comerica, prevent[ing] Plaintiffs from successfully selling, leasing, or refinancing any of the Properties to allow Great Lakes Capital to purchase the entire portfolio at a *significant discount*." (Plaintiffs' Brief, 14, PageID.683) (emphasis in original). Plaintiffs' Amended Complaint does not include a claim for breach of an implied covenant of good faith and fair dealing. (*See* Am. Compl. ¶¶ 18, 51-54, PageID.36, 40).

2019 WL 2056702

Moreover, "Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing." *Rodgers v. JPMorgan Chase Bank NA*, 890 N.W.2d 381, 386 (Mich. Ct. App. 2016) (citation and quotation omitted); *See Meadowlark Builders LLC v. Evans*, No. 341492, 2019 WL 452157, at *2 (Mich. Ct. App. Feb. 5, 2019) ("It is [ ] well-settled that, unlike some other jurisdictions, Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing.") (citation and quotation omitted); *see also Golden v. Bank of New York Mellon Tr. Co., N.A.*, No. 1:15-cv-1152, 2015 WL 12851792, at *3 (W.D. Mich. Dec. 22, 2015) (collecting cases).

Michigan "does impose an implied good-faith covenant on contracting parties where one party to the contract makes its performance a matter of its own discretion." *FCA US LLC v. Eagle Auto-Mall Corp.*, 702 F. App'x 301, 306 (6th Cir. 2017) (citation and quotation omitted). "However, such an implied covenant cannot override express contract terms." *Id.* (citation and quotation omitted). "In order to invoke the implied covenant of good faith and fair dealing, a litigant must show that a party breached the underlying contract itself." *Garrow v. Wells Fargo Bank, N.A.*, No. 1:15-cv-1277, 2016 WL 1637441, at *5 (W.D. Mich. Apr. 26, 2016) (citation and quotation omitted); *See Haskins v. Wilmington Sav. Fund Soc'y, FSB*, No. 1:16-cv-941, 2017 WL 3668909, at *2 (W.D. Mich. June 14, 2017). Defendant listed the properties under the Broker Agreements for sale and for lease. There is no evidence that defendant acted in concert with Great Lakes Capital and Comerica to prevent plaintiffs from selling, leasing, or refinancing the properties in question.[22] Plaintiffs have not, and cannot, identify any provision in the Broker Agreements where defendant agreed to find or supply financing to prevent plaintiffs from breaching their Settlement Agreement with Comerica. Defendant is entitled to judgment in its favor on this claim as a matter of law.

## II. Breach of Statutory Fiduciary Duty Claims

 **\*14** Plaintiffs allege breaches of five fiduciary duties under Mich. Comp. Laws § 339.2512d(2).[23]

### A. Private Cause of Action

The Court must address the threshold question of whether an alleged breach of a duty imposed by Mich. Comp. Laws § 339.2512d(2) supports a private case of action. When a federal court applies state law, the court "must follow the decisions of the state's highest court when that court has addressed the relevant issue." *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013). Where the state's supreme court has not weighed in on the issue, federal courts must anticipate how the state's supreme court would rule by considering "all available data, including the decisional law of the state's lower courts[.]" *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2001); *See City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 478 (6th Cir. 2017) ("[I]f the state supreme court has yet to resolve an issue, we follow state appellate court decisions, whether reported or not."); *Cf. Bennett v. MIS Corp.*, 607 F.3d 1076, 1096 (6th Cir. 2010) ("It would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation and quotation omitted).

The Court has located one unpublished decision of the Michigan Court of Appeals addressing the issue. *See Schwartz v. Real Estate One, Inc.*, No. 328727, 2017 WL 378749 (Mich. Ct. App. Jan. 26, 2017) (*per curiam*). In *Swartz*, the plaintiff alleged breaches of statutory duties under Mich. Comp. Laws § 339.2512d(2). The defendants did not argue that the obligations were not owed to the plaintiff or that they were not violated. "Instead, they argue[d] that the violations could not be rectified in a private action filed by plaintiff." 2017 WL 378749, at *5. The Michigan Court of Appeals held that the Oakland County Circuit Court erred in dismissing the breach of fiduciary duties claims for failure to state a claim on which relief could be granted. The "defendants [ ] failed to prove that there [was] a prohibition on a private cause of action for violation of [ ] fiduciary duties" under Mich. Comp. Laws § 339.2512d(2). 2017 WL 378749, at *6. Although the Michigan Supreme Court has not addressed the issue, this Court will assume that there is a private cause of action under Mich. Comp. Laws § 339.2512d(2).

### B. Duties Owed to Benner Under Service Provision Agreements

The statutory duties under Michigan law are to the client under the "service provision agreement." Mich. Comp. Laws § 339.2512d(2). " 'Service provision agreement' means a buyer agency agreement or listing agreement executed by a real estate broker and a client that establishes an agency relationship." Mich. Comp. Laws § 339.2501(j). Here, all the Broker Agreements were between Benner and defendant.

 **\*15** Plaintiffs allege that defendant violated the following duties: reasonable care and skill (Count III), performance

2019 WL 2056702

(Count IV), loyalty (Count V), confidentiality (Count VI), and marketing (Count VII).[24] To prove a breach of fiduciary duty under any of these theories, plaintiffs must show: "(1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages proximately caused by the breach." *Delphi Auto. PLC v. Absmeir*, 167 F. Supp. 3d 868, 884 (E.D. Mich. 2016).

### 1. Reasonable Care and Skill and Loyalty

Plaintiffs allege that defendant violated duties of reasonable care and skill, as well as loyalty, by "acting in its own self-interest in acquiring for itself the Benner properties that were the subject of the Broker Agreements[.]" (Am. Compl. ¶¶ 57, 65, PageID.40-41). Defendant is entitled to judgment in its favor as a matter of law on these claims because defendant never acquired the properties that it listed for sale or lease.

### 2. Performance and Marketing

Plaintiffs allege that defendant violated its duties of performance and marketing by failing to use its "best efforts" to find purchasers and lessees for the listed properties. (*Id.* at ¶¶ 61, 73, PageID.41-42). For the reasons previously stated in the discussion of "best efforts" under the Broker Agreements, the Court finds that there are genuine issues of fact only on issues of breach. These claims falter, however, on the elements of causation and damages.

### 3. Confidentiality

Count VI is plaintiffs' claim that defendant breached a duty of "Confidentiality." (Am. Compl. ¶¶ 67-70, PageID.41-42). Plaintiffs allege that defendant breached this duty by using information without plaintiffs' permission to acquire the listed properties "through companies related to [defendant]." (*Id.* at ¶ 69, PageID.42).

Plaintiffs argue that Mr. Benner provided defendant with "thousands of pages of documents." (Plaintiffs' Brief, 17-18, PageID.686-87). Such vague assertions do not suffice at the summary judgment stage to establish a breach of a statutory duty of confidentiality. Plaintiffs were required to identify the specific documents and establish that they were confidential. See *Doe v. Henry Ford Health Sys.*, 865 N.W.2d at 921-22;

*Michigan One Funding, LLC v. MacLean*, 2012 WL 4210424, at *2-3.

Plaintiffs' brief includes a discussion of Mr. Mundell's communications with Attorney Roach, but it is not connected to any specific claim against defendant for breach of a statutory duty. It is discussed here because it appears within a discussion of confidentiality. (Plaintiffs' Brief, 17-19, PageID.686-88). The emails do not indicate that Mr. Mundell provided any confidential information. He received the courtesy of advance notice that he would be receiving a subpoena to testify in bankruptcy court. He also received copies of public records regarding the Settlement Agreement and receivership order. Although Mr. Mundell indicated on September 10, 2014, that Great Lakes Capital was interested in buying Comerica's note, there is no evidence that he shared any confidential information. Moreover, Comerica sold its position months later to the highest bidder. Defendants are entitled to judgment as a matter of law on this claim.

### III. Causation and Damages

 **\*16** Plaintiffs have not presented evidence on which a reasonable trier of fact could find in their favor on breach of contract claims or breach of fiduciary duty claims. "The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Alan Custom Homes, Inc. v. Krol*, 667 N.W.2d 379, 383 (Mich. Ct. App. 2003). Damages that are speculative or based on conjecture are not recoverable. *Ensink v. Mecosta Co. Gen. Hosp.*, 687 N.W.2d 143, 148 (Mich. Ct. App. 2004). Damages are not speculative merely because they cannot be ascertained with mathematical precision. *Godwin v. Ace Iron & Metal Co.*, 137 N.W.2d 151, 156 (Mich. 1965). It is sufficient if a reasonable basis for computation exists, although the result be only approximate. *McCullagh v. Goodyear Tire & Rubber Co.*, 69 N.W.2d 731, 737 (Mich. 1955).

Plaintiffs do not have any damage claims against defendant based on failed refinancing. Plaintiffs never had a contract with defendant to provide refinancing. Benner and Benner III had been in bankruptcy for years. After they failed pay the $18.75 million owed under the settlement agreement, Comerica proceeded with its available remedies and eventually sold its position to the highest bidder. Defendant was not a guarantor that plaintiffs would not lose their properties.

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.151 Filed 10/22/20 Page 77 of 115

S.D. Benner, LLC v. Bradley Company, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 2056702

Even if GRR Capital was a defendant and plaintiffs had alleged that it paid less than fair market value for Comerica's loan position, the proffered damages claim would fail. Plaintiffs' damage calculation is "made by subtracting Plaintiffs' liability to Comerica ($18,750,000.00) from the fair market value of the Properties ($29,244,999.00)." (Plaintiffs' Brief, 20, ECF No. 109, PageID.689). Plaintiffs did not provide any expert report regarding the value of properties. The BOV generated by some unknown individual at Signature Associates, at some unspecified time before March 19, 2012, is manifestly insufficient.

None of plaintiffs' damage calculations are grounded in the Broker Agreements. Plaintiffs failed to present any evidence that there were ready, willing and able buyers or lessees for the properties listed with defendant, or that such buyers or lessees did not purchase or lease properties because defendant did not list them at an earlier date. Further, plaintiff has not provided evidence on which a reasonable trier of fact could find in their favor on causation and damages based on disclosure of any confidential document. Plaintiffs had no control over records regarding properties after the receiver was appointed. The only evidence before the Court is that GRR Capital relied on the due diligence package provided by Comerica to evaluate and purchase Comerica's position in December 2014.

The Court finds that defendant is entitled to judgment in its favor on plaintiffs' breach of contract and breach of fiduciary duty claims as a matter of law.

## IV. Mental Anguish

Count VII of plaintiffs' Amended Complaint is a "Mental Anguish" claim. (Am. Compl. ¶¶ 75-79, PageID.42-43). Mental anguish is not a cause of action. *See Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 56-57 (Mich. 1980) (emotional distress damages are unavailable for a breach of contract even if the breach was in bad faith). Plaintiffs' claims against defendant are based on alleged breaches of commercial contracts. Mental anguish damages are not recoverable in a commercial contract action. *See Benkert v. Med. Protective Co.*, 842 F.2d 1144, 146 (6th Cir. 1988); *see also Gooch v. Accredited Home Lenders*, No. 1:14-cv-689, 2015 WL 5097619, at *8 (W.D. Mich. Aug. 28, 2015) (collecting cases); *Lane v. KinderCare Learning Centers, Inc.*, 588 N.W.2d 715, 717 (Mich. Ct. App. 1998) (noting that Michigan law provides an exception for "personal" contracts such as a contract for the care and burial of a dead body). Defendant is entitled to judgment in its favor on this claim as a matter of law.

## Conclusion

**\*17** Accordingly, and for the reasons stated herein, defendant's motion for summary judgment (ECF No. 105) is GRANTED, and the Court will enter a separate judgment in favor of defendant on all plaintiffs' claims.

## All Citations

Not Reported in Fed. Supp., 2019 WL 2056702

## Footnotes

1  All other claims have been dismissed. (ECF No. 22).

2  The Court takes judicial notice of the bankruptcy proceedings and the proceedings in Kent County Circuit Court and related appeals. *See In re S.D. Benner III, LLC*, No. 11-8112 (W.D. Mich. Bankr.); *In re S.D. Benner, LLC*, No. 11-8113 (W.D. Mich. Bankr.); *In re The Village of Knapp's Crossing, LLC*, No. 13-6094 (W.D. Mich. Bankr.); *Comerica v. Benner*, No. 11-8297-CH (Kent County Circuit Court). All of these lawsuits are mentioned in the Settlement Agreement between Comerica and Steven Benner, including the plaintiff LLCs. (ECF No. 106-1, PageID.410-11).

3  Great Lakes Capital, LLC is a real estate private equity firm located in South Bend, Indiana. (Smoke Aff. ¶ 2, ECF No. 106-14, PageID.611; Benner Dep., 129-30, PageID.863).

4  These properties were part of the 22 properties securing the Comerica loan. (Benner Dep., 108-09, PageID.857-58).

5  None of the properties could have been sold without advance notice to creditors in the bankruptcy proceedings and approval of the sale by the bankruptcy court.

6  On April 18, 2014, Attorney Steven Roach, Comerica's representative in the bankruptcy cases, sent an email to Mr. Mundell advising him that he should anticipate receiving a subpoena. Comerica intended to call Mr. Mundell as a witness during the trial on the motion to convert plaintiffs' Chapter Eleven petitions into Chapter Seven liquidations. (Mundell Dep., 71-72, PageID.774; ECF No. 109-19, PageID.1170).

S.D. Benner, LLC v. Bradley Company, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 2056702

7    The settlement agreement includes a broad release from liability by Mr. Benner, Benner, and Benner III in favor of Comerica's assigns and others. (ECF No. 106-1, PageID.417). Further, it specifies that the provisions of the agreement shall inure to the benefit of Comerica and its successors, assigns or any holders of the Note. (*Id.* at PageID.426). Mr. Benner, Benner, and Benner III agreed that they would not take any action that impeded Comerica's ability to enforce its rights under the settlement agreement. (*Id.* at PageID.421).

8    Knapp's Crossing entered into a listing agreement with Bradley Company for the sale of property located at 2300 East Beltline Avenue, N.E. (ECF No. 106-4, PageID.525-26; ECF No. 109-14, PageID.1074-75). That contract is not at issue because Knapp's Crossing is not a party to this lawsuit.

9    This Opinion appears at ECF No. 260 in the *Knapp's Crossing* case.

10    Some of these properties were subject to Comerica's secured interest. (Benner Dep., 122, PageID.861).

11    This Order appears at ECF No. 636 in the *Benner* bankruptcy case (No. 11-8113) and at ECF No. 440 in the *Benner III* bankruptcy case (No. 11-8112).

12    This Order appears at ECF No. 637 in the *Benner* bankruptcy case and at ECF No. 441 in the *Benner III* bankruptcy case. Mr. Benner's email appears at ECF No. 639 in the former and at ECF No. 443 in the latter.

13    Mr. Benner states in his affidavit that, even in the days preceding September 9, 2014, he continued to provide Mr. Mundell with documents and information, and that based on Mr. Mundell's representations on defendant's behalf regarding refinancing, he dramatically scaled back his efforts to obtain refinancing from other lenders. (Benner Aff. ¶¶ 28-31, PageID.698).

14    Mr. Benner testified that, in February 2015, he hired a different attorney to make an offer of 14 million for the Comerica portfolio. (Benner Dep., 166, PageID.872).

15    Comerica's sale is also referred to as a note sale.

16    Around September 9, 2014, Comerica obtained a personal protection order against Mr. Benner after serious threats were made against Comerica's employees. 2017 WL 4158031, at 1. The decision of the Court of Appeals includes a footnote describing the numerous motions that Mr. Benner filed, including multiple attempts to recuse the trial court judge. *Id.* at 2 n.2.

17    The Court of Appeals stated that GRR Capital was originally entitled to approximately 23 million, but it elected to forgo two years of accrued interest. 2017 WL 4158031, at 2 n.1.

18    Plaintiffs did not file the exhibits that were part of the of the response made to the Benner and Benner III complaints.

19    On June 26, 2015, plaintiffs Benner and Benner III filed this lawsuit. (ECF No. 1). They filed an amended complaint on August 21, 2015. (ECF No. 6). On March 30, 2017, the Court entered an opinion and order granting defendant's Rule 12(b)(6) motion to dismiss plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act (RICO). (ECF No. 22).

The only claims before the Court are those expressly alleged in plaintiffs' Amended Complaint that have not been dismissed. The claims at issue cannot be expanded through plaintiffs' briefs filed in response to defendant's motion for summary judgment. *See Bridgeport Music, Inc. v. Basic Corp.*, 508 F.3d 394, 400 (6th Cir. 2007); *Tucker v. Union of Needletrades, Indus. & Textile Emp.*, 407 F.3d 784, 788 (6th Cir. 2005).

20    No implied contract claim is alleged, and even if it had been alleged, the evidence here could not support it. Mr. Benner is not a party to this lawsuit. His purported reliance on defendant for refinancing is untenable given the absence of any written agreement and the representations that Mr. Benner made to the bankruptcy court. Mr. Benner testified in June 2014, that Silver Arch would be providing a loan to pay off the debt to Comerica. In September 2014, Mr. Benner made a similar assertion that Cantor Fitzgerald had come forward with last minute financing after five months of negotiations.

21    Plaintiffs cite nothing in support of their argument that Bryse Toothaker, by working similar roles as a director of Bradley Capital Market and a director for Great Lakes Capital, was able to use otherwise confidential information provided to Bradley in considering investment opportunities for Great Lakes Capital. (Plaintiffs' Brief, 10, ECF No. 109, PageID.679). Plaintiffs did not take Bryse Toothaker's deposition and there is no evidence that he took such action. Arguments in parties' briefs are not evidence. *Dha v. grim, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006).

22    Even if every property sold at the asking price, and that the bankruptcy court approved the sale before the September 9, 2014, deadline, the sales would have generated only a fraction of what plaintiffs had to pay Comerica under the Settlement Agreement. (*See* Exhibit A).

23    Effective March 29, 2017, Michigan amended Mich. Comp. Laws 339.2512d. Plaintiffs filed their Amended Complaint long before the amendments went into effect. Plaintiffs' claims are evaluated herein under the earlier version of Mich. Comp. Laws 339.2512d.

2019 WL 2056702

24    Defendant argues that the dual agency agreement eviscerated and drastically reduced its duties toward plaintiffs. (Reply Brief, 8, ECF No. 112, PageID.1489-90) (citing *Vanhellemont v.    leason*, No. 286350, 2009 WL 3049582 (Mich. Ct. App. Sept. 24, 2009) ). This argument is vague and fails to address the specific terms of this dual agency agreement. But defendant's observation that the agreement provided notice to plaintiffs that Great Lakes Capital was a potential buyer represented by defendant is valid.

---

End of Document

© 2020 Thomson Reuters. No claim to original .S. Government Works.

# EXHIBIT G

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.155 Filed 10/22/20 Page 81 of 115

Lancia Jeep Hellas S.A. v. Chrysler Group Intern. LLC, Not Reported in N.W.2d (2016)

2018 WL 1165404

2016 WL 1178303
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

LANCIA JEEP HELLAS
S.A., Plaintiff–Appellant,

v.

CHRYSLER GROUP INTERNATIONAL
LLC, Fiat S.P.A., and Fiat Group
Automobiles S.P.A., Defendants–Appellees.

Docket No. 329481.
|
March 24, 2016.

Oakland Circuit Court; LC No.2014–142918–CZ.

Before: K.F. KELLY, P.J., and FORT HOOD and
BORRELLO, JJ.

**Opinion**

PER CURIAM.

*1 In this contract dispute, plaintiff, Lancia Jeep Hellas S.A.,
appeals by leave granted[1] the trial court's opinion and order
granting partial summary disposition to defendants[2] under
MCR 2 .116(C)(8) (failure to state a claim on which relief
can be granted). For the reasons set forth in this opinion, we
affirm.

A. FACTS

This case arises out of a Settlement Agreement reached by the
parties in a prior action, which was ultimately dismissed with
prejudice pursuant to the terms of the Settlement Agreement.
Because this contractual dispute involves the trial court's
partial grant of summary disposition under MCR 2.116(C)
(8)—without consideration of documentary evidence—the
pertinent "facts" are largely comprised of the allegations in
plaintiff's complaint.

According to its complaint, plaintiff is a Greek business
organization, which formerly distributed Chrysler, Dodge and
Jeep branded vehicles in Greece. As of May 2010, plaintiff
had distributed the vehicles for nearly 20 years. In April
2010, defendants announced that many Chrysler products
would be rebranded and marketed on an exclusive basis under
the Lancia brand. One month later, defendants sent a letter
to LJH terminating LJH as an importer and distributor for
Chrysler and Dodge effective May 31, 2011. In response, LJH
instituted the prior action for, *inter alia,* breach of contract.

Ultimately, the parties executed a lengthy Settlement
Agreement, in which they agreed to dismissal of the prior
action with prejudice. The Settlement Agreement contained
the following release clause wherein LJH agreed to release its
claims against defendants "arising out of or relating to" the
prior action, with the following exceptions:

(1) any potential warranty or product liability claims for
vehicles or parts sold prior to the date of this Agreement,
(2) any claims, demands, actions, causes of action of
any nature whatsoever, at law or in equity, related to
the negotiation or breach of this Agreement, or (3) any
claims, demands, actions, causes of action of any nature
whatsoever, at law or in equity, relating to future business
operations.

The Settlement Agreement also contained a merger/
integration clause which provided as follows:

9.1 *Entire Understanding.* This Agreement with its
Exhibits shall be deemed to contain the final, complete and
exclusive agreement and understanding between the parties
hereto and their Affiliates in respect of the transactions
contemplated hereby and thereby and supersedes and
replaces all prior agreements, arrangements, negotiations,
representations and understandings among the parties
hereto and their Affiliates, actual, proposed or otherwise,
whether written or oral, concerning the subject matter
hereof and thereof. The terms of this Agreement shall
control over the terms of any of the Exhibits hereto.

In return, defendants agreed, in pertinent part, to appoint
plaintiff "as a distributor for Greece to sell and resell new
Lancia branded vehicles and relevant parts, and to service
Lancia branded vehicles in the Greek market and sell relevant
parts," subject to the "pricing terms and policies generally
applied by FGA [Fiat] to its distributors." Under the terms of
the agreement, plaintiff retained the rights to distribute Jeep
branded vehicles and parts and to service existing Chrysler

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.156 Filed 10/22/20 Page 82 of 115

Lancia Jeep Hellas S.A. v. Chrysler Group Intern. LLC, Not Reported in N.W.2d (2016)

2018 WL 1165404

and Dodge vehicles in Greece. Defendants also agreed to appoint plaintiff "as a dealer in two locations in Athens to sell and service Fiat, Alfa Romeo, and Fiat Professional branded vehicles and relevant parts, and as a dealer in one location in Athens to sell and service Abarth branded vehicles and relevant parts."

**\*2** The Settlement Agreement incorporated a "Lancia Distribution Agreement," which governed the terms by which plaintiff would distribute Lancia vehicles in Greece. The final version of the Lancia Distribution Agreement set forth terms under which LJH would distribute certain Lancia "Contract Vehicles." However, the Lancia Distribution Agreement also contained a clause wherein defendants retained the rights to alter, modify, stop production of, or withdraw from the market any of the Contract Vehicles or any "derivative" of the Contract Vehicles.

On December 26, 2014, plaintiff filed the instant action against defendants alleging several causes of action, including fraud and breach of the Settlement Agreement based on breach of the duty of good faith and fair dealing. Plaintiff alleged that defendants represented during the settlement negotiations that they intended to produce a full line of Lancia vehicles and that the Lancia brand would be expanded with eight new models from 2011 through 2014. Plaintiff further alleged that, in deciding whether to enter into the Settlement Agreement, it considered the right to distribute the Lancia product line to be the primary compensation for defendants' termination of the Chrysler distribution agreement with plaintiff. Plaintiff asserted that it relied on defendants' representations and that it would not have agreed to distribute Lancia products in Greece absent defendants' representations that the Lancia line of products would be expanded and improved. Plaintiff alleged that defendants did not expand and improve the Lancia line and that, contrary to defendants' representations, they never intended to introduce an expanded line of Lancia vehicles. According to plaintiff, several of the promised models should have been far along in development at the time of the representations because the development process in the automobile industry is typically two to three years. Plaintiff alleged that the fact that not one of the promised new models ever entered the market indicates that they were never being developed. Plaintiff further asserted that it relied on defendants' representations and began preparing its distribution network for the promised Lancia line, spending millions of Euros. Finally, plaintiff alleged that in 2014 it became clear that defendants intended

to discontinue the Lancia brand in every European country except Italy.

Defendants filed a motion for partial summary disposition pursuant to MCR 2.116(C)(8), arguing, in relevant part, that the Settlement Agreement contained an integration clause and contained no representations regarding developing an expanded line of Lancia models. Defendants maintained that the integration clause nullified any alleged representation that defendants would develop an expanded line of Lancia automobiles. Defendants asserted that if it was important to plaintiff that defendants develop a full line of Lancia vehicles, plaintiff should have ensured that the alleged promise was included in the Settlement Agreement. Defendants further argued that the Settlement Agreement gave defendants complete control regarding the products that plaintiff was entitled to sell and allowed defendants to withdraw any vehicle from the market. Finally, defendants argued that Michigan does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing.

**\*3** In response, plaintiff argued that defendants conveniently neglected to mention article 2.2, i.e., the release clause, of the Settlement Agreement, which explicitly preserved plaintiff's right to file suit regarding claims related to the negotiation of the Settlement Agreement. Plaintiff asserted that the plain language of the release clause preserved its fraud claim and defeated defendants' argument regarding integration. Plaintiff also argued that Michigan law recognizes a breach of contract claim based on the violation of the duty of good faith and fair dealing.

Following oral argument, the trial court granted defendants' motion and dismissed several counts of plaintiff's complaint. Only count 1 (fraud) and count 2 (breach of the duty of good faith and fair dealing) are at issue in this appeal. With respect to plaintiff's fraud claim, the trial court explained:

> Here, [plaintiff] is claiming that it was fraudulently induced to enter into the settlement agreement based on Defendants' representation that they intended to develop a complete line of Lancia vehicles. Although Lancia is not claiming that the parties entered into a collateral agreement, it is claiming that it relied on Defendants' promises to perform obligations not included in the settlement agreement. Thus, this case is nearly indistinguishable from [*Hamade v. Sunoco, Inc,* 271 Mich.App 145; 721 NW2d 233 (2006)], where the plaintiff also alleged fraudulent inducement based on his reliance on certain promises Defendants made before they entered into the agreement. Because

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.157 Filed 10/22/20 Page 83 of 115

Lancia Jeep Hellas S.A. v. Chrysler Group Intern. LLC, Not Reported in N.W.2d (2016)

2018 WL 1165404

the integration clause renders [plaintiff's] reliance on Defendants' pre-contractual promises unjustifiable, the fraud claim fails as a matter of law.

The court also reasoned that the release clause did not save plaintiff's fraud claim, explaining:

If the Court were to conclude that the release language allows [plaintiff] to pursue damages based on Defendants' alleged pre-contractual promises, that interpretation would render the integration clause meaningless. Contrary to [plaintiff's] claim, the integration clause does not negate the release language. [Plaintiff] still has the right to pursue a claim based on the settlement negotiations, provided that the claim is not barred by the integration clause. Because [plaintiff's] fraud claim based on alleged pre-contractual promises of performance is barred by the integration clause, it cannot be salvaged by the release language. For all of these reasons, Defendants are entitled to summary disposition of [plaintiff's] Count 1 claiming fraud.

Regarding plaintiff's breach of contract claim, the court stated that although it may imply a covenant of good faith and fair dealing where one party to a contract has complete discretion regarding how to perform its obligations, plaintiff failed to cite to any portion of the Settlement Agreement that gave defendants "unfettered discretion on how to perform their obligations."

The court proceeded to grant defendants' motion for summary disposition in its entirety. Subsequently, this Court granted plaintiff's motion for immediate consideration and its application for leave to appeal, but denied plaintiff's motion for preemptory reversal.[3]

## B. STANDARDS OF REVIEW

**\*4** On appeal, plaintiff argues that the trial court erred in granting defendant's motion for summary disposition.

A trial court's ruling on a motion for summary disposition is reviewed de novo. *Johnson v. Pastoriza,* 491 Mich. 417, 428; 818 NW2d 279 (2012). "A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of the complaint." *Id.* at 434–435. A motion is properly granted under MCR 2.116(C)(8), where "[a]ll well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant ... the claims alleged are so clearly

unenforceable as a matter of law that no factual development could possibly justify recovery." *Id.* To the extent that our review requires interpretation and application of the Settlement Agreement, "[t]he existence and interpretation of a contract are questions of law reviewed de novo." *Kloian v. Domino's Pizza LLC,* 273 Mich.App 449, 452; 733 NW2d 766 (2006).

"A party may not support a motion under subrule (C)(8) with documentary evidence[.]" *Dalley v. Dykema Gossett,* 287 Mich.App 296, 305; 788 NW2d 679 (2010). However, under MCR 2.113(F), "[w]hen an action is based on a written contract, it is generally necessary to attach a copy of the contract to the complaint." *Laurel Woods Apartments v. Roumayah,* 274 Mich.App 631, 635; 734 NW2d 217 (2007). "Accordingly, the written contract becomes part of the pleadings themselves, even for purposes of review under MCR 2 .116(C)(8)." *Id.*

In this case, the parties failed to attach to their respective pleadings the written instruments on which their claims and defenses in this action are based, and they also failed to allege facts sufficient to satisfy the exceptions listed under MCR 2.113(F)(1)(a) or (b). Nevertheless, because the parties should have done so, and in the interest of judicial economy, we will consider the written instruments at issue in this case as part of the pleadings for purposes of review under MCR 2.116(C)(8).

## C. ANALYSIS

## I. FRAUDULENT INDUCEMENT

A settlement agreement is a contract and is interpreted as such. *Gramer v. Gramer,* 207 Mich.App 123, 125; 523 NW2d 861 (1994). "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties." *Shay v. Aldrich,* 487 Mich. 648, 660; 790 NW2d 629 (2010) (quotation marks and citation omitted). If contractual language is unambiguous, it must be interpreted in accordance with its plain meaning. *Id.* "[C]ourts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins Group Agency, Inc,* 468 Mich. 459, 468; 663 NW2d 447 (2003).

A claim of fraud in the inducement may arise "where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.158 Filed 10/22/20 Page 84 of 115

*Lancia Jeep Hellas S.A. v. Chrysler Group Intern. LLC, Not Reported in N.W.2d (2016)*
2018 WL 1165404

relied upon and are relied upon." *Custom Data Solutions, Inc v. Preferred Capital, Inc,* 274 Mich.App 239, 242–243; 733 NW2d 102 (2006). "Fraud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party." *Samuel D Begola Servs, Inc v.. Wild Bros,* 210 Mich.App 636, 640; 534 NW2d 217 (1995).

**\*5** Plaintiff argues that it was fraudulently induced to enter into the Settlement Agreement by defendants' pre-settlement representations that they would produce an expanded line of Lancia vehicles, including eight new models. Defendants, on the other hand, argue that the Settlement Agreement did not contain any provisions regarding the alleged representations and rely on the following integration, or merger, clause:

9.1 *Entire Understanding.* This Agreement with its Exhibits shall be deemed to contain the final, complete and exclusive agreement and understanding between the parties hereto and their Affiliates in respect of the transactions contemplated hereby and thereby and supersedes and replaces all prior agreements, arrangements, negotiations, representations and understandings among the parties hereto and their Affiliates, actual, proposed or otherwise, whether written or oral, concerning the subject matter hereof and thereof. The terms of this Agreement shall control over the terms of any of the Exhibits hereto.

The central issue, therefore, is whether, the integration clause barred the introduction of parol evidence such that plaintiff could not prove that it justifiably relied on defendants' alleged pre-settlement representations. To resolve this issue, we turn to *Hamade,* 271 Mich.App 145.

In *Hamade,* the plaintiff owned a Sunoco gas station. *Id.* at 149. In 1997, the plaintiff sought to enter into a new franchise agreement with Sunoco; however, Sunoco insisted that the plaintiff make numerous improvements to his existing station before it would agree to enter into a new franchise agreement. *Id.* After making the requested improvements, the plaintiff began negotiations with Sunoco for a new franchise agreement. *Id.* According to the plaintiff, during the negotiations he requested that Sunoco include a provision in the new agreement that would prevent Sunoco from approving a competing station within a certain distance from the plaintiff's station. *Id.* at 149–150. The plaintiff alleged that, before he signed the new agreement, a Sunoco representative assured him that Sunoco would never approve another station near the plaintiff's station. *Id.* at 150. However, three years after the plaintiff signed

the new franchise agreement Sunoco approved a competing Sunoco gas station approximately one mile from the plaintiff's station. *Id.* The plaintiff sued Sunoco alleging, *inter alia,* that Sunoco fraudulently induced him to enter the new franchise agreement. *Id.* at 151, 166. The trial court dismissed the plaintiff's fraud claims on grounds that the franchise agreement's merger clause barred parol evidence to support the claims; the plaintiff appealed. *Id.* at 152.

On appeal, the issue was whether the plaintiff could introduce parol evidence to prove that he was fraudulently induced into entering the franchise agreement, which contained a merger clause. *Id.* at 166–168. The *Hamade* Court explained how the parol evidence rule operates in the context of a merger clause as follows:

**\*6** Parol evidence is generally admissible to demonstrate fraud, which, if proved, would render the contract voidable by the innocent party.

'However, in the context of an integration clause, which releases all antecedent claims, only certain types of fraud would vitiate the contract.' 3 Corbin, Contracts, § 578, p. 411, states in part:

'To establish fraud, it is not sufficient merely to show that the writing states that there was no antecedent agreement when the fact is that there had been one. If by artifice or concealment, one party induces the other to suppose that the antecedent agreement is included in the writing, or to forget that agreement and to execute an incomplete writing, while describing it as complete, the written provision may be voidable on the ground of fraud.'

In other words, while parol evidence is generally admissible to prove fraud, fraud that relates solely to an oral agreement that was nullified by a valid merger clause would have no effect on the validity of the contract. Thus, when a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause. 3 Corbin, Contracts, § 578. [*Hamade,* 271 Mich.App at 169–170, quoting *UAW–GM Human Resource Ctr v. KSL Recreation Corp,* 228 Mich.App 486, 503; 579 NW2d 411 (1998).]

Relying on *UAW–GM,* the *Hamade* Court explained that the plaintiff's fraud claim was based "on an oral representation" and therefore, "[b]ecause this representation was expressly

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.159 Filed 10/22/20 Page 85 of 115
Lancia Jeep Hellas S.A. v. Chrysler Group Intern. LLC, Not Reported in N.W.2d (2016)
2018 WL 1165404

nullified by the integration clause, if the integration clause is valid, fraud based on this representation will have no effect on the validity of the contract. Thus, plaintiff must demonstrate that the fraud in question invalidated the integration clause itself." *Hamade,* 271 Mich.App at 170. This Court concluded that the plaintiff could not demonstrate fraud "that would invalidate the integration clause or otherwise the entire contract," explaining:

Hamade knew that the agreement he signed did not contain a clause granting him an exclusive territory. His only claim on appeal is that he was led to believe that he did not need such a clause. Furthermore, the [franchise] Agreement actually contains an express term applicable to Sunoco's decision to authorize another Sunoco station near Hamade's station. Pursuant to § 3.24(a)(2), Hamade warranted to Sunoco that

'[t]here have been no promises, claims or representations made to [Hamade] by [Sunoco] or its representatives of any kind, including but not limited to promises (i) concerning price, quality or quantity of products and services sold or supplied by [Sunoco]; (ii) the condition, future repairs to or replacement of Loaned Equipment; (iii) *present or future market conditions or competitive activities* other than as set forth in this Agreement or any other written documents signed by the parties as a part of the Franchise relationship.

* * *

**\*7** Plaintiff failed to demonstrate fraud that would invalidate the integration clause or otherwise invalidate the entire contract. Furthermore, because the valid integration clause nullified all prior and contemporaneous agreements, understandings, representations, and warranties, plaintiff may not use parol evidence to contradict the explicit terms of the integration clause ... Likewise, the valid integration clause renders reliance on the representation unreasonable as a matter of law. [*Hamade,* 271 Mich.App at 170–171.]

In contrast to *Hamade,* in *Custom Data v. Preferred Capital,* 274 Mich.App 239, 733 NW2d 102 (2006), this Court rejected the defendant's argument that an integration clause barred the plaintiff from introducing evidence to prove fraud. In *Custom Data,* the plaintiff entered into telecommunications service and equipment rental agreements (ERAs) with Norvergence. *Id.* at 240–241. Norvergence then assigned some of the ERAs to the defendant, Preferred Capital. *Id.* According to the plaintiff, Norvergence was unable to perform the promised services, yet Norvergence and its assigns sought to collect on the contracts. *Id.* at 241. The plaintiff commenced suit,

alleging, *inter alia,* fraud in the inducement. *Id.* During discovery, the plaintiff produced "uncontroverted evidence that the agreement ... [was] the result of a fraudulent scheme by Norvergence to finance the services that Norvergence was promising to provide to Plaintiff and others," which "invalidates the *entire contract* including the merger clause." *Id.* at 244 (emphasis added). The circuit court explained:

'The Court is satisfied that Plaintiff's reliance upon the representations made by Norvergence was reasonable, and that the UCC and the provisions regarding rejection of goods does [sic] not apply to the case at hand. Consequently, the merger clause in the equipment rental agreements is insufficient to prevent Plaintiff from introducing evidence of fraud, and Plaintiff's motion for summary disposition to void the contract should be granted.' [*Custom Data,* 274 Mich.App at 244.]

On appeal, Norvergence argued that the plaintiff's reliance on pre-contract representations was "patently unreasonable" because the representations were not contained within the written ERAs, which contained merger clauses. *Id.* at 242. This Court rejected Norvergence's argument, explaining:

plaintiff presented unrefuted evidence in support of its motion for partial summary disposition that Norvergence's statements regarding its ability to provide plaintiff with a total telecommunications and products package induced plaintiff to enter into the agreement with Norvergence ... Defendant came forward with no evidence to refute that Norvergence made these representations, that these representations induced plaintiff to enter into a contract that included the ERAs for the matrix boxes (those at issue were assigned to defendant by Norvergence), that the matrix boxes were never installed and never functioned, and that Norvergence knew at the time it made the representations to plaintiff that it was incapable of providing the services promised. Defendant's argument thus fails. [*Id.* at 245.]

**\*8** In this case, plaintiff contends that *Custom Data* is controlling and that the trial court erred in relying on *Hamade.* Plaintiff's argument is unpersuasive. The critical difference that distinguishes this case from *Custom Data* is that, contrary to the plaintiff in *Custom Data,* in this case, plaintiff did not seek to void the merger clause or the Settlement Agreement in its entirety.[4] Rather, like in *Hamade,* plaintiff seeks to recover damages and enforce the Settlement Agreement. As previously noted, "when a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would *invalidate the merger clause itself,* i.e., fraud

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.160 Filed 10/22/20 Page 86 of 115
Lancia Jeep Hellas S.A. v. Chrysler Group Intern. LLC, Not Reported in N.W.2d (2016)
2018 WL 1165404

relating to the merger clause *or fraud that invalidates the entire contract* including the merger clause." *Hamade,* 271 Mich.App at 169–170 (quotation marks and citations omitted, emphasis added). In this case, like the plaintiff in *Hamade,* plaintiff's claim is based on the assertion that the parties had an agreement that was not within the integrated terms of the Settlement Agreement—i.e. that defendants would develop a full-line of Lancia vehicles. Plaintiff does not seek to void the agreement in its entirety, but rather seeks to add a term to the agreement guaranteeing that defendant will develop a full-line of Lancia vehicles and then recover for defendants' breach of that term. Because the Settlement Agreement contained a merger clause, this claim failed as a matter of law. *Hamade,* 271 Mich.App at 167–170.

Moreover, the Settlement Agreement, by incorporation, included a clause that provided defendants discretion to withdraw all contract vehicles from the market. Similar to the plaintiff in *Hamade,* where the franchise agreement provided Sunoco with the authority to approve another gas station, here, defendants reserved the right to withdraw any and all contract vehicles from the market. Plaintiff cannot now introduce parol evidence to counter those plain terms. Because plaintiff has not alleged facts that would void the merger clause or the Settlement Agreement in its entirety, like in *Hamade,* plaintiff's fraud claim fails as a matter of law. *Id.; UAW–GM,* 228 Mich.App at 503.

Plaintiff argues that the release clause preserved its right to pursue claims related to the negotiation of the Settlement Agreement. The release clause provided as follows:

> [Plaintiff] releases and forever discharges [defendants] and their Affiliates ... from any and all claims ... whatsoever, in law or in equity, that it had, now has or may have in the future, whether known or unknown ... including without limitation, all claims arising out of or relating to the Litigation, the Chrysler/[Plaintiff] General Distributor Agreement, and/or the notice of termination, effective May 31, 2011, of the Chrysler/[Plaintiff] General Distributor Agreement, *except for ... (2) any claims, demands, actions, causes of action of any nature whatsoever, at law or in equity, related to the negotiation or breach of this Agreement ....*

**\*9** Here, even if this language preserved plaintiff's right to bring a claim based on the negotiation, as discussed above, plaintiff's claim failed as a matter of law. In other words, the fact that LJH's alleged claim for fraud in the inducement is not barred by the release clause has no bearing on whether

that claim is, under MCR 2.116(C)(8), one on which recovery can be granted. Accordingly, the trial court properly held that the release clause did not save plaintiff's claim, albeit it did so for different reasons. *Gleason v. Mich. Dept of Transp,* 256 Mich.App 1, 3; 662 NW2d 822 (2003) ("A trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason.")

In short, plaintiff's fraudulent inducement claim was "so clearly unenforceable as a matter of law that no factual development could possibly justify recovery" and summary disposition as to the claim was proper under MCR 2.116(C) (8). *Maiden,* 461 Mich. at 119.

## II. BREACH OF CONTRACT

Plaintiff also argues that the trial court erroneously dismissed its claim of breach of contract based on defendants' breach of the duty of good faith and fair dealing. This argument lacks merit.

Under the common law, it is well-settled that, "[u]nlike some other jurisdictions, Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing." *In re Leix Estate,* 289 Mich.App 574, 591; 797 NW2d 673 (2010) (quotation marks and citations omitted). The same is true regarding the duty of good faith imposed, under MCL 440.1304, on "[e]very contract or duty" that is governed by the UCC. "[W]hile the obligation of good faith under the UCC may affect the construction and application of UCC provisions governing particular commercial transactions in various situations, it has no life of its own that may be enforced by an independent cause of action." *Gorman v. American Honda Motor Co, Inc,* 302 Mich.App 113, 133; 839 NW2d 223 (2013).

Nevertheless, plaintiff argues that because defendants had discretion regarding development of the Lancia line, there was an implied duty of good faith and fair dealing that attached to that discretion. This argument is not persuasive.

This Court has recognized that a covenant of good faith and fair dealing may attend contracts that make the manner of one party's performance "a matter of its own discretion." *Burkhardt v. City Nat'l Bank of Detroit,* 57 Mich.App 649, 652; 226 NW2d 678 (1975). Applying Michigan law, the Fifth Circuit Court of Appeals[5] has explained that "[t]he implied covenant of good faith and fair dealing essentially

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.161 Filed 10/22/20 Page 87 of 115
*Lancia Jeep Hellas S.A. v. Chrysler Group Intern. LLC, Not Reported in N.W.2d (2016)*
2018 WL 1165404

serves to supply limits on the parties' conduct when their contract defers decision on a particular term, omits terms or provides ambiguous terms." *Hubbard Chevrolet Co v. Gen. Motors Corp,* 873 F.2d 873, 876–877 (CA 5, 1989). However, there is no implied duty of good faith where the parties have "unmistakably expressed their respective rights," because the implied duty "cannot override express contract terms." *Stephenson v. Allstate Ins Co,* 328 F3d 822, 827 (CA 6, 2003).

**\*10** In this case, the Settlement Agreement did not omit terms, provide ambiguous terms, or defer decision on a particular term. *Hubbard,* 873 F.2d at 876–877. As noted above, the integration clause provided that the agreement contained all of the terms and conditions of the contract. Furthermore, the express terms of the contract provided defendants the option to withdraw contract vehicles from the Greek market. Accordingly, plaintiff cannot argue that an implied duty of good faith overrides these plain terms.

*Stephenson,* 328 F 3d at 827; see also *Hubbard,* 873 F 3d at 877–878 (holding that there was no implied duty of good faith and fair dealing where the dealer franchise agreement "gave GM the authority to approve or disapprove relocation for its own reasons, and thus set out the limits of what the contract requires of these parties.")

In sum, the trial court did not err in dismissing plaintiff's breach of contract claim based on defendants' breach of the duty of good faith and fair dealing. *Maiden,* 461 Mich. at 119; MCR 2.116(C)(8).

Affirmed. Defendants having prevailed, may tax costs. MCR 7.219(A).

### All Citations

Not Reported in N.W.2d, 2016 WL 1178303

---

### Footnotes

1   *Lancia Jeep Hellas SA v. Chrysler Group International LLC,* unpublished order of the Court of Appeals, entered October 29, 2015 (Docket No. 329481).

2   During the pendency of this action, the three defendant business organizations were effectively extinguished via merger. Nevertheless, for the sake of clarity, we refer to those organizations and their successors in interest collectively as "defendants."

3   *Lancia Jeep Hellas SA v. Chrysler Group International LLC,* unpublished order of the Court of Appeals, entered October 29, 2015 (Docket No. 329481). LJH later filed a motion to expedite the consideration of this appeal, which this Court also granted. *Lancia Jeep Hellas SA v. Chrysler Group International LLC,* unpublished order of the Court of Appeals, entered November 20, 2015 (Docket No. 329481).

4   Indeed, it its brief on appeal, plaintiff states that it "stands on the agreement and brings an action for damages."

5   "Though not binding on this Court, federal precedent is generally considered highly persuasive when it addresses analogous issues." *Fed Home Loan Mtg Ass'n v. Kelley (On Reconsideration),* 306 Mich.App 487, 494 n 7; 858 NW2d 69 (2014).

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

2019 WL 567507©

KeyCite Yellow Flag - Negative Treatment

Distinguished by Lussoro v. Ocean Financial Federal Credit Union, E.D.N.Y., April 22, 2020

2018 WL 4374076

Only the Westlaw citation is currently available.

United States District Court, W.D. Wisconsin.

Matthew DOMANN, individually
and on behalf of all others
similarly situated, Plaintiff,

v.

SUMMIT CREDIT UNION, Defendant.

18-cv-167-slc
|
Signed 09/13/2018

### Attorneys and Law Firms

Douglas P. Dehler, Laura Jean Lavey, O'Neil, Cannon, Hollman, DeJong & Laing S.C., Milwaukee, WI, Richard Dale McCune, Jr., McCune Wright Arevalo, LLP, Ontario, CA, for Plaintiff.

Stuart M. Richter, Katten Muchin Rosenman LLP, Los Angeles, CA, William Warren Ehrke, Crivello Carlson, S.C., Milwaukee, WI, for Defendant.

### OPINION AND ORDER

STEPHEN L. CROCKER, Magistrate Judge

**\*1** Plaintiff Matthew Domann has filed a proposed class action in which he alleges that his credit union, defendant Summit Credit Union, misled him (and similarly situated customers) about its overdraft fee policy. *See* Complaint, dkt. 1. In particular, Domann argues that SCU used a method of calculating his balance that deviated from the method described in its contracts with Domann, leading SCU to charge him excess overdraft fees. In this putative class action, Domann brings claims against SCU for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, money had and received, violation of Regulation E of the Electronic Fund Transfers Act (EFTA), and violation of the Wisconsin Deceptive Trade Practices Act.

Defendant SCU has filed a motion (dkt. 9) to dismiss the First Cause of Action (breach of contract based on SCU's "Opt-In" form); Second Cause of Action (breach of contract based on the Membership Agreement); Fifth Cause of Action (unjust enrichment); Sixth Cause of Action (money had and received); and Seventh Cause of Action (violation of EFTA (Regulation E) ).

For the reasons that follow, I am granting defendant's motion.

### I. BACKGROUND

Overdraft fees have attracted the attention of regulators and the media in recent years.[1] In 2009, the Federal Reserve adopted Regulation E, a set of rules intended to "assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions where such services do not meet their needs." Electronic Fund Transfers, 74 Fed. Reg. 59,033-01 (Nov. 17, 2009) (codified at 12 C.F.R. § 205.1). Regulation E "require[s] financial institutions to secure a customer's 'affirmative consent' before charging overdraft fees," which must be obtained through an opt-in notice. This opt-in notice must contain a "brief description of the financial institution's overdraft service" and be "substantially similar" to the Fed's Model Form A-9. 12 C.F.R. § 1005.17(d).

Overdraft fees are tied to the customer's account balance. Financial institutions primarily use two methods to calculate an account holder's checking account balance: the "ledger" balance and the "available" balance. As described by the Consumer Financial Protection Bureau ("CFPB"),

> [a] ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared.

CFPB, Winter 2015 Supervisory Highlights, Section 2.3.[2]

**\*2** The following example illustrates the distinction:

2019 WL 567507©

If a member has a $100 ledger balance but uses his debit card to buy dinner for $40, then there is a pre-authorization hold on his account (at the request of the restaurant), and his available balance (the money he has left to use) is $60.00. In other words, the $40, which the member just spent, is no longer *available* for use. His ledger balance is still $100 until the restaurant charge is submitted and posted to his account. On the credit side, if he deposits an out-of-the-state check in the amount of $5,000 a hold will be placed on all but $200. In this example, his available balance is $200 and his ledger balance is $5,000, even though the check may never clear.

SCU's Br. in Supp., dkt. 11, at 3.

Not surprisingly, "[u]sing the available balance method often leads to more frequent overdrafts because there is less money available in the account due to holds and pending transactions." *Tims v. LGE Cmty. Credit Union*, No. 1:15-CV-4279-TWT, 2017 WL 5133230, at *1 (N.D. Ga. Nov. 6, 2017). Many account holders who have been subjected to overdraft charges based on "available balance" calculations not only feel blindsided by this, they feel that this practice is a breach of their contract with their credit union or bank. A series of virtually identical lawsuits has been filed across America challenging this practice. *See, e.g., Walker v. People's United Bank*, 305 F. Supp. 3d 365 (D. Conn. 2018); *Walbridge v. Ne. Credit Union*, 299 F. Supp. 3d 338 (D.N.H. 2018); *Tims v. LGE Cmty. Credit Union*, No. 1:15-CV-4279-TWT, 2017 WL 5133230 (N.D. Ga. Nov. 6, 2017); *Smith v. Bank of Hawaii*, No. CV 16-00513 JMS-RLP, 2017 WL 3597522 (D. Haw. Apr. 13, 2017); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991 (N.D. Cal. Mar. 21, 2017)*; Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009 (D. Nev. June 22, 2016); *Wodja v. Washington State Employees Credit Union*, 2016 WL 3218832 (W.D. Wash. June 9, 2016); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848 (W.D. Mich. 2016); *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016).

The instant case is at least the fifth time lead counsel for both sides have squared off against each other in this type of a lawsuit. In the previous four cases, the defendant institution filed a motion to dismiss, winning two (*Tims* and *Chambers*) and losing two (*Walbridge* and *Ramirez*), although plaintiffs' counsel's batting average defeating dismissal motions is close to perfect in the other lawsuits.

## II. PLAINTIFF'S ALLEGATIONS

Plaintiff Matthew Domann is a resident of Portage, Wisconsin and was a member of SCU at all times relevant to the allegations in the complaint. SCU is a state-chartered, Wisconsin-based credit union and is a "financial institution" within the meaning of Regulation E.

SCU offers its consumer banking customers a checking account. One of the features of this checking account is a debit card, which the account holder can use to purchase goods and services. SCU checking account holders can also write checks, withdraw money from ATMs, schedule Automated Clearing House (ACH) transactions, and perform other debit transactions from the account.

**\*3** On February 9, 2017, Domann was charged a $25 overdraft fee on a debit card payment of $4.63, which was made when Domann's ledger balance was $85.51. This is because SCU uses the "actual balance" rather than the "ledger balance" method when it determines whether an account holder has sufficient funds in his account to cover a transaction. Domann claims that by assessing him an overdraft fee on a positive ledger balance, SCU breached both its standard membership agreement (which he refers to as the "Account Agreement") and the Regulation E Opt In Agreement.[3] According to Domann, these documents promise to use the "ledger balance" method of calculating whether the member's account contains available funds to cover a transaction, but SCU actually uses the "available balance" method. In addition, Domann alleges, SCU violated Regulation E by failing to describe SCU's actual overdraft practice.

Domann brings this class action to assert claims in his own right, and in his capacity as the class representative of all other persons similarly situated. The "class" is composed of three separate classes, only two of which are relevant to this motion. The "Positive Balance Class" includes

All United States residents who have or have had accounts with SCU who incurred an overdraft fee or overdraft fees when the balance in the checking account was sufficient to cover the transactions during the period beginning six years preceding the filing of this Complaint and ending on the date the Class is certified.

The "Regulation E Class" includes

All United States residents who have or have had accounts with SCU who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010 and ending on the date the Class is certified.

SCU now moves to dismiss the breach of contract claims for failure to state a claim, arguing that the Account and Opt-In Agreements, construed together, unambiguously state that SCU would use the available balance method in assessing overdraft fees. SCU moves to dismiss the equitable claims on the ground that they cannot be maintained where Domann has conceded that an express contract controls the parties' relationship. SCU moves to dismiss the Regulation E claim on the ground that it is untimely.

### III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *Fed. R. Civ. P. 12(b)(6)*; *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### IV. DISCUSSION

#### A. Breach of Contract

**\*4** Domann's first two counts allege that SCU breached both the Opt-In Agreement and the Account Agreement by imposing overdraft fees based on his available balance instead of his ledger balance. In Wisconsin, a complaint states a claim for breach of contract when it alleges: "(1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3) damages." *Brew City*

*Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App 39, ¶ 11, 289 Wis. 2d 795, 807, 714 N.W.2d 582, 588, *aff'd sub nom. Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 2006 WI 128, ¶ 11, 297 Wis. 2d 606, 724 N.W.2d 879.[4]

SCU insists that plaintiff's claims fail because the contract cannot reasonably be read as providing that SCU would use the ledger balance method in assessing overdraft fees. "If the terms of the contract are plain and unambiguous, it is the court's duty to construe the contract according to its plain meaning even though a party may have construed it differently." *Woodward Commc'ns, Inc. v. Schockley Commc'ns Corp.*, 2001 WI App 30, ¶ 9, 240 Wis.2d 492, 498, 622 N.W.2d 756, 759-760. Thus, if a contract is unambiguous and the plaintiff's claims are unmerited under its terms, then dismissal of the complaint is appropriate under *Fed. R. Civ. P. 12(b)(6)*. *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 991 (7th Cir. 1991) (terms of a written contract prevail over pleadings). On the other hand, if the contract is facially ambiguous, then dismissal is not appropriate. *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992).

Whether a contract is ambiguous is a question of law. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). "A contract is ambiguous when its terms are reasonably susceptible to more than one interpretation." *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996). Under Wisconsin law, "[t]he general rule as to construction of contracts is that the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." *Pronschinske Trust Dated March 21, 1995 v. Kaw Valley Companies, Inc.*, 899 F.3d 470, 473 (7th Cir. 2018), quoting *Tempelis v. Aetna Cas. & Sur. Co.*, 169 Wis. 2d 1, 485 N.W.2d 217, 220 (1992). Moreover, the court must give contract terms their plain or ordinary meaning. *Id.*, citing *Huml v. Vlazny*, 293 Wis.2d 169, 716 N.W.2d 807, 820 (2006). Further, the court is to interpret the contract in a way that avoids absurd results. *Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 525 5 (7th Cir. 2008), citing *Kabes v. Sch. Dist.*, 2004 WI App 55, 270 Wis.2d 502, ¶ 11 (Ct. App. 2004); *see also Chapman v. B.C. Ziegler & Co.*, 2013 WI App 127, ¶ 2, 351 Wis. 2d 123, 128, 839 N.W.2d 425, 427.

##### 1. Opt In Agreement

The Opt In Agreement, officially titled "Debit Card Overdraft Coverage Consent," is a single-page, double-sided form through which a SCU member chooses to have certain

2019 WL 567507©

overdrafts paid for by SCU and to incur a fee for that service. Dkt. 12, Exh. 1. SCU's form mirrors in all material respects the A-9 Model Consent Form for Overdraft Services (§ 205.17). The Opt In Agreement states: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." The Opt In Agreement explains that there are two kinds of protection: standard practices for protection as part of the SCU account and other overdraft protection plans that would link with another account, such as a savings account or a line of credit. The Opt In Agreement pertains to the standard practices.

 **\*5** The Opt In Agreement does not define or explain what is meant by the phrase "when you do not have enough money in your account to cover a transaction." Domann argues that the plain meaning of this phrase is that an overdraft would occur only when there was not enough money in the account, as shown by the ledger balance, to cover the transaction. SCU argues that the Opt In Agreement is part of the Account Agreement and must be read in conjunction with that Agreement. When the documents are read together, SCU argues, the plain meaning of "enough money" is the available balance.

Standing alone, the Opt In Agreement does not sufficiently define or explain the term "enough money" to put account holders on notice that "enough money" means the available balance. As Domann points out, the Opt In Agreement does not mention or explain the available balance in any way, nor does it contain any language alerting the consumer that holds placed on funds earmarked for transactions that have not yet been settled or deposits that have not yet cleared can reduce the amount of money that is otherwise available for the consumer to use. This stands in contrast to the Opt In Agreement at issue in *Chambers*, 222 F. Supp. 3d at 10, a case cited by SCU, which specifically used the term "available balance" and included examples to illustrate what "not enough money in your account" meant, such as when the account holder "inadvertently miscalculate[s] [her] available balance," or "when funds from a recent deposit are not available." Moreover, the Opt In Agreement in this case does not specifically reference the Account Agreement.

All of this being so, I agree with SCU that the Opt In Agreement must be construed together with the Account Agreement. As SCU notes, in Wisconsin, instruments executed at the same time between the same contracting parties in the course of the same transaction generally will be construed together. *Wipfli v. Bever*, 37 Wis. 2d 324, 326,

155 N.W.2d 71, 72 (1967); *Harris v. Metro. Mall*, 112 Wis. 2d 487, 496, 334 N.W.2d 519, 523 (1983) (same). Although Domann has not alleged when he entered into the respective agreements, he has not attempted to distinguish these cases on the ground that he executed the Opt In Agreement and the Account Agreement at separate times. Moreover, even if the agreements were not executed simultaneously, there would be no need for the overdraft coverage provided for in the Opt In Agreement were it not for the existence of a corresponding account established through the Account Agreement. *Accord Walbridge*, 299 F. Supp. 3d at 343–44 ("Although the Agreements are separate, they are arguably linked with respect to an account holder's overdraft protection."); *Smith*, 2017 WL 3597522, at \*6 ("Simply stated, a customer cannot 'opt-in' to overdraft protection for an account that does not exist."). Accordingly, I find that the language of the Opt In Agreement must be construed together with the Account Agreement for purposes of the breach of contract claims.

2. Account Agreement
Customers at SCU are provided with a Membership Guide that covers the parties' rights and responsibilities concerning the account. Dkt. 12, Exh. 2. The Membership and Account Agreement, which is the first of three agreements or disclosures that constitute the Membership Guide, is 11 pages long and contains 34 sections. SCU points to a number of provisions in the Membership Guide that it says communicate the use of available balance, rather than ledger balance, as the trigger for potential overdraft fees. First, the "Withdrawal Restrictions" section of the Account Agreement provides:

 **\*6 a. Withdrawal Restrictions.** We will pay checks or drafts, permit withdrawals, and make transfers from *available* funds in your account. The *availability* of funds in your account may be delayed as described in our Funds Availability Policy Disclosure. We may also pay checks or drafts, permit withdrawals, and make transfers from your account from insufficient *available* funds if you have established an overdraft protection plan or, if you do not have such a plan with us, according to our overdraft payment policy.

*Id.*, p. 5, ¶ 11 (emphases added).

Second, two paragraphs later, the Account Agreement's "Overdrafts" Section provides:

 **a. Payment of Overdrafts.** If, on any day, the *available* funds in your share or deposit account are not sufficient

2019 WL 567507©

to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it, as described below. The Credit Union's determination of an insufficient *available account balance* may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient *available* funds in order to pay an item. Your account may be subject to a charge for each item regardless of whether we pay or return the item.

> *Id.*, p. 6, ¶ 12 (emphases added).

Third, in the "Fund Transfers" section, the Account Agreement specifies that SCU is "not obligated to execute any order to transfer funds out of your account if the amount of the requested transfer plus applicable fees exceeds the *available funds* in your account." *Id.*, p.4, ¶ 9 (emphasis added).

Finally, SCU points to its "Funds Availability Policy Disclosure," a one-and-a half-page document contained within the Membership Guide and referred to explicitly in the "Withdrawals" section set out above, which explains that not all funds deposited by check will be "available" immediately for use. *Id.*, pp. 11-12. This policy explains that in some cases

> [f]unds may not be available until the second business day after the day of your deposit. However, the first $200.00 of your deposit will be available on the first business day after the day of your deposit. If we are not going to make all of the funds from your deposit available on the same business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available.

> *Id.* at 12.

When these provisions are read in context and as a whole, argues SCU, the only reasonable way to interpret the contract is that SCU will assess overdrafts based on the member's available balance, rather than the ledger balance.

I agree. As an initial matter, the term "available" is used to modify the term "funds" or "account balance" several times throughout the Account Agreement, including three times in the "Overdrafts" section. If this term meant "all of the funds" in the member's account, as Domann urges, then the adjective "available" would be meaningless and unnecessary. Such a construction would violate the rule that "a construction which gives effect to every word of a contract should be

preferred to one which results in surplusage." *McCullough v. Brandt*, 34 Wis. 2d 102, 106, 148 N.W. 2d 718 (1967) (citation omitted). The word "available" has meaning only if it denotes something other than "all of the funds" or "actual balance."

The conclusion that "available" means something other than "actual" is not only supported by the rules of contract construction, but it is spelled out in the contract itself. In particular, the "Withdrawals" section—which appears before and refers to the overdrafts policy—refers explicitly to the Funds Availability Policy. By its express terms, this policy informs the member that the entirety of funds deposited into the account will not necessarily be "available to you on the same business day that we receive your deposit." Giving this section its plain reading, it conveys clearly that there may be a difference between the actual balance on a member's account and the amount of funds that are "available" for the member to use. Thus, although it is true that the Account Agreement does not have a glossary or expressly define the term "available account balance" or "available funds," the Funds Availability Policy makes clear that the word "available" has a specific meaning and that funds "available" in a customer's account may be a subset of the dollars shown on the ledger balance.

**\*7** Domann points out that other federal district courts have denied motions to dismiss after concluding that the relevant agreements were ambiguous as to whether the actual or available balance would be used to determine if an account was in overdraft. *See, e.g., Walker*, 305 F. Supp. 3d at 371; *Walbridge*, 299 F. Supp. 3d at 346; *Smith*, 2017 WL 3597522, at *5; *Ramirez*, 2017 WL 1064991, at *5; *Gunter*, 2016 WL 3457009, at *3; *Wodja*, 2016 WL 3218832 at *3; *Pinkston-Poling*, 227 F. Supp. 3d at 855. Having read and considered these cases, I do not find that their reasoning compels a different result. Many of the account agreements at issue in these cases did not contain (or the court did not mention) a Funds Availability Policy like the one referenced in Domann's Account Agreement. In fact, several of these cases did not use the term "available" at all.

Although the courts in *Walbridge* and *Ramirez* found ambiguity in spite of a Funds Availability Disclosure, neither case convinces me that I should do the same here. In *Walbridge*, 299 F. Supp. 3d 338, the court discounted the funds availability policy because it "was not linked to the Opt In Agreement or to the parts of the Account Agreement that discussed overdrafts." *Id.* at 346. However, the "overdrafts" section of the account agreement at issue in *Walbridge* did not use the term "available funds" or "available account balance,"

2019 WL 567507©

but instead merely used the term "insufficient funds." *Id.* at 344. In this case, by contrast, SCU's "overdrafts" section uses the term "available" multiple times, and the section appears within the Account Agreement only two paragraphs after the "withdrawals" section, which contained a specific reference to the Funds Availability Policy.

*Ramirez,* 2017 WL 1064991, is more on point, but I respectfully disagree with the court's analysis leading to a finding of ambiguity. The *Ramirez* court appears to have given short shrift to the inconsistency between the language of the Funds Availability Policy—which clearly signifies that not all funds shown on an account holder's ledger balance are "available"—and the plaintiff's insistence that the term "available balance" as used elsewhere in the account agreement could reasonably mean ledger balance.

I am more persuaded by the decisions in *Chambers,* 222 F.Supp.3d 1, and *Tims,* 2017 WL 5133230, in which the courts found the existence of funds availability disclosures to be fatal to the plaintiff's claim that her bank breached a promise to assess overdraft fees only on transactions that overdrew her ledger balance. Relying on the language of the funds availability disclosure, these courts found that "[w]hen the account agreement refers to 'available' funds, it must be referring to a subset of funds unencumbered by such restrictions—exactly the type of restrictions that can create a divergence between the actual and available balances in the first place." *Chambers,* 222 F. Supp. 3d at 11 (citation omitted); *Tims,* 2017 WL 5133230 at *4 (quoting *Chambers* ). Both courts found that, when the funds availability disclosure was read in the context of the agreements as a whole, the agreements could only be reasonably interpreted as providing for use of the available balance method, not the ledger balance method, for assessing overdrafts. Reading Domann's contract in a similar fashion, I reach the same conclusion.

As a final observation, I note that Domann makes much of the fact that the Funds Availability Policy explains only that funds might not be available when a hold is placed on a deposit, without also informing the member that funds might also be reduced as a result of holds placed on funds earmarked for pending transactions. Complaint, ¶ 36; Plt.'s Br., dkt. 23, at 14. Accepting this as true, the fact that SCU omitted relevant information from its account contract concerning holds on pending transactions does not mean that SCU promised to use the ledger balance when assessing overdrafts, which is what Domann must show to proceed on his breach of contract claims.

**\*8** To be sure, the Account Agreement–and the "Overdrafts" section in particular–could have been written more clearly to explain how the "available balance" method works and its potential impact on overdraft charges. But the question presented to the court is not whether SCU could have or should have explained its procedures more clearly, the question is whether the terms as written reasonably can be understood as a promise by SCU to use a member's actual or "ledger" balance when assessing overdraft fees. The contract at issue cannot reasonably be read this way. Accordingly, Domann's breach of contract claims will be dismissed.

**B. Unjust Enrichment and Money Had and Received**
SCU moves to dismiss Domann's equitable claims for unjust enrichment and money had and received (the Fifth and Sixth Causes of Action) on two grounds: first, the two claims are indistinguishable, *see Meyer v. The Laser Vision Institute,* 290 Wis. 2d 764, 778 (Ct. App. 2006) (stating unjust enrichment and money had and received are same cause of action); second, neither claim can be maintained because the parties entered into a written contract addressing the same subject matter. Domann acknowledges that he cannot recover on both a contract theory and an unjust enrichment theory but contends that he may plead these theories in the alternative. Br. in Opp., dkt. 23, at 28.

Domann is correct, but only to a point. A party *can* plead quasi-contract and contract claims in the alternative, but only in limited situations. As the court explained in *U.S. ex rel. Roach Concrete, Inc. v. Veteran Pac., JV,* 787 F. Supp. 2d 851, 859 (E.D. Wis. 2011), one of the cases cited by plaintiff:

> Where a plaintiff asserts a breach of contract claim and fails to allege any facts from which it could at least be inferred that the contract on which that claim is based might be invalid, the plaintiff is precluded from pleading in the alternative claims that are legally incompatible with the contract claim. This is but an application of the rule that "[a] plaintiff pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits...." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1086 (7th Cir. 2008) (quoting *Kolupa v. Roselle Park Dist.,* 438 F.3d 713, 715 (7th Cir. 2006) ).

In Wisconsin, "[t]he doctrine of unjust enrichment does not apply where the parties have entered into a contract." *Greenlee v. Rainbow Auction/Realty Co.,* 202 Wis. 2d 653, 671, 553 N.W. 2d 257, 265 (Ct. App. 1996) (citing

*Continental Cas. Co. v. Wis. Patients Comp. Fund*, 164 Wis. 2d 110, 118, 473 N.W. 2d 584, 587 (Ct. App. 1991) ).

Throughout his complaint, Domann asserts that he entered into "binding" contracts with SCU in which SCU promised to do certain things that it did not do. Domann's claims for unjust enrichment and money had and received are not based upon an alternative theory under which there is no express contract; to the contrary, both counts incorporate by reference all of the breach of contract allegations. Complaint, dkt. 1, at ¶¶ 88, 92. Domann's allegations that the parties' relationship is governed by the terms of express, written contracts are thus incompatible with his quasi-contract theories. As a result, those claims must be dismissed. *Accord Thekan v. Revane*, 1998 WL 692324, *1, 222 Wis. 2d 624, 587 N.W. 2d 457 (Table) (unpublished disposition) (upholding trial court's dismissal of plaintiff's alternative unjust enrichment claim where plaintiff brought breach of express contract claim covering same subject); *Cohen v. American Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) (same) (applying similar Illinois law).

## C. EFTA Claim

**\*9** Finally, SCU moves to dismiss Count 7, in which Domann alleges that SCU violated Regulation E of EFTA, 12 C.F.R. § 1005.17, by not accurately describing SCU's overdraft service in the Opt In Agreement. SCU moves to dismiss the claim on the grounds that the claim is untimely.

Generally, 15 U.S.C. § 1693m imposes civil liability on an institution that fails to comply with the provisions of EFTA. 15 U.S.C. § 1693m(a). EFTA claims must be brought "within one year from the date of the occurrence of the violation." § 1693m(g). Domann does not allege facts to show when he signed the Opt In Agreement. He does allege, however, that he was charged overdraft fees, based on the Opt In Agreement, on four occasions in 2017: February 9, February 10, November 7 (his business account), and December 7. Domann filed his complaint on March 9, 2018, within one year of his November and December 2017 overdraft fees but more than one year after he was assessed the February 2017 overdraft fees.

SCU argues that an EFTA violation "occurs" (and starts the one-year clock) when the *first* overdraft fee is charged after an alleged failure to obtain proper authorization pursuant to Regulation E, whereas Domann argues that a one-year clock begins anew with *each* improper overdraft fee. The bulk of authority is on SCU's side. Although the Seventh

Circuit has not addressed the precise issue, most district courts that have considered the EFTA statute of limitations have concluded that the limitation period is triggered when a financial institution makes a first unauthorized transfer or charges an overdraft fee, rejecting the application of a "continuing violation" theory. *See, e.g., Walbridge*, 299 F. Supp. 3d at 350 (overdraft fee); *Wheeler v. Native Commerce Studios*, LLC, 2018 WL 447716, at *1–*2 (W.D. Mich. Jan. 17, 2018) (unauthorized transfer); *Whittington v. Mobiloil Federal Credit Union*, 2017 WL 6988193, *2–*4 (E.D. Texas, Sept. 14, 2017) (overdraft fee) (citing and discussing cases); *Harvey v. Google*, 2015 WL 9268125, at *3 - *4 (N.D. Calif. Dec. 21, 2015) (unauthorized transfer); *Repay v. Bank of America, N.A.*, 2013 WL 6224641, *4–*5 (N.D. Ill. Nov. 27, 2013) (recurring transfer). In *Harvey*, 2015 WL 9268125, at *4, the court explained the reasoning behind this rule:

> Although the consumer is financially injured with each transfer, the basis of the wrongful conduct is the failure to obtain proper authorization in the first instance. The EFTA claim based on such conduct is fully consummated when the first unauthorized transfer is made.

Domann attempts to distinguish these cases on the ground that an overdraft fee is nonrecurring, unlike the recurring transfers at issue in some of the cases cited above. He finds support for his position in *Smith*, 2018 WL 1662107 at *5, in which the court saw a distinction between preauthorizing a series of transfers and opting in to an overdraft service, explaining:

> In the first instance, a consumer gives express permission for a series of recurring transfers from his or her account. But in the second instance a consumer merely opts in to a service, perhaps with no intention of ever using it, and he or she does not agree to any specific fee or charge, let alone a series of them.

The *Smith* court saw this as a reason to treat each overdraft fee separately that triggered a new one-year limitations period. *Id.*

**\*10** With all due respect, the reasoning of *Smith* is not persuasive. As a general rule, a statute of limitations begins to run when the plaintiff has "a complete and present cause of action" upon which the plaintiff "can file suit and obtain relief." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 195, 201 (1997). "Customarily, that is true when the defendant breaches a duty (here a duty imposed by statute) and the claimant is injured." *Wike v. Vertrue, Inc.*, 566 F.3d 590, 593 (6th Cir. 2009). Here, Domann alleges that SCU violated the EFTA by failing "to comply with the 12 C.F.R. § 1005.17 opt-in

requirements, including failing to provide its customers with a valid description of the overdraft program ...". Complaint, dkt. 1, ¶ 99. Thus, the alleged wrongful conduct is based on a single omission: the failure of SCU's opt-in contract to explain that SCU would use the "available" balance in the account rather than the "ledger" balance when assessing overdrafts.

I accept that Domann was not *injured* by this conduct until he was first assessed an overdraft fee based on an insufficient available balance. *Accord Wike*, 566 F.3d at 593 (finding that one year limitations period for alleged violation of EFTA's restriction on "preauthorized electronic fund transfers" occurred when first recurring transfer took place, not when payee arranged it). However, there is no basis to find that a new cause of action accrued with each new overdraft fee. Domann does not allege that it was improper *per se* for SCU to charge him an overdraft fee, but only that SCU misled him about the circumstances under which it would charge such a fee. Domann was aware–or should have been aware–that he had been misled when the first overdraft charge took place on February 9, 2017. At that time, his EFTA claim based on the alleged Regulation E violation was fully consummated. It did not begin anew with subsequent overdraft charges.

Taking a different tack, Domann contends that, pursuant to the discovery rule, the statute of limitations did not start to run until he met with his attorney in December 2017. Under federal law, the discovery rule "starts the statute of limitations running only when the plaintiff learns that he[has] been injured, and by whom." *United States v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010), citing *United States v. Kubrick*, 444 U.S. 111 (1979); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). Although a plaintiff does not need to negate a statute of limitations defense in his complaint, he must ultimately show that "even with the exercise of reasonable diligence [he] could not have known of the purported injury" in time to file a timely complaint. *Cathedral of Joy Baptist Church v. Vill. of Hazel Crest*, 22 F.3d 713, 717 (7th Cir. 1994).

Domann asserts that he could not discover before meeting with his lawyer that SCU was using the "available balance" method in assessing overdrafts because that fact was not disclosed in his account agreements. Br. in Opp., dkt. 23, at 26-27. This argument is unpersuasive. In the complaint, Domann alleges that he was charged an overdraft when his account had a positive ledger balance, and his EFTA claim is based on the premise that SCU's Opt-In Agreement said SCU

would *not* assess overdraft fees when there was a sufficient positive ledger balance to cover the withdrawal or debit. On the basis of these allegations, then, Domann should have known when he was charged his first overdraft on a positive ledger balance that SCU was *not* using the ledger balance method to assess overdraft fees. At the very least, Domann would have had reason upon receiving the overdraft charge to review his account statement and account documents to find out what SCU's overdraft policy was and whether SCU was violating it. Thus, I agree with other courts that have found that, with reasonable diligence, plaintiff could have discovered his injuries when he received his first overdraft charge either by viewing his online account or looking at his bank statement.[5] *Whittington*, 2017 WL 6988193, *13 (rejecting application of discovery rule); *Walbridge*, 299 F. Supp. 3d at 351 (plaintiff failed to explain why he could not have discovered that fees were improperly charged); *Harvey*, 2015 WL 9268125, *4 (rejecting plaintiff's EFTA claim as untimely where she failed to view her bank statements and discover improper fees).

**\*11** Finally, Domann argues that, because he did not realize until he met with counsel in December 2017 that SCU's assessment of a single overdraft was "part of a systematic practice" that harmed an entire class of plaintiffs, he should be entitled to the exception announced in *Goodhand v. United States*, 40 F.3d 209 (7th Cir. 1994). In *Goodhand*, 40 F.3d at 212-13, the Seventh Circuit adopted a "trivial injury" exception for claims brought under the Federal Tort Claims Act, holding that where an injury is reasonably initially thought to be too slight to warrant the expense, inconvenience and uncertainties of litigation, the running of the statute of limitations is suspended until the injury is discovered to be serious. Domann cites no case extending this rule—which applies to personal injuries—to consumer class actions. The reason for this lack of authority is obvious: taken to its logical conclusion, Domann's argument would effectively suspend the limitations period for all putative class actions until the date on which a potential class representative met with class counsel and learned the "scope" of the harm. Nothing in *Goodhand* supports such an enormous extension of a limited exception to the ordinary discovery rule.

In sum, with reasonable diligence Domann would have known of his injury when he received his first overdraft fee on February 9, 2017. Because he did not file his lawsuit until more than one year later, the EFTA claim is untimely.

Domann v. Summit Credit Union, Not Reported in Fed. Supp. (2018)
2019 WL 567507©

ORDER

IT IS ORDERED THAT defendant's Motion to Dismiss plaintiff's First, Second, Fifth, Sixth and Seventh Causes of Action under F. R. Civ. P. 12(b)(6) is GRANTED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4374076

Footnotes

1    For a thorough review of this history, see *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016).

2    Matters outside the pleading cannot be considered unless the motion is treated as one for summary judgment, and the parties are given "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *Doss v. Clearwater Title Co.*, 551 F.3d 634, 639 (7th Cir. 2008). However, there is "a narrow exception to the Rule 12(d) instructions that permits a district court to take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a motion for summary judgment." *Doss*, 551 F.3d at 640. Judicial notice of the CFPB's report is warranted because it is a report of an administrative body. *See Radaszewski v. Maram*, 383 F.3d 599, 600 (7th Cir. 2004)(taking judicial notice of administrative findings in public record); *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998)("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper."). Accordingly, plaintiff's unopposed request for judicial notice, dkt. 24, is granted as to this report. The other documents attached to plaintiff's request may be appropriate for judicial notice as well, but they are irrelevant to the motion to dismiss.

3    Plaintiff did not attach copies of these documents to his complaint, but defendant has submitted copies with its motion to dismiss. Dkt. 12, Exhs. 1 and 2. The court may consider these documents in ruling on the dismissal motion. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) ) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.").

4    The parties appear to agree that Wisconsin law applies. This is consistent with Section 33 of the Account Agreement, which states that the contract is governed by the laws "of the state in which the Credit Union's main office is located."

5    In reaching this conclusion, I have relied solely on the complaint and not on either version of Domann's account statement submitted by the parties. *See* Dkt. 12, exh. 3 and Dkt. 19.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT I

Tilley v. Mountain America Federal Credit Union, Not Reported in Fed. Supp. (2018)

2018 WL 4600655

2018 WL 4600655
Only the Westlaw citation is currently available.
United States District Court, D. Utah.

Lewis TILLEY, Plaintiff,
v.
MOUNTAIN AMERICA FEDERAL
CREDIT UNION, Defendant.

Case No. 2:17-cv-01120-JNP-BCW
|
Signed 09/25/2018

**Attorneys and Law Firms**

Jae K. Kim, Pro Hac Vice, Richard D. McCune, Pro Hac Vice, Mccune Wright Arevalo LLP, Ontario, CA, Jon V. Harper, M. Denise Dalton, Harper Law PLC, Salt Lake City, UT, Taras Kick, Pro Hac Vice, The Kick Law Firm APC, Los Angeles, CA, for Plaintiff.

Joseph A. Skinner, Scalley Reading Bates Hansen & Rasmussen, Gary E. Doctorman, Zack L. Winzeler, Parsons Behle & Latimer, Salt Lake City, UT, Andrew J. Demko, Pro Hac Vice, Stuart M. Richter, Pro Hac Vice, Katten Muchin Rosenman LLP, Los Angeles, CA, Jonathan H. Rupp, Mountain American Federal Credit Union, West Jordan, UT, for Defendant.

**MEMORADUM DECISION AND ORDER GRANTING MOUNTAIN AMERICA'S MOTION TO DISMISS**

Jill N. Parrish, United States District Court Judge

**\*1** Before the court is Mountain America Federal Credit Union's motion to dismiss Lewis Tilley's complaint. [Docket 23]. The court GRANTS the motion and dismisses Tilley's only federal claim with prejudice. The court, therefore, dismisses the remaining state-law claims without prejudice for lack of subject matter jurisdiction.

**BACKGROUND**

Tilley had a checking account at Mountain America and had agreed to participate in its overdraft service. Under this service, the credit union agreed to cover a charge when there were insufficient funds in the account. Mountain America charged a $20 fee for each overdraft draw it covered. The opt-in agreement to Mountain America's overdraft service described the conditions under which it assesses an overdraft fee as follows: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."[1]

There are two principal methods for determining the amount of money in a checking account. The first is the ledger balance method, which is the amount that a credit union member sees when he or she looks up their account balance. The ledger balance excludes debit card charges that have been authorized by the financial institution but that have not yet posted to the account. It also includes the full amount of deposits even if the funds have not yet cleared. The second is the available balance method. The available balance takes into account authorized debit card charges that have not yet posted to the account and excludes deposits if the funds have not yet been cleared by the credit union. Mountain America uses the available balance method to determine whether a member has overdrawn his or her checking account.

On January 10, 2016, Tilley had a ledger balance of $49.31 in his checking account. He made a debit card purchase for $11.86. But the available balance of the account was insufficient to cover this charge, so Mountain America assessed a $20 overdraft fee.

On October 10, 2017, Tilley filed a complaint against Mountain America based upon this overdraft charge. He asserted a federal claim under the Electronic Fund Transfer Act (EFTA). Tilley also asserted six state-law claims: breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, money had and received, common law unconscionability, and a claim under the Utah Truth in Advertising Act. The complaint sought certification of a class-action lawsuit so that Tilley can represent similarly-situated individuals.

**\*2** Mountain America filed a motion to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Tilley failed to state a claim upon which relief can be granted.

**ANALYSIS**

**I. THE EFTA CLAIM**

2018 WL 4600655

Pursuant to authority granted by the EFTA, the Bureau of Consumer Financial Protection (Bureau) issued Regulation E to establish protections for consumers that engage in electronic funds transfers. 12 C.F.R. § 1005.1. Regulation E sets standards for overdraft services provided by financial institutions, including an opt-in requirement:

[A] financial institution holding a consumer's account shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution: (i) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service; ... [and] (iii) Obtains the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions ....

Id. § 1005.17(b)(1); see also id. § 1005.17(d)(1) (requiring a "brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed").

The notice required by Regulation E "shall be substantially similar to Model Form A–9," which is promulgated by the Bureau. Id. § 1005.17(d). Model Form A–9 includes the following description of an overdraft service: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Id § 1005, App. A. The opt-in form used by Mountain America uses verbatim the language suggested by Model Form A–9 to describe its overdraft service.

Tilley alleges in his complaint that Mountain America violated Regulation E, and by extension the EFTA, because the notice it provided to him did not adequately describe its overdraft service. Specifically, Tilley claims that the notice failed to inform him that Mountain America used the available balance method to determine when an overdraft occurs rather than the ledger balance method.

The court concludes that Tilley failed to state a claim under the EFTA for two reasons: (1) he did not file his complaint within the applicable limitations period and (2) Mountain America is insulated from liability by the EFTA's safe harbor provision.

### A. Limitations Period

15 U.S.C. § 1693m(a) authorizes consumers to initiate a lawsuit for a failure to comply with any provision of the EFTA.[2] The lawsuit must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g).

**\*3** Tilley alleges that Mountain America violated Regulation E on January 10, 2016, by assessing an overdraft fee without complying with the notice requirement found in the regulation. Tilley did not file his complaint until October 10, 2017, nine months after the one-year limitations period had run. Tilley argues, however, that the court should not dismiss his EFTA claim because the imitations period was tolled by the discovery rule.[3]

The federal discovery rule tolls the statute of limitations until "the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." Indus. Constructors Corp. v. U.S. Bureau of Reclamation, 15 F.3d 963, 969 (10th Cir. 1994). In order to raise a delayed discovery argument, a plaintiff must plead facts supporting his or her failure to discover the injury and its cause as well as facts demonstrating the plaintiff's reasonable diligence to discover the cause of the injury. See Boettcher v. Conoco Phillips, Co., No. 17-6115, 2018 WL 817879, at *2 (10th Cir. Feb. 12, 2018) (unpublished); Ballen v. Prudential Bache Sec., Inc., 23 F.3d 335, 337 (10th Cir. 1994).

Tilley does not plead any facts supporting the delayed discovery argument he raises in response to Mountain America's motion to dismiss. He does not state in his complaint when or how he discovered his injury and its cause. Nor does he allege facts showing that he exercised reasonable diligence to discover the injury or its cause. This failure to plead facts supporting his delayed discovery argument merits dismissal of the EFTA claim.

**\*4** Furthermore, the facts alleged in the complaint establish that the discovery rule does not apply. The crux of Tilley's claim is that Mountain America violated Regulation E when it assessed an overdraft fee without providing him with an adequate notice of how its overdraft service works. Tilley was aware of or had reason to know the content of the opt-in notice that was provided to him when he agreed to participate in the overdraft service. He also knew or had reason to know that the ledger balance of his checking account was $49.31 when he used his debit card to make an $11.86 purchase on January 10, 2016. Finally, he had reason to know that Mountain America assessed a $20 overdraft fee based upon this purchase. Thus he knew or had reason to know of his injury—the $20 fee. And to the extent that he was

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.175 Filed 10/22/20 Page 101 of 115
Tilley v. Mountain America Federal Credit Union, Not Reported in Fed. Supp. (2018)
2018 WL 4600655

surprised by the fee, he knew or had reason to know of the cause of his injury—the inadequate warning of the overdraft fee procedures provided by Mountain America in the opt-in notice. *See Whittington v. Mobiloil Fed. Credit Union*, No. 1:16-CV-482, 2017 WL 6988193, at *13 (E.D. Tex. Sept. 14, 2017) ("If [the plaintiff] had exercised due diligence, she would have discovered her injuries either by viewing her online ... account or looking at her bank statements."); *Harvey v. Google Inc.*, No. 15-CV-03590-EMC, 2015 WL 9268125, at *4 (N.D. Cal. Dec. 21, 2015) ("If [the plaintiff] had exercised due diligence, she should have discovered the injury either by looking at her ... account or even more simply, looking at her bank statements.").

Tilley nonetheless argues that the discovery rule should toll the limitations period because he had no reason to know that Mountain America had assessed the overdraft fee based upon the available balance method. But Tilley alleges no facts to support this claim. He does not allege, for example, that he exercised reasonable diligence by asking someone at Mountain America to explain his overdraft fee. Nor does he allege that none of Mountain America's publicly available information discloses the method by which overdraft fees are assessed. Moreover, Tilley did not have to know the precise method Mountain America used to assess an overdraft fee in order to have reason to know the cause of his injury—the inadequate opt-in notice. Under his EFTA claim, he only needed to have reason to know that the opt-in notice did not sufficiently inform him that he could be liable for an overdraft fee even if the ledger balance of his account was sufficient to cover a charge. Tilley did not have to know that Mountain America used the available balance method.

The court, therefore, determines that the discovery rule does not apply here and dismisses the EFTA claim because it is barred by the one-year limitations period.[4]

### B. Safe Harbor Provision

The EFTA contains a safe harbor provision, which states that "[n]o provision of this section ... imposing any liability shall apply to ... any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board." 15 U.S.C. § 1693m(d). Regulation E mandates that financial institutions shall use an opt-in notice that is "substantially similar to Model Form A–9," which is promulgated by the Bureau. 12 C.F.R. § 1005.17(d). Mountain America argues that the EFTA's safe harbor provision insulates it from liability

because it used verbatim the appropriate clause of Model Form A–9 to describe its overdraft service. Indeed, its opt-in notice is almost identical to Model Form A–9, with only slight modifications to account for differences in its overdraft service. Tilley, however, contends that the safe harbor provision does not bar his EFTA claim for three reasons.

Tilley first argues that the EFTA's safe harbor provision does not shield financial institutions from challenges to the adequacy of the language of the opt-in notice. Citing authority from a federal district court in Michigan, he asserts that "the statutory language [of the safe harbor provision] suggests that this defense insulates an institution only from a challenge as to the form—not the adequacy—of the disclosure." *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 852 (W.D. Mich. 2016) (alteration in original) (citation omitted).[5] This reading of the safe harbor provision divides the inadequate disclosure claims that may be brought under the EFTA into two categories: challenges as to the form of the disclosure and challenges as to the substance or adequacy of the disclosure. *Pinkston-Poling* reasoned that a claim that the language of a disclosure is inadequate falls into the second category and held that the safe harbor provision does not apply to such claims. 227 F. Supp. 3d at 852–53.

*5 This court respectfully disagrees with the *Pinkston-Poling* court's interpretation of the EFTA's safe harbor provision because it would render it a nullity. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted); *accord Washington Mkt. Co. v. Hoffman*, 101 U.S. 112, 115–16 (1879) ("As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' "). Interpreting the safe harbor provision to exclude any protection from challenges to the adequacy of the language of the disclosure would make the provision completely ineffectual. Regulation E requires financial institutions to disclose certain specified information, including a "brief description of the ... overdraft service," the amount of any fees imposed, and the maximum number of overdraft fees that may be assessed in one day. 12 C.F.R. § 1005.17(d). Any legal challenge to a disclosure made pursuant to Regulation E necessarily must contest the adequacy of the language used to make the disclosure. Thus,

Case 2:20-cv-12318-PDB-EAS ECF No. 7, PageID.176 Filed 10/22/20 Page 102 of 115

Tilley v. Mountain America Federal Credit Union, Not Reported in Fed. Supp. (2018)

2018 WL 4600655

excluding challenges to the adequacy of the disclosure from the protection afforded by the safe harbor clause would render it superfluous and without effect.

A plain language reading of the safe harbor provision avoids such a disfavored result. The provision insulates a financial institution from liability for "any failure to make disclosure in proper form" if the institution uses the appropriate model clause from Form A–9. In other words, if a financial institution uses model language provided by the Bureau to make a disclosure, it is shielded from liability for claims that the disclosure is deficient. In this context, the word "form" refers to the "particular ... structure[ ] or construction of a thing; the particular mode in which a thing exists or manifests itself." *Form*, The Oxford English Dictionary (2d Ed. 1991); *accord form*, The Random House College Dictionary (Rev. Ed. 1980) ("configuration.... the manner or style of arranging and coordinating parts for a pleasing or effective result."). Thus, the form of the disclosure must necessarily include the substantive language from which it is constructed. By shielding banks and credit unions from liability as to the form of a disclosure if they adopt model language drafted by the Bureau, the safe harbor provision provides immunity against claims that the structure or construction of the model language provided by the Bureau violates Regulation E.

The court concludes that the narrow interpretation of the EFTA's safe harbor provision advanced by Tilley would render it illusory. Indeed, Tilley's reading would transform the safe harbor into a siren song that lures financial institutions to founder on rocky shoals. The court determines, therefore, that the form of a disclosure includes the substantive language used to make the disclosure.

Second, Tilley argues that the safe harbor provision does not apply because his EFTA claim is not based upon a failure to properly disclose information. He contends that his claim is based upon a provision that prohibits financial institutions from charging customers overdraft fees. But even a cursory review of Regulation E reveals this argument to be spurious. Regulation E provides that financial institutions "shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution: (i) Provides the consumer with a notice in writing ... describing the institution's overdraft service." *Id.* § 1005.17(b)(1). Tilley's EFTA claim is that Mountain America improperly charged an overdraft fee because it did not provide a proper written notice—i.e., disclosure—to him beforehand. The key

issue in Tilley's claim is whether Mountain America provided an adequate disclosure of its overdraft services. Thus, the safe harbor provision applies to Tilley's claim.

Finally, Tilley argues that the Bureau's official interpretation of Regulation E bars the application of the safe harbor provision in this case. The official interpretation contains the following comment on the model forms drafted by the Bureau and attached as Appendix A to Regulation E: "[T]he Bureau has issued model clauses for institutions to use in designing their disclosures. If an institution uses these clauses accurately to reflect its service, the institution is protected from liability for failure to make disclosures in proper form."[6] *Id.* § 1005, Supp. I. Contrary to Tilley's assertion, this official interpretation does not defeat the safe harbor protections afforded by 15 U.S.C. § 1693m(d). It is true that financial institutions are not entitled to safe harbor protections if they use an inappropriate model clause or if the disclosure is inaccurate. *See Hale v. MBNA Am. Bank, N.A.*, No. 99CIV.8831(AGS), 2000 WL 1346812, at *3 (S.D.N.Y. Sept. 18, 2000) ("Quoting a model that inaccurately describes the situation is no defense against liability."); *Cirone-Shadow v. Union Nissan of Waukegan*, 955 F. Supp. 938, 944 (N.D. Ill. 1997) ("[C]ompliance with the model form does not protect [the defendant] from claims that it made misrepresentations within its contract."). But the model clause adopted by Mountain America does not misstate facts or inaccurately represent its overdraft service. At most, the notice is ambiguous because it did not clarify whether the credit union used the ledger balance method or the available balance method to determine whether an overdraft has occurred. *See Tims v. LGE Cmty. Credit Union*, No. 1:15-CV-4279-TWT, 2017 WL 5133230, at *6 (N.D. Ga. Nov. 6, 2017) ("Because 'enough money' can mean the available balance method, [the] opt-in notice was not inaccurate, it did not run afoul of the Bureau's official interpretation of Regulation E.

**\*6** The court, therefore, concludes that the safe harbor provision of the EFTA insulates Mountain America from liability for any violations of Regulation E.

### C. Leave to Amend
Amendments that are not permitted as a matter of course under Rule 15(a)(1) of the Federal Rules of Civil Procedure require written consent from the opposing party or leave of the court. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* "Refusing

2018 WL 4600655

leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009) (citation omitted).

Here, leave to amend would be futile. The safe harbor provision is a fundamental legal impediment to the EFTA claim. Because the only facts that are relevant to the safe harbor defense are the language of the opt-in agreement and the language of Model Form A–9, pleading additional facts cannot change the operation of the safe harbor provision. The court, therefore, dismisses the EFTA claim with prejudice.

## II. THE STATE-LAW CLAIMS

The sole basis for this court to hear the state-law claims against Mountain America is supplemental jurisdiction. This court "may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted); *accord Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."). The court, therefore, declines to exercise supplemental jurisdiction over the remaining state-law claims and dismisses them without prejudice.

## III. REQUESTS FOR JUDICIAL NOTICE

In support of its motion to dismiss, Mountain America requested that this court take judicial notice of its opt-in agreement and its membership agreement. Tilley objected, arguing that the court may not consider documents outside of the complaint without converting Mountain America's motion to a motion for summary judgment. As noted in footnote 1 of this Order, the court may consider a document referenced in the complaint when resolving a motion to dismiss if the document's authenticity is undisputed. *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005). Because the complaint references the opt-in agreement and its authenticity is undisputed, the court takes judicial notice of this document. The court, however, has no occasion to consider the membership agreement in resolving the motion to dismiss the ETFA claim. Accordingly, Mountain America's request to take judicial notice of the membership agreement is denied as moot.

**\*7** Tilley also requests judicial notice of several other documents and state-court orders. The court concludes that these documents are either not relevant to the motion to dismiss the EFTA claim or are not binding authority. The court, therefore, denies Tilley's request for judicial notice.

## CONCLUSION AND ORDER

The court GRANTS Mountain America's motion to dismiss. The EFTA claim shall be DISMISSED WITH PREJUDICE. The remaining state-law claims shall be DISMISSED WITHOUT PREJUDICE.

## All Citations

Not Reported in Fed. Supp., 2018 WL 4600655

## Footnotes

1    Mountain America attached a copy of the opt-in agreement to its motion to dismiss. Because this document was referenced in Tilley's complaint and no one disputes the its authenticity, the court may consider the opt-in agreement without converting Mountain America's motion to a motion for summary judgment. *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005) ("[A] document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute.").

2    This civil liability provision authorizes a lawsuit against "any person who fails to comply with any provision of this subchapter [i.e. the EFTA] with respect to any consumer." 15 U.S.C. § 1693m(a). This language is limited to violations of the provisions of the EFTA and does not explicitly permit lawsuits for violations of regulations authorized by the EFTA. Moreover, the civil liability provisions of other federal statutes contain language expressly authorizing civil enforcement actions for violations of regulations. *See, e.g.,* 31 U.S.C. §§ 5320, 5321, 5322 (authorizing injunctive relief and civil and

criminal penalties against financial institutions for "violating this subchapter or a regulation prescribed or order issued under this subchapter"). But because the parties have not raised this issue, and because the court dismisses the EFTA claim on other grounds, the court does not address whether the EFTA impliedly authorizes civil lawsuits based upon the violation of a regulation.

3   The EFTA does not contain a discovery rule provision. It states that a lawsuit must be brought within one year of the violation and does not allow for any exceptions. The Supreme Court has noted that "the cases in which a statute of limitation may be suspended by causes not mentioned in the statute itself ... are very limited in character, and are to be admitted with great caution otherwise the court would make the law instead of administering it.' " *Ga elli v. S. C.*, 56 U.S. 442, 454, (2013) (alteration in original) (citation omitted). But the Court has explicitly declined to decide whether some lower courts have correctly held that "all federal statutes of limitations ... incorporate a general discovery rule unless Congress has expressly legislated otherwise.' " , *n . v. n re s*, 534 U.S. 19, 2 (2001) (quoting *n re s v. , n .*, 225 F.3d 1063, 106 (9th Cir. 2000) see also *i . at 35–36 s*, (Scalia, J., concurring).

The Tenth Circuit has held that the discovery rule applies to judicially-created *ivens* actions. *n s. Constr tors Corp. v. U.S. rea o e la ation*, 15 F.3d 963, 969 (10th Cir. 1994). Additionally, this circuit has read the discovery rule into the limitations provision of the Copyright Act even though the Act is silent on this issue. *Cooper v. CS earson, n ., 33 F.3d 1013, 1015 (10th Cir. 2013).* Arguably, the holding of *Cooper* does not apply here because the language of the limitations provision of the Copyright Act differs from the language of the limitations provision of the EFTA. *See* 1 U.S.C. § 50 (b) (providing that a copyright action must be filed "within three years after the claim accrued"). The court, however, need not decide whether the limitations provision of the EFTA incorporates the discovery rule because, as discussed below, even if it applies it does not toll the statute of limitations in this case.

4   The litigants disagree as to whether limitations period would begin anew for overdraft charges that occurred after the anuary 10, 2016 charge. The court, however, has no occasion to resolve this dispute because Tilley did not plead any other overdraft charges to his account.

5   *See also inkston oling v. via Cre it Union*, o. 1 15-C -120 , 201 515321 , at 2 ( . . Mich. Apr. 20, 201 ) (denying a motion for reconsideration on the safe harbor issue) *al ri ge v. e. Cre it Union*, o. 1 -C -434- , 201 11 40 , at ( . . Mar. , 201 ) (adopting the holding of *inkston oling*) *G nter v. Unite e . Cre it Union*, o. 315C 004 3MM C, 201 42 4196, at 3 ( . ev. Sept. 25, 201 ) (same) *S ith v. ank o a aii*, o. C 16-00513 MS- , 201 359 522, at ( . aw. Apr. 13, 201 ) (same) *a ire v. a ter Cre it Union*, o. 16-C -03 65-S 201 11 59, at ( . . Cal. an. 12, 201 ) (same). *t see i s v. LG C ty. Cre it Union*, o. 1 15-C -42 9-T T, 201 5133230, at ( . . a. ov. 6, 201 ) (dismissing an EFTA claim and reasoning that the safe harbor provision applied to a claim that the opt-in language was unclear).

6   Tilley appears to suggest that the court should defer to the official interpretation issued by the Bureau. enerally, courts must defer to an agency's official interpretation of its own regulations. *See Chase ank US , . . v. M Coy*, 562 U.S. 195, 211 (2011). But the Bureau's interpretation of egulation E is not at issue here. The uestion before the court is how to interpret the safe harbor provision contained in the EFTA, a statute enacted by Congress. here the Bureau's defendant financial institutio[n] cannot be said to have explicitly misled the laintiff or inaccurately described its overdraft program. The only thing [the defendant financial institution] can be said to be guilty of is a lac of precision."). Because the model clause contained in the official interpretation does not purport to interpret the EFTA, at least not directly, it is unclear whether the interpretation warrants *Chevron* deference. *See Chevron, U.S. ., n . v. at. es. e . Co n il, n .*, 46 U.S. 3 , 44 (19 4) ("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer ...."). or is it clear whether the official interpretation was issued pursuant to notice-and-comment rulema ing, a prere uisite to *Chevron* deference. *See Christensen v. arris Cty.*, 529 U.S. 5 6, 5 (2000) (holding that agency interpretations that were not arrived at after a formal adjudication or notice-and-comment rulema ing and which lac the force of law "do not warrant *Chevron*-style deference"). owever, because the Bureau's official interpretation of egulation E does not conflict with the court's reading of the safe harbor provision, the court need not determine whether it must defer to the Bureau's interpretation.

**End of Document**

© 2020 Thomson euters. o claim to original U.S. overnment or s.

# EXHIBIT J

2005 WL 1459625
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

GREENFIELD COMMERCIAL
CREDIT, L.L.C., Plaintiff-Appellant,
v.
COMERICA BANK, DTE Energy Company,
Inc., DTE Energy Solutions, Inc ., and
DTE Technologies, Defendants-Appellees.

No. 260123.
|
June 21, 2005.

Before: GAGE, P.J., and WHITBECK, C.J., and SAAD, J.

[UNPUBLISHED]

PER CURIAM.

**\*1** Plaintiff, a commercial lender that does business in factoring receivables, appeals the trial court's orders that granted summary disposition to defendants. We affirm.

I. Facts

Plaintiff's claims arise from a $4,316,520.07 electronic payment that the Universal Service Administrative Company ("USAC") made to a Comerica Bank account held by Global View Technologies ("Global View"). Comerica "swept" this transfer out of Global View's account to pay down a $10 million line of credit that Global View held with Comerica. This "sweep" was made in accordance with the terms of that line of credit. USAC had ordered the electronic funds transfer to pay an invoice for services that Global View's subsidiary, Clover Technologies ("Clover"), performed for the Detroit Public Schools ("DPS") pursuant to a contract that Global View had assigned to Clover. Plaintiff held a senior security interest in Clover's assets and accounts receivable from the DPS contract.

Plaintiff claimed that Comerica's "sweep" of the funds constituted a wrongful conversion of money that belonged to plaintiff pursuant to its security interest in Clover's invoice. Plaintiff brought this three-count action against Comerica, asserting claims for common-law conversion, statutory conversion, and unjust enrichment. Plaintiff also sued DTE Energy Co., Inc., DTE Energy Solutions, Inc., and DTE Technologies (collectively the "DTE Entities"), who were guarantors of Global View's line of credit. Plaintiff subsequently dismissed the common-law and statutory conversion claims against the DTE Entities, leaving only the unjust enrichment claim against those defendants. The trial court granted defendants' motions for summary disposition of all claims pursuant to MCR 2.116(C)(8) and (10).

II. Standard of Review

We review de novo a trial court's resolution of a motion for summary disposition. *Veenstra v. Washtenaw Country Club,* 466 Mich. 155, 159; 645 NW2d 643 (2002). A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint. *Adair v. State,* 470 Mich. 105, 119; 680 NW2d 386 (2004). The reviewing Court accepts all well-pleaded factual allegations as true and construes them in a light most favorable to the non-moving party. *Id.* A motion under subrule (C)(10) tests the factual sufficiency of the complaint. *Kraft v. Detroit Entertainment, LLC,* 261 Mich.App 534, 539; 683 NW2d 200 (2004). The trial court must consider the affidavits, pleadings, depositions, admissions, and any other documentary evidence submitted by the parties in a light most favorable to the nonmoving party. *Id.* at 539-540.

Although the trial court indicated that it was granting Comerica's summary disposition motion under MCR 2.116(C)(8), it considered documentary evidence attached to Comerica's summary disposition brief. Thus, in substance, the court granted summary disposition under MCR 2.116(C)(10). This Court may review the order under the appropriate subrule. *Stewart v. Isbell,* 155 Mich.App 65, 74; 399 NW2d 440 (1986).

III. Analysis

**\*2** The common-law tort of conversion is defined as "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with the rights

2005 WL 1459625

therein." *Head v Phillips Camper Sales & Rental, Inc,* 234 Mich.App 94, 111; 593 NW2d 595 (1999), quoting *Foremost Ins Co v Allstate Ins Co,* 439 Mich. 378, 391; 486 NW2d 600 (1992). "The gist of conversion is the interference with control of the property." *Sarver v. Detroit Edison Co,* 225 Mich.App 580, 585; 571 NW2d 759 (1997), quoting Prosser & Keeton, Torts (5th ed), § 15, p 102.

Plaintiff's common-law conversion claim fails as a matter of law for reasons other than the one relied upon by the trial court,[1] and this Court will not reverse a trial court's order if it reached the right result for the wrong reason. *Etefia v. Credit Technologies, Inc,* 245 Mich.App 466, 470; 628 NW2d 577 (2001). Plaintiff fails to cite any provision of the Uniform Commercial Code, MCL 440.4101 *et seq.,* that gives it a priority interest over the USAC payment to Global View's account, particularly because there were no special instructions regarding this wire transfer. Plaintiff's status as Clover's senior lender did not give it any control over Global View's account under MCL 440.9104(1);[2] this status belonged to Comerica. However, plaintiff says that it was entitled to the payment because Comerica collected the money knowing that plaintiff held a senior security interest in the USAC payment on the Clover invoice. Plaintiff's claim raises the question whether a creditor's secured interest in a payment, which is deposited directly in a debtor's bank account, takes precedence over the bank's interest in the deposit, where the bank had general knowledge of a security interest, though there was no specific agreement to hold the payment in trust for plaintiff.

To resolve this issue, we turn to the law governing special and general bank deposits. Our Supreme Court distinguished between general and special bank deposits in *Owosso Masonic Temple Ass'n v. State Savings Bank,* 273 Mich. 682, 689-690, 263 NW 771 (1935):

Deposits in banks are ordinarily divided into general and special deposits. A general deposit creates the relation of debtor and creditor between the bank and the depositor, and may be repaid on demand, in whole or in part, in current money. It consists of money which is mingled with the money of other depositors in a general fund chargeable with the payment of general deposits, possesses no trust quality, and loses its special identity in its general commingling with the funds of the bank. A special deposit of money is a deposit for safe-keeping. It contemplates the return of the identical money deposited. The relation of bailor and bailee exists between the depositor and the bank. The bank has no right to handle or use the money constituting a special deposit. No relation of debtor and creditor exists between the depositor and the bank. In case of a general deposit, there is a depositor, not a bailor; a debtor, not a bailee; a creditor, not an owner. The title of the money constituting a special deposit does not pass to the bank. The title to the money constituting a general deposit does pass to the bank.

**\*3** Where one receives money as a trustee and it is not placed in a special deposit in the bank but in a general deposit so its identity is lost, it becomes debtor for money, and the bank becomes debtor for the amount. *Neely v. Rood,* 54 Mich. 134; 19 NW 920 (1884).

In *Portage Aluminum Co v. Kentwood Nat'l Bank,* 106 Mich.App 290; 307 NW2d 761 (1981), this Court considered the *Owosso Masonic Temple* Court's distinction between general and special deposits. The plaintiffs in *Portage Aluminum* were employers who used a payroll service, Computer Payroll and Accounting Systems, Inc. ("CPAS"), to process payroll checks. *Id.* at 292. CPAS held a bank account with the defendant bank to hold the funds for the payroll checks; the employers paid the payroll amount and service fees into this account, and the payroll checks were drawn against this account. *Id.* Because CPAS experienced chronic difficulty in keeping the account fully funded in time for the employees to cash their paychecks, the defendant bank closed the account, forcing CPAS into involuntary bankruptcy. *Id.* at 293. The plaintiffs brought an action against the bank for breach of contract, breach of fiduciary duty, negligence, fraud, and conversion, and the trial court found in favor of the plaintiffs with respect to liability for breach of fiduciary duty and negligence. *Id.*

This Court held that the bank held no fiduciary duty to the plaintiffs. The Court considered and rejected the plaintiffs' argument that CPAS's general account with the defendant bank "possessed any special 'trust' qualities." *Id.* at 295. The Court explained:

The fact that the money deposited in the account was intended to be used for a specific purpose by CPAS does not make it a trust fund on behalf of a defendant bank. *The money deposited becomes a trust fund only if it had been deposited with defendant bank on the understanding that it should be set apart for a particular purpose and not commingled with other money of the bank. A trust cannot be implied unless the understanding was that the money deposited for a specific purpose was not to be mingled.* [*Id.* (Emphasis added.) ]

2005 WL 1459625

This Court reversed the trial court, and specifically commented that the record was "barren of any unique relationship by which we can factually distinguish the instant case from other commercial transactions regulated by traditional banking laws and the Uniform Commercial Code." *Id.* at 298-299. The Court emphasized "that to hold defendant liable under these facts is too radical a departure from well-established law." *Id.* at 299.

Plaintiff's claim that Comerica owed it a duty to honor plaintiff's interest in a particular deposit in a customer's account is analogous to the plaintiffs' claim in *Portage Aluminum* that the bank owed them a duty to protect the payroll funds in a customer's account. In both cases, the bank received no instructions regarding the deposit, and the deposit was not identified as a special deposit to be held for the plaintiff's benefit. Additionally, as in *Portage Aluminum,* plaintiff claims that Comerica should have known, from the circumstances surrounding the transaction, that plaintiff had a special interest in the deposit that Comerica was obligated to protect. Although plaintiff characterizes *Portage Aluminum* as an irrelevant case that "simply concerned the issues of whether the bank owed its depositors' customers a fiduciary duty and whether the account at issue was a special trust account," the underlying issue, whether the bank was obligated to give special treatment to a particular deposit, is substantially similar in both cases.

 **\*4** The Court's reasoning in *Portage Aluminum* is equally applicable here. The USAC payment was not identified as payment for an accounts receivable in which plaintiff had a superior security interest. Neither Global View nor USAC gave Comerica any instructions to treat the deposit as a special deposit, to be segregated from Global View's other funds and held in trust for plaintiff. These are the crucial facts leading to the conclusion that Comerica had no obligation to segregate the deposit and immunize it from the ordinary terms of Global View's account and $10 million line of credit agreement.

Under *Owosso Masonic Temple* and *Portage Aluminum,* Comerica's knowledge of plaintiff's, Global View's, Clover's, and DPS's business transactions does not warrant any exception to relevant UCC provisions. Those provisions, including MCL 440.9104, cited above, and MCL 440.9327, are controlling and clearly provide that the bank's security interest has priority over a conflicting interest held by another secured party.[3] Also, plaintiff has cited no authority holding that a bank must honor a third party's senior security interest in a deposit to a customer's account where the deposit is

not identified, though the customer's file contains sufficient information to trace the deposit to the third party's security interest. A party who fails to cite authority in support of his position on appeal waives the argument. *Amerisure Ins Co v. Auto-Owners Ins Co,* 262 Mich.App 10, 22; 684 NW2d 391 (2004). Absent special instructions regarding the disputed deposit, banks are not required to treat deposits as special deposits, despite the bank's knowledge of the security interests of the third parties.

Plaintiff's reliance on *Blair v. Trafco Products, Inc,* 142 Mich.App 349; 369 NW2d 900 (1985), and *Hansman v. Imlay City State Bank,* 121 Mich.App 424; 328 NW2d 653 (1982), is misplaced. *Blair* involved a claimant's right to funds under the building contract fund act, MCL 570.151 *et seq.,* which is not relevant here. Plaintiff correctly asserts that in *Hansman,* a case involving a bank's right to setoff, this Court held that there were material questions of fact with regard to whether the debtor was the owner of the set-off funds. However, ownership was in question because the account was jointly held by the debtor and his wife, and the bank had not shown that the deposited money belonged to the debtor. Accordingly, these cases do not warrant relief for plaintiff.

Comerica also was entitled to summary disposition on the statutory conversion count. In *Campbell v. Sullins,*[4] this Court held:

"Statutory conversion ... consists of knowingly 'buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property.' MCL 600.2919a." *Head v Phillips Camper Sales Rental, Inc,* 234 Mich.App 94, 111; 593 NW2d 595 (1999). The clear language of the statute indicates that the "statute is not designed to provide a remedy against the individual who has actually stolen, embezzled, or converted the property." *Marshall Lasser, PC v. George,* 252 Mich.App 104, 112; 651 NW2d 158 (2002). Rather, "[t]he actions proscribed-buying receiving, or aiding in the concealment-all occur after the property has been stolen, embezzled, or converted by the principal." *Id.* "If the Legislature had meant for the statute to also apply to the thief as well as someone who aids him, it could have written the statute to include the thief's action in possessing or concealing the property." *Id.*

 **\*5** Here, plaintiff's complaint alleged only that Comerica itself converted the funds when it conducted the electronic sweep of funds from Global View's account to pay down Global View's line of credit. Plaintiff did not allege that Global View, USAC, Clover, or any other party converted the

2005 WL 1459625

money before Comerica received it. Accordingly, summary disposition was proper under MCR 2.116(C)(8). Because plaintiff's complaint was deficient on its face with respect to this claim, plaintiff was not entitled to further discovery to establish that Comerica committed statutory conversion.

Because plaintiff clearly failed to allege statutory conversion as defined in MCL 600.2919a, we need not consider plaintiff's argument that the trial court misapplied MCL 440.4603(1), MCL 440.4604, and MCL 440.4904.

Comerica also was entitled to summary disposition on the unjust enrichment claim. To prove a claim of unjust enrichment, the plaintiff must establish (1) that the defendant received a benefit from the plaintiff, and (2) that an inequity resulted to the plaintiff because of the defendant's retention of the benefit. *Belle Isle Grill Corp v. Detroit,* 256 Mich.App 463, 478; 666 NW2d 271 (2003). In *Michigan Educational Employees Mutual Ins Co v Morris,* 460 Mich. 180, 198; 596 NW2d 142 (1999), our Supreme Court, citing *Hoyt v. Paw Paw Grape Juice Co,* 158 Mich. 619, 626; 123 NW 529 (1909), ruled that the right to bring an unjust enrichment claim exists when a person has in his possession money which in equity and good conscience belongs to the plaintiff. Unjust enrichment is an equitable doctrine that requires a person who has been unjustly enriched at the expense of another to make restitution to the other. *Id.*

Though we have already concluded that Global View's payments to plaintiff on September 25 and 26, 2002, did not preclude plaintiff's common-law conversion claim against Comerica, we nonetheless conclude that these payments preclude plaintiff's unjust enrichment claim. Regardless whether these payments restored plaintiff's right to the disputed invoice payment, they reversed any benefit that Comerica was allegedly holding at plaintiff's expense. The crux of a conversion claim is the defendant's wrongful exercise of dominion over property, but the crux of an unjust enrichment claim is the defendant's retention of a benefit at the plaintiff's expense. When Global View drew on its line of credit to pay plaintiff, Comerica was no longer retaining the benefit from the previous day's sweep. These payments thus negate plaintiff's unjust enrichment claim.

Because the balance on Global View's line of credit immediately arose following the reduction on September 24, 2002, there was no lasting reduction of Global View's debt that reduced the DTE Entities' exposure as guarantors. Under these circumstances, there can be no material fact with respect to the elements of an unjust enrichment claim, because the DTE Entities could not have received the alleged benefit.[5]

**\*6** Affirmed.

**All Citations**

Not Reported in N.W.2d, 2005 WL 1459625

Footnotes

1    We find two flaws in the trial court's reasoning that Global View's September 25 and 26 payments to plaintiff defeat plaintiff's common-law conversion claim. First, the submitted evidence does not clearly connect these payments to the Clover invoice in question. Plaintiff argued that these payments were associated with other Clover invoices under the DDS contract. Consequently, there is a question of fact whether these post-September 24 payments constituted restoration of the allegedly converted funds, and summary disposition on this basis would be improper. Additionally, the gist of plaintiff's common-law conversion claim is that Comerica wrongfully swept funds that it knew were intended for plaintiff. Accordingly, evidence that Global View later paid plaintiff from its line of credit does not preclude a finding that Comerica acted wrongfully against plaintiff, although the evidence would be relevant to the amount of plaintiff's damages.

2    MCL 440.9104(1) provides:
     A secured party has control of a deposit account if 1 or more of the following apply:
     (a) The secured party is the bank with which the deposit account is maintained.
     (b) The debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor.
     (c) The secured party becomes the bank's customer with respect to the deposit account.

3    MCL 440.9104 is set forth above. MCL 440.932 provides:
     The following rules govern priority among conflicting security interests in the same deposit account:

Greenfield Commercial Credit, L.L.C. v. Comerica Bank, Not Reported in N.W.2d (2005)

2005 WL 1459625

(a) A security interest held by a secured party having control of the deposit account under section 9104 has priority over a conflicting security interest held by a secured party that does not have control.

(b) Except as otherwise provided in subdivisions (c) and (d), security interests perfected by control under section 9314 ran☐according to priority in time of obtaining control.

(c) Except as otherwise provided in subdivision (d), a security interest held by the ban☐with which the deposit account is maintained has priority over a conflicting security interest held by another secured party.

(d) A security interest perfected by control under section 9104(1)(c) has priority over a security interest held by the ban☐ with which the deposit account is maintained.

Clearly, subdivision (c) gives Comerica priority over the account.

4    25☐ Mich.App 1☐9, 191-192☐66☐ ☐☐ 2d ☐☐☐ (2003).

5    ☐laintiff also argues that the trial court should have permitted it to dismiss the unjust enrichment claim against the ☐TE Entities without prejudice. ☐owever, plaintiff does not explain why this argument provides an alternative ground for granting it relief on appeal. This issue is therefore waived, because a party may not merely announce a position and leave it to this Court to discover and rationalize the basis for the claim. *☐eri☐an ☐rans☐ission, ☐n☐ v. Channel ☐o ☐etroit, ☐n☐*, 239 Mich.App 695, ☐05☐609 ☐☐ 2d 60☐ (2000). ☐laintiff also asserts in its statement of ☐uestions presented that the trial court erred in granting the ☐TE Entities☐motion for sanctions, but plaintiff fails to provide any argument concerning sanctions. Therefore, this issue also is waived.    .

☐astly, plaintiff sets forth a detailed analysis of ☐lobal ☐iew☐s financial statements to show that the allegedly wrongful reduction of ☐lobal ☐iew☐s line of credit on September 24, 2002, saved ☐lobal ☐iew and Clover from imminent financial ruin, and spared ☐TE Entities the severe hardship of paying off ☐lobal ☐iew☐s line of credit at that time. This evidence is not part of the lower court record, and plaintiff did not raise this argument in the trial court. Conse☐uently, this argument does not provide a basis for challenging the trial court☐s grant of summary disposition.

---

End of Document    ☐ 2020 Thomson ☐euters. ☐o claim to original U.S. ☐overnment ☐or☐s.

# EXHIBIT K

2014 WL 6859292

2014 WL 6859292
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Marc BEGININ and Boom Boom
Room LLC, Plaintiffs–Appellants,

v.

THOMAS HOSPITALITY
GROUP, INC., and Michael E.
Scheid, Defendants–Appellees.

Docket No. 317515.
|
Dec. 4, 2014.

Oakland Circuit Court; LC No.2010–109251–CK.

Before: RIORDAN, P.J., and SAAD and TALBOT, JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiffs appeal the trial court's grant of summary disposition to defendants under MCR 2.116(I)(2). For the reasons stated below, we affirm.

I. FACTS AND PROCEDURAL HISTORY

In December 2006, plaintiffs[1] ("BBR") agreed to purchase a restaurant in Pontiac owned by T & F, Inc. ("T & F"). Defendants[2] ("Thomas Hospitality") acted as the broker for the sale. The purchase contract required BBR to deposit $40,000 in Thomas Hospitality's escrow account. The $40,000 check, which BBR issued to Thomas Hospitality on January 12, 2007, was the subject of a separate escrow agreement signed by BBR and Thomas Hospitality. The agreement stated that the restaurant's landlord, ULD Partners ("ULD"), would be the beneficiary of the $40,000 deposit, in part because it was owed back rent on the property. The document further outlined specific "triggering events" that would require Thomas Hospitality to distribute the $40,000

held in escrow to ULD. It did not mandate that Thomas Hospitality segregate the $40,000 from other escrow monies held in the escrow account, and Thomas Hospitality did not create a separate account to receive the $40,000 deposit.

BBR and T & F's deal to purchase the restaurant fell apart in late 2007, which caused BBR to file multiple lawsuits. In conjunction with these actions, BBR demanded that Thomas Hospitality refrain from distributing the $40,000 from escrow until a court ruled on how or whether it should do so. However, in November 2008, Thomas Hospitality, believing that one of the "triggering events" specified in the escrow agreement had occurred, released the $40,000 to ULD.

In 2010, BBR sued Thomas Hospitality for breach of contract, and alleged, among other things, that Thomas Hospitality's distribution to ULD violated the purchase and escrow agreements ("the 2010 lawsuit"). Though the trial court rejected BBR's claims and granted summary disposition to Thomas Hospitality, our Court reversed that order and granted summary disposition to BBR.[3] The trial court subsequently ordered Thomas Hospitality to pay the $40,000 to BBR, which it did in February 2013.

However, BBR apparently did not find this relief adequate, as it filed this action in the Oakland Circuit Court two months after it received the payment. It claimed that Thomas Hospitality's payment of the $40,000 to ULD not only constituted breach of contract, but also conversion under MCL 600.2919a(1)(a).[4] BBR requested summary disposition per MCR 2.116(C)(9) and (C)(10). Thomas Hospitality responded with its own motion for summary disposition under MCR 2.116(I)(2), and argued that BBR's conversion claim was without merit because: (1) it had no obligation to return a specific check or specific monies to BBR; (2) it never converted the $40,000 for its own use, as that sum remained in its escrow account; and (3) it timely paid BBR $40,000 pursuant to the opinion of our Court.

The trial court held from the bench that while Thomas Hospitality breached its purchase and escrow agreements with BBR, this breach of contract was not conversion. It accordingly granted summary disposition to Thomas Hospitality under MCR 2.116(I)(2).

**\*2** On appeal, BBR claims that the trial court erred when it granted of summary disposition to Thomas Hospitality, because Thomas Hospitality converted $40,000 under MCL 600.2919a(1)(a). It also makes two related arguments that

2014 WL 6859292

it did not raise at trial, namely that Thomas Hospitality: (1) converted $40,000 under MCL 600.2919a(1)(b); and (2) converted $40,000 under common law. Thomas Hospitality asks us to uphold the judgment of the trial court, and makes the same arguments on appeal as it did at trial.

## II. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *Gorman v. American Honda Motor Co., Inc.,* 302 Mich.App 113, 115; 839 NW2d 223 (2013). "The trial court appropriately grants summary disposition to the opposing party under MCR 2.116(I)(2) when it appears to the court that the opposing party, rather than the moving party, is entitled to judgment as a matter of law." *Sherry v. East Suburban Football League,* 292 Mich.App 23, 34; 807 NW2d 859 (2011). "Issues raised for the first time on appeal are not ordinarily subject to review." *Booth Newspapers, Inc. v. Univ. of Mich. Bd of Regents,* 444 Mich. 211, 234; 507 NW2d 422 (1993).

Matters of statutory interpretation are reviewed de novo. *Madugula v. Taub,* 496 Mich. 685, 695; 853 NW2d 75 (2014). "[W]hen interpreting a statute, courts must ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute, which requires courts to consider the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme." *In re AJR,* 496 Mich. 346, 353; 852 NW2d 760 (2014) (citations and quotation marks omitted). "When the Legislature has not defined a statute's terms, we may consider dictionary definitions to aid our interpretation." *Autodie, LLC v. City of Grand Rapids,* 305 Mich.App 423, 434; 852 NW2d 650 (2014).

## III. ANALYSIS

Conversion is a tort that provides a cause of action at both common law and under MCL 600.2919a.[5] Common law conversion "is any distinct act of dominion wrongfully exerted over another person's personal property." *Pamar Enterprises, Inc. v. Huntington Banks of Mich.,* 228 Mich.App 727, 734; 580 NW2d 11 (1998). MCL 600.2919a, among other things, allows a plaintiff to recover treble damages for conversion if a defendant steals, embezzles, or converts

property "to the [defendant's] own use."[6] In relevant part, it provides:

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a) Another person's stealing or embezzling property or converting property to the other person's own use. [MCL 600.2919a.]

The purpose of MCL 600.2919a, then, is to punish wrongdoing and embezzlement by granting victims of conversion the possibility of treble damages.[7]

"To support an action for conversion of money, the defendant must have an obligation to return the specific money entrusted to his care. The defendant must have obtained the money without the owner's consent to the creation of a debtor and creditor relationship." *Head v. Phillips Camper Sales & Rental, Inc.,* 234 Mich.App 94, 111–112; 593 NW2d 595 (1999) (citations and quotation marks omitted). When money is placed in a general deposit account, it will inevitably "mingle[ ] with the money of other depositors in a general fund chargeable with the payment of general deposits, possess[ ] no trust quality, and lose[ ] its special identity in its general comingling with the funds of the bank." *Owosso Masonic Temple Ass'n. v. State Savings Bank,* 273 Mich. 682, 690; 263 NW 771 (1935). The effect of this comingling makes it impossible for a plaintiff who deposits money in a general deposit account to claim conversion of money placed in the account, as the defendant will not have "an obligation to return the specific money entrusted to his care." *Head,* 234 Mich.App at 111.

**\*3** Here, BBR unconvincingly claims that Thomas Hospitality converted $40,000 under MCL 600.2919a(1)(a) when it released $40,000 from its escrow account to ULD. As a preliminary matter, Thomas Hospitality never had an obligation to return the specific $40,000 given to it by BBR for deposit in its escrow account. And the escrow agreement did not provide for segregation of the $40,000 from other monies contained in Thomas Hospitality's escrow account. Accordingly, BBR fails to show that Thomas Hospitality had "an obligation to return the specific money entrusted to [its] care." *Head,* 234 Mich.App at 111.

More importantly, Thomas Hospitality never converted the $40,000 "to [its] own use" within any reasonable

2014 WL 6859292

understanding of that phrase.[8] "Own" is defined as "of, pertaining to, or belonging to oneself or itself." *Random House Webster's Unabridged Dictionary* (1998). Here, the funds at issue never were "of, pertaining to, or belonging to" Thomas Hospitality-they were held in escrow, and eventually distributed to a third party, ULD. Again, Thomas Hospitality followed what it thought were the instructions of the escrow agreement, and distributed the money to the beneficiary of the funds in escrow, ULD, when it believed one of the "triggering events" occurred.

Thomas Hospitality's interpretation of the agreement's terms —though ultimately wrong[9]—was a plausible reading of a confusing contract, one with which the trial court that adjudicated the 2010 lawsuit concurred. The proper remedy for Thomas Hospitality's actions was a suit for breach of the escrow agreement—a suit which BBR has already won, and from which it received the $40,000 to which it was rightly entitled under the agreement. BBR cannot now demand an additional $80,000 by attempting to transform a valid breach of contract claim into a meritless conversion action.[10] To allow BBR to do so would pervert the purpose of MCL 600.2919a, which is to punish wrongdoing and embezzlement,[11] not grant a windfall to a party that believes its former contract partner misinterpreted the stipulations of the contract.

The trial court therefore correctly rejected BBR's claims and granted summary disposition to defendants under MCR 2.116(I)(2).

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2014 WL 6859292

---

Footnotes

1   Plaintiff Marc Beginin is the managing partner of Boom Boom Room, LLC. Because plaintiffs make no distinction between the claims of Beginin as an individual, and Boom Boom Room as a corporate entity, we refer to plaintiffs as "BBR" throughout the opinion.

2   In a similar vein, BBR makes no distinction between its claims against Thomas Hospitality Group, Inc., and its owner, Michael Scheid. For this reason, we refer to defendants as "Thomas Hospitality" throughout the opinion.

3   *Marc Beginin v. Thomas Hospitality Group, Inc.,* unpublished opinion per curiam of the Court of Appeals, issued October 11, 2012 (Docket No. 304903) p. 1.

4   BBR's complaint did not specify which section of MCL 600.2919a Thomas Hospitality allegedly violated, but because its complaint stresses that Thomas Hospitality converted the $40,000 for its *own* use, we analyze its claim under MCL 600.2919a(1)(a).

5   The distinction between "common law conversion" and "statutory conversion" under MCL 600.2919a used to be significant, because an older version of the statute stated that conversion only occurred where "another person" knowingly bought, received, or aided "in the concealment of any stolen, embezzled, or converted property." See *Head v. Phillips Camper Sales & Rental, Inc.,* 234 Mich.App 94, 111; 593 NW2d 595 (1999). In 2005, the Legislature revised MCL 600.2919a and expanded its scope by adding section (1)(a), which permits recovery against "[a]nother person's stealing or embezzling or converting property to the other person's own use."
    This addition to the statute makes the difference between the definition of "common law conversion" and "statutory conversion" one of form, not substance, because the statutory and common law definitions of "conversion" are now the same. See *Aroma Wines and Equip, Inc. v. Columbia Distrib Servs, Inc.,* 303 Mich.App 441, 448; 844 NW2d 727 (2013) (quotation marks omitted), lv gtd 852 NW2d 901 (2014) ("[c]onversion, both at common law and under the statute, is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein").

6   The meaning of "use" in the phrase "converting property to the [defendant's] own use" is unclear. Another panel of our Court, quoting *Random House Webster's College Dictionary* (1992), recently held that "[t]he term 'use' requires only that a person 'employ for some purpose [.]' " *Aroma Wines,* 303 Mich.App at 448. The Michigan Supreme Court granted leave to appeal in September 2014, and asked the parties to address "the issue of the proper interpretation of 'converting property to the other person's own use,' as used in MCL 600.2919a." *Aroma Wines,* 852 NW2d 901 (2014). Accordingly, it is unclear whether the definition of "use" advanced by our Court is a proper interpretation of that word in the context of MCL 600.2919a. However, this issue is not relevant to the determination of this case, as we discuss at n. 8, infra.

Beginin v. Thomas Hospitality Group, Inc., Not Reported in N.W.2d (2014)

2014 WL 6859292

7    See *New Properties, Inc. v. George D. Newpower, Jr., Inc.,* 282 Mich.App 120, 137; 762 NW2d 178 (2009) (emphasis original) (noting that trial court "assessed treble damages against [the converter] as a *penalty,* not as a single award of damages. The purpose of this award extended beyond restoring [the victims of conversion] to their original condition. The award was intended to *penalize* [the converter]") (emphasis in original).

8    Despite BBR's assertions to the contrary, our case is not identical to the MCL 600.2919a(1)(a) conversion claim adjudicated in *Aroma Wines.* That decision involved a warehouse-operating defendant who refused to allow the wine merchant plaintiff to access its wines after plaintiff became delinquent in its storage payments. *Aroma Wines,* 303 Mich.App at 443. The wine merchant then sued the warehouse operator for, among other things, conversion under MCL 600.2919a(1)(a). *Id.* at 444. As noted, in its decision, the panel focused on the definition of "use" contained in MCL 600.2919a(1)(a)—not "own"—and held that "use" "is defined as 'to employ for some purpose" or "[t]he application or employment of something[.]" *Id.* at 447–448.

Here, though Thomas Hospitality "used" the $40,000, in that it "employ[ed]" the money "for some purpose," it did not do so for its *own* purposes—it transferred the money to a third party, OLD. Accordingly, it cannot have converted the $40,000 "to [its] own use" under MCL 600.2919a(1)(a).

9    See *Beginin,* unpublished opinion per curiam of the Court of Appeals, issued October 11, 2012 (Docket No. 304903) p. 2.

10   As noted, BRR did not claim that Thomas Hospitality committed common law conversion or violated MCL 600.2919a(1)(b) at trial. *Booth Newspapers,* 444 Mich. at 234. These issues are therefore unpreserved and need not be addressed. In any event, the claims would fail for the reasons explained above.

11   See *New Properties, Inc.,* 282 Mich.App at 137.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.